# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE HUNTINGTON NATIONAL BANK, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| IYS VENTURES, LLC; MUWAFAK RIZEK; | ) | |
| I MART STORES L.L.C.; LEANNE HOLDINGS | ) | |
| LLC; and KENAN ENTERPRISES, INC., | ) | |
| | ) | |
| *Defendants.* | ) | |

## AFFIDAVIT OF STEVE BERNAL
## IN SUPPORT OF THE HUNTINGTON NATIONAL BANK'S
## MOTION FOR PREJUDGMENT ATTACHMENT

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | ss: |
| Cook County | ) | |

I, Steve Bernal, being first duly sworn, state the following:

1. I am a Business Banking Area Manager at Plaintiff, The Huntington National Bank ("Huntington"). In that role and based upon my review of documents maintained in Huntington's ordinary course of business, I make the statements contained herein.

2. The factual statements made in the Complaint filed by Huntington in this action are true and correct to the best of my knowledge, information, and belief.

3. Plaintiff Huntington is a national banking association chartered by the Comptroller of the Currency of the U.S. Treasury that provides various financial and cash management services to individuals and businesses. Huntington maintains its corporate headquarters in the state of Ohio, with its main office at 17 South High Street, Columbus, Ohio. Accordingly, Huntington is a citizen

of Ohio.

4.      Muwafak Rizek ("Rizek") is an individual, who, upon information and belief, resides at 7924 Keystone Road, Orland Park, Illinois 60462.

5.      IYS Ventures, LLC ("IYS Ventures") is an Illinois limited liability company, with its principal office listed as 15416 S. 70th Court, Orland Park, Illinois 60462. Rizek is identified as its Registered Agent and its only Manager, and, upon information and belief, Rizek is the sole member of IYS Ventures. Accordingly, IYS Ventures is a citizen of Illinois.

6.      I Mart Stores L.L.C. ("I Mart") is a Minnesota limited liability company, with its principal executive office listed as 3017 1st Avenue, Hibbing, Minnesota 55719. Rizek is the only identified Manager, and, upon information and belief, Rizek is the sole member of I Mart. Accordingly, I Mart is a citizen of Illinois.

7.      Leanne Holdings LLC ("Leanne") is an Indiana limited liability company, with its principal office address listed as 15416 S. 70th Court, Orland Park, Illinois 60462. Rizek is the only identified Manager, and, upon information and belief, Rizek is the sole member of Leanne. Accordingly, Leanne is a citizen of Illinois.

8.      Kenan Enterprises, Inc. is an Indiana corporation, with its principal office address listed as 15416 S. 70th Court, Orland Park, Illinois 60462. Rizek is identified as its President. Accordingly, Kenan is a citizen of Illinois and Indiana.

**A.      Rizek Entered Into The Deposit Account Agreement With Huntington And Opened Three Business Checking Accounts In IYS Ventures' Name.**

9.      On May 5, 2020, Rizek, on behalf of IYS Ventures, opened an Unlimited Plus Checking Account with Huntington in IYS Ventures' name, with an account number ending in x8201 ("Account 8201").

10.     In order to open Account 8201, Rizek signed the Limited Liability Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 8201 Resolutions") and executed a Business Signature Card  for Account 8201("Account 8201 BSC"). True and correct copies of the Account 8201 Resolutions and Account 8201 BSC are attached hereto as **Exhibits 1** and **2**, respectively.

11.     On June 7, 2022, Rizek, on behalf of IYS Ventures, opened a second Unlimited Plus Checking Account with Huntington IYS Ventures' name, with an account number ending in x2014 ("Account 2014").

12.     In order to open Account 2014, Rizek signed the Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 2014 Resolutions") and executed a Business Signature Card for Account 2014 ("Account 2014 BSC"). True and correct copies of the Account 2014 Resolutions and Account 2014 BSC are attached hereto as **Exhibits 3** and **4**, respectively.

13.     The same day, Rizek, on behalf of IYS Ventures, opened a third Unlimited Plus Checking Account with Huntington in IYS Ventures' name, with an account number ending in x2027 ("Account 2027," and sometimes collectively with Account 8201 and Account 2014, the "Huntington Accounts").

14.     As with the first two Huntington Accounts, in order to open Account 2027, Rizek signed the Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 2014 Resolutions," and sometimes collectively with the Account 8207 Resolutions and Account 2014 Resolutions, the "Resolutions") and executed a Business Signature Card for Account 2027 ("Account 2027 BSC," and sometimes collectively with the Account 8207 BSC and Account 2014 BSC, the "Business Signature Cards"). True and correct copies of the Account 2027 Resolutions and Account 2027 BSC are attached hereto as **Exhibits 5** and **6**, respectively.

15.     By executing the Resolutions, IYS Ventures agreed that "overdrafts, if any, shall not be considered to be a loan[.]" *See* Exs. 1, 3, 5.

16.     By executing the Business Signature Cards, IYS Ventures agreed to be bound by the Business Deposit Account Agreement ("Deposit Account Agreement") and the terms contained therein for all three Huntington Accounts. A true and correct copy of the Deposit Account Agreement is attached hereto as **Exhibit 7**.

17.     Pursuant to the Deposit Account Agreement, IYS Ventures has "no right to overdraw [the Huntington] Account[s.]" *See* Ex. 7, p. 7. In the event that IYS Ventures overdrew the Huntington Accounts, IYS Ventures agreed that it "must pay [Huntington] immediately for the amount of the overdraft and any associated fees." *Id.*   Moreover, IYS Ventures agreed to "indemnify [Huntington] and hold [Huntington] harmless from any claim (including reasonable attorneys' fees)" arising as a result of any debt owed by IYS Ventures to Huntington. *Id.* at p. 11.

**B.     Mechanics Of ACH And Wire Transfers.**

18.     ACH transfers are electronic money transfers into an account at one financial institution (the "Receiving Account")from an account at another financial institution (the "Sending Account").

19.     ACH transfers are initiated when an account holder causes one of those financial institutions to send an instruction through the ACH system to the other financial institution to complete the transfer.  The financial institution that sends this instruction is referred to in the banking industry as the Originating Depository Financial Institution ("ODFI").  The financial institution that receives the instruction is referred to in the banking industry as the Receiving Depository Financial Institution ("RDFI").

20.     That is, an account holder can initiate an ACH transfer by causing the ODFI to instruct the RDFI to debit a Sending Account in a specified amount and transmit the funds to a Receiving Account at the ODFI.

21.     Typically, an ACH transfer takes about two (2) banking days to settle. In other words, the receiving account at the ODFI does not immediately receive the funds while the RDFI processes the transfer. This period is known as the "ACH Float Period." Nonetheless, most financial institutions that permit their customers to use ACH transfers, including Huntington, make funds immediately available in the Receiving Account during this period (the "ACH Float Period"). The funds made available during the ACH Float Period are referred to here as "ACH Float Funds."

22.     The "ACH Limit" for a deposit account refers to the maximum amount of ACH Float Funds to which the Receiving Account holder at an ODFI has immediate access during the ACH Float Period. An ACH transfer that cannot be completed for any reason (i.e., insufficient funds in the Sending Account, closure of the Sending account, etc.) is referred to as a "Dishonored Transaction." Dishonored Transactions are "returned" to the RDFI when the ODFI never receives the funds requested as part of the ACH transaction.

23.     On the other hand, a wire transfer constitutes a transmission of funds from a Sending Account to a Receiving Account that settles immediately. In other words, funds sent via a wire transfer are immediately deducted from the Sending Account, are immediately available in the Receiving Account, and the transfer instruction cannot be "returned" to the financial institution from where the wire transfer was originated.

**C.**    **Rizek And IYS Ventures Made False Representations To Huntington Regarding Their Asset And Net Worth Valuations To Increase Their Access To Funds.**

24.    On or around June 13, 2022, Rizek spoke by telephone with Huntington employee Jimmy Liu ("Liu") about Rizek's interest in certain Huntington commercial banking products. During this conversation, Rizek represented to Huntington that IYS Ventures operates and controls around seventy (70) gas stations. Upon information and belief, this information is materially false because IYS Ventures does not own or control anywhere near that many gas stations. Rizek also represented that he intended to move all of IYS Ventures' operating accounts from a different banking entity, JPMorgan Chase & Co. ("Chase"), to Huntington.

25.    On or around June 17, 2022, Rizek provided to Huntington employee Mark Freeman ("Freeman") the following documents:

a.    Statement of Revenue and Expenses and Balance Sheet for IYS Ventures for the period of January 1, 2022 through May 31, 2022 ("IYS Financial Statements"). The IYS Financial Statements stated that IYS Ventures had assets valued at $27,759,716.93. Upon information and belief, the IYS Financial Statements are materially false.

b.    A list of eight properties cumulatively valued at $7,120,000.00 ("Rizek Property List") that he claimed he personally owned free and clear of any liens. Upon information and belief, the Rizek Property List is materially false.

c.    Rizek's signed personal financial statements representing a personal net worth of $31,905,679.00 ("Rizek Financial Statements"). Upon information and belief, the Rizek Financial Statements are materially false.

26.     On or around July 5, 2022, Rizek spoke with Huntington employee William Beher, ("Beher") and requested that Account 8201's ACH Limit be increased from $75,000.00 to $150,000.00. At this time, Account 8201 was the only Huntington Account with ACH origination services.

27.     On or around July 11, 2022, based on Rizek's representations about Rizek's and IYS Ventures' financial status and ability to generate cash flow, the other two Huntington Accounts were set up for ACH originations services and each of the three Huntington Accounts was given an ACH Limit of $150,000.00.

**D.      IYS Ventures Agreed To The Terms Of Huntington's Treasury Management Services, Which Allowed Rizek And IYS Ventures To Remotely Send Wire Transfers Out Of The Huntington Accounts.**

28.     In conjunction with Huntington's financial and cash management services, Huntington also provides treasury management services which, among other things, allow its customers to remotely access and transfer funds through Huntington's online platform without having to physically visit a Huntington branch location ("Treasury Management Services"). Huntington's Treasury Management Services include remote access to both ACH and wire transfers.

29.     On or around June 8, 2022, Rizek, on behalf of IYS Ventures, signed and entered into the Treasury Management Services Agreement with Huntington ("TM Services Agreement") to gain access to Huntington's Treasury Management Services. A true and correct copy of the TM Services Agreement and the Authorization and Agreement for TM Services is attached hereto as **Exhibits 8** and **9**, respectively.

30.     Under Part I, Section 2 of the TM Services Agreement, IYS Ventures agreed to "pay [Huntington] the applicable fees and charges disclosed to you for use of [Huntington's

services]" and that Huntington was "authorized to charge the fees and charges to any of [the Huntington] Account(s) when due[.]" Ex. 8, p, 3. In the event of an overdraft, IYS Ventures agreed to "repay [Huntington] immediately, without demand, the amount of such overdraft plus any overdraft fees, charges or interest[.]" *Id.* Specifically regarding wire transfers, "[i]f an [o]verdraft is created in an [a]ccount in order to complete a wire transfer, [IYS Ventures] agree[d] to immediately repay [Huntington], and [IYS Ventures] agree[d] and authorize [Huntington] to debit any of [the Huntington] Accounts [] in the amount equal to the overdraft and applicable fees." *Id.* at p. 35.

31.     All three Huntington Accounts are subject to the TM Services Agreement. *See id.*, Schedule A.

32.     On or around September 19, 2022, Huntington enabled each of the Huntington Accounts for Treasury Management Services, which allowed Rizek to remotely send funds via wire transfer out of the Huntington Accounts.

**E.      Rizek And IYS Ventures Continued To Make False Representations To Increase IYS Ventures' ACH Limit.**

33.     In September 2022, Rizek requested an increase in IYS Ventures' ACH Limit for the Huntington Accounts, representing to Huntington that he was in the process of moving all of IYS Ventures' operating accounts from Chase to Huntington and that an ACH limit increase would, among other things, facilitate the transfer of IYS Ventures' operating accounts.

34.     Based on Rizek's representations, Huntington increased the ACH Limit from $150,000.00 to $350,000.00 for each of the Huntington Accounts.

35.     In or around late September, Rizek requested another ACH Limit increase for the Huntington Accounts. Rizek represented to Huntington that he was still in the process of moving all IYS Ventures' operating accounts to Huntington and that he required an increase in IYS

Ventures' ACH Limit to cover IYS Ventures' daily accounts payable, which, according to Rizek, totaled about $650,000.00 per day.

36.    On or around September 30, 2022, based on Rizek's representations, Huntington increased the ACH Limit to $650,000.00 for each of the Huntington Accounts.

37.    On or around October 24, 2022, based on Rizek's representations that he was finalizing the transfer of IYS Ventures' operating accounts to Huntington, the Huntington Accounts were approved for a final increase of the ACH limit from $650,000.00 to $1,300,000.00 for each of the Huntington Accounts.

**F.    Rizek And IYS Ventures Carried Out Defendants' Fraudulent Scheme By Overdrawing Funds From The Huntington Accounts To Send Funds To Defendants.**

38.    In September 2022, IYS Ventures began initiating ACH Transactions that pulled funds into the Huntington Accounts from Sending Accounts held by entities affiliated with IYS Ventures and Rizek, including accounts at Chase, Business First Bancshares, Inc., Republic Bank of Chicago, BMO Harris Bank, N.A., Greenwoods State Bank, Old National Bank, and First National Bank Minnesota ("ACH Sending Accounts").

39.    However, the ACH Sending Accounts often did not have sufficient funds to settle the ACH transfers to the Huntington Accounts, resulting in numerous Dishonored Transactions.

40.    During the ACH Float Period for the various Dishonored ACH Transactions and before the Dishonored ACH Transactions settled, Huntington immediately made ACH Float Funds for the respective Dishonored ACH Transactions available to IYS, up to the aggregate ACH Limit.

41.    Rizek took advantage of the ACH Float Period and initiated wire transfers of the ACH Float Funds from the Huntington Accounts to accounts held by IYS Ventures, Rizek, Leanne, I Mart, and/or Kenan at third-party financial institutions ("Wire Receiving Accounts").

      i.    *Rizek's And IYS Ventures's Use Of ACH Float Funds In Account 8201.*

42.    In October 2022, IYS Ventures initiated 79 ACH transactions to and deposited 10 checks into Account 8201. In November 2022, IYS Ventures initiated 103 ACH transactions to and deposited 12 checks into Account 8201. Of the 182 ACH transfers to Account 8201 between October 1, 2022 and November 30, 2022, 87 were returned to the ACH Sending Accounts due to insufficient funds in the ACH Sending Accounts. 22 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

43.    The total amount of the 87 ACH transfers and the 22 checks that were returned was $11,064,708.47.

44.    During the ACH Float Period for the Dishonored ACH Transactions in October 2022, IYS Ventures wire transferred $1,299,307.00 of the ACH Float Funds available in Account 8201 in October 2022 to the Wire Receiving Accounts. During the ACH Float Period for the Dishonored ACH Transactions in November 2022, IYS Ventures wire transferred $2,620,060.95 of the ACH Float Funds available in Account 8201 in November 2022 to the Wire Receiving Accounts.

45.    Rizek and IYS Ventures wire transferred a total of $3,919,367.95 from Account 8201 to the Wire Receiving Accounts using ACH Float Funds from October 1, 2022 and November 30, 2022. By November 30, 2022, this created an overdraft balance of $501,013.05.

      ii.    *Rizek's And IYS Ventures's Use Of ACH Float Funds In Account 2014.*

46.    In September 2022, IYS Ventures initiated 13 ACH transactions to Account 2014. In October 2022, IYS initiated 48 ACH transactions to and deposited 4 checks into Account 2014. In November 2022, IYS Ventures initiated 183 ACH transactions to and deposited 7 checks into Account 2014. Of the 244 ACH transfers to Account 2014 between September 1, 2022 and

November 30, 2022, 91 were returned to the ACH Sending Accounts due to insufficient funds in the ACH Sending Accounts. 11 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

47.     The total amount of the 91 ACH transfers and the 11 checks that were returned was $11,158,496.89.

48.     During the ACH Float Period for the Dishonored ACH Transactions in September 2022, IYS Ventures wire transferred $364,543.00 of ACH Float Funds available in Account 2014 in September 2022 to the Wire Receiving Accounts. During the ACH Float Period for the Dishonored ACH Transactions in October 2022, IYS Ventures wire transferred $1,709,706.00 of ACH Float Funds available in Account 2014 in October 2022 to the Wire Receiving Accounts. During the ACH Float Period for the Dishonored ACH Transactions in November 2022, Rizek and IYS Ventures wire transferred $1,812,442.08 of ACH Float Funds available in Account 2014 in November 2022 to the Wire Receiving Accounts.

49.     Rizek and IYS Ventures wire transferred from Account 2014 to the Wire Receiving Accounts a total of $3,886,691.08 using ACH Float Funds between September 1, 2022 and November 30, 2022. This created an overdraft balance of $757,337.29 in Account 2014 by November 30, 2022.

      *iii.*    *Rizek's And IYS Ventures's Use Of ACH Float Funds In Account 2027.*

50.     In September 2022, IYS Ventures initiated 43 ACH transactions to Account 2027. In October 2022, IYS initiated 110 ACH transactions to and deposited 3 checks into Account 2027. In November 2022, IYS Ventures initiated 189 ACH transactions to and deposited 7 checks into Account 2027. Of the 342 ACH transfers to Account 2027 between September 1, 2022 and November 30, 2022, 104 were returned to the ACH Sending Accounts due to insufficient funds at

the ACH Sending Accounts. 10 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

51.     The total amount of the 104 ACH transfers and the 10 checks for Account 2027 that were returned was $13,001,900.81.

52.     During the ACH Float Period for the Dishonored ACH Transactions in September 2022, Rizek and IYS Ventures wire transferred $1,088,452.00 of ACH Float Funds available in Account 2027 in September 2022 to the Wire Receiving Accounts. During the ACH Float Period for the Dishonored ACH Transactions in October 2022, Rizek and IYS Ventures wire transferred $1,686,713.85 of ACH Float Funds available in  Account 2027 in October 2022 to the Wire Receiving Accounts. During the ACH Float Period for the Dishonored ACH Transactions in November 2022, Rizek and IYS Ventures wire transferred $2,487,873.00 of ACH Float Funds available in Account 2027 in November 2022 to the Wire Receiving Accounts.

53.     Rizek and IYS Ventures wire transferred from Account 2027 to the Wire Receiving Accounts a total of $5,263,038.85 using ACH Float Funds between September 1, 2022 and November 30, 2022. This created an overdraft balance of $667,306.33 in Account 2027 by November 30, 2022.

54.     Accordingly, the Huntington Accounts are overdrawn by $1,880,075.01 in the aggregate (the "Overdraft").

**G.      Huntington's Demands To Cover The Overdraft Are Ignored.**

55.     On December 6, 2022, Huntington sent a demand letter to Defendants for immediate payment of the Overdraft ("Demand Notice"). A true and correct copy of the Demand Notice is attached hereto as **Exhibit 10**.

56.     Defendants have not responded to the Demand Notice or otherwise taken steps to cover the Overdraft.

57.     In investigating the wire transfers to the Rizek Wire Receiving Accounts, Huntington learned that the representations Rizek and IYS Ventures made to induce it into increasing the ACH limit on the Huntington Accounts were false.

58.     Accordingly, Huntington filed a Complaint against Defendants Rizek, IYS Ventures, I Mart, Leanne, and Kenan seeking recovery of $1,880,075.01 in funds that Defendants unlawfully schemed to defraud from Huntington (the "Overdraft"), as well as attorney's fees and costs incurred by Huntington in recovering the Overdraft funds.

59.     Based on my review of the documents Rizek submitted to Huntington in connection with his overdraft scheme, Defendants claim an interest in specific assets and personal property that it currently possesses and could use to satisfy a potential judgment. Those specific assets and personal property are identified in detail in **Exhibit 11.**

60.     I make this Affidavit in support of HNB's Motion for Order of Prejudgment Attachment.

61.     I believe the matters stated in this affidavit are true to the best of my personal knowledge, information, and belief.

FURTHER AFFIANT SAYETH NAUGHT

Steve Bernal

Subscribed and sworn to before me on this ⎣6th⎦ day of March, 2023.

Holly M Goodspeed

Notary Public

My Commission Expires:

OFFICIAL SEAL
HOLLY M GOODSPEED
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires April 30, 2025

# EXHIBIT 1

 **Huntington**

## Certified Copy of Limited Liability Company Resolutions to Open and Maintain a Bank Account or Safe Deposit Box

The undersigned hereby certifies to The Huntington National Bank that: I am the
President
and, as such, I am familiar with the records and proceedings of:
IYS VENTURES LLC
Single Member LLC , a duly organized and existing limited liability company under the laws of the
State of IL.

the following is a true, accurate and compared copy of resolutions duly adopted by the LLC; and that the resolutions have not been rescinded, modified or revoked, and are in full force and effect.

RESOLVED, that:

(i) The Huntington National Bank (the "Bank") is hereby designated as a depository of the LLC;

(ii) one or more safe deposit boxes may be leased or one or more account(s) may be opened and maintained, in accordance with the rules and regulations or procedures of the Bank pertaining to such accounts as amended from time to time, and in the name of the LLC with the Bank;

(iii) any of the individuals whose names are set forth in (iv), below or, whose genuine signatures appear on separate cards dated and filed with the Bank, (collectively the "Authorized Signatories" and individually an "Authorized Signatory") are hereby authorized to act individually on behalf of the LLC and in its name to:

    a. sign checks, drafts, notes, bills of exchange, acceptances, or other orders for payment of funds from any account maintained by the LLC;

    b. indorse checks, drafts, notes, bills, certificates of deposit, or other instruments owned or held by the LLC for deposit in any such account, or for collection or discount by the Bank and such indorsement may be written or imprinted with an authorized facsimile a ("Stamp") in the name of the LLC without the designation of the person making such indorsement (the LLC shall be fully responsible for any and all payments made by the Bank in reliance upon said Stamp and agrees to indemnify and hold harmless the Bank from any claims, demands, expenses, losses or damages suffered or incurred by the Bank arising out of the misuse or unlawful or unauthorized use by any person of such Stamp);

    c. identify, approve and guarantee the indorsements of any and all checks and drafts drawn by the LLC;

    d. waive demand, protest, and notice of protest, or dishonor of any check, draft, note, bill, certificates of deposit or other instruments made, drawn, or indorsed by the LLC;

    e. act for the LLC in the transaction of all other business (whether or not it is of the kind, nature or character specified in this certificate) on the LLC's behalf with the Bank, including but not limited to executing contracts and delegating person to engage in transaction in connection with such contracts;

    f. open and maintain an account in the name of the LLC (any account so opened shall be bound by the provisions of this certificate);

    g. open or lease a Safe Deposit Box in the name of the LLC;

    h. certify to the Bank the names of the Authorized Signatories and shall certify such change to the Bank, and the Bank shall be fully protected in relying on such certification and shall be indemnified and held harmless from any claims, demands, expenses, losses or damages resulting from or arising out of the Bank honoring the signature of any individual so certified, or refusing to honor the signature of any individual not so certified;

    i. delegate other person(s) to perform any of the foregoing acts;



(iv) Name of Authorized Signatories:

MUWAFAK RIZEK

FURTHER RESOLVED, that:

(i) the Bank is authorized to honor, receive, certify, or pay all instruments signed in accordance with this certificate even though drawn or indorsed to the order of any Authorized Signatory signing the same, tendered for cash, or in payment of a personal obligation or for deposit into a personal account of said Authorized Signatory and the Bank is not required or obligated to inquire into the circumstances of the issuance or use of any instrument signed in accordance with this certificate, or the application, or disposition of such instrument, or the proceeds thereof;

(ii) overdrafts, if any, shall not be considered to be a loan; and

(iii) the provisions of this certificate shall remain in full force and effect until written notice of its amendment or rescission shall have been received by the Bank and the Bank has a reasonable amount of time to act upon such notice, and that receipt of such notice shall not affect any action taken by the Bank prior thereto.

FURTHER RESOLVED, that the undersigned be, and hereby is, authorized and directed to certify to the Bank the foregoing resolutions and that the provisions thereof are in conformity with the governing documents of the LLC.

I further certify that there is no provision in the governing documents of the LLC limiting the power of the LLC to pass the foregoing resolutions and that the same are in conformity with the governing documents of the LLC.

IN WITNESS WHEREOF, I have hereunto subscribed my name this   $5+h$   day of  $May$   , 20 $20$ .

☒  LLC has only one member or manager, second confirming signature is not required.

Note: If the member or manager is an entity indicate the name of the entity, and the name and title of the individual signing on behalf of the entity.

Signature

Muwick S Rm   $Pres.d-1$

Name and Title

If the person signing above is designated as an Authorized Signatory and is not the only member or manager another manager, member or officer of the LLC must also sign the following further confirming this certificate as follows:

Signature

Title



# EXHIBIT 2

# Business Signature Card



**Huntington**

Welcome.

Date: May 5, 2020

Time: 05:31 PM ET                    Acct #   01060178201

**Account Title:**       IYS VENTURES LLC

**Address:**       7924 KEYSTONE RD, ORLAND PARK IL 60462-5166       Phone: **716-417-1144**       SSN/EIN:  832162420

I/We hereby acknowledge receipt of Huntington's Account Documents in connection with this account and agree to be bound by all terms and conditions, as amended from time to time. I/We represent this account will be used for business purposes.

**TAXPAYER IDENTIFICATION NUMBER CERTIFICATION** (Substitute W-9) (Not applicable to IOLTA/IOTA accounts)
Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. UNLESS THE FOLLOWING LANGUAGE IS STRICKEN, I am not subject to backup withholding because:
    (a.) I am exempt from backup withholding, or
    (b.) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or
    (c.) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. Person (including a U.S. resident alien), and
4. I am exempt from FATCA reporting.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

**Authorized Signers** (Please sign in black ink.)

Signature _____ Date ___5/5/2020___

Name:       MUWAFAK RIZEK

Title:       Pres/Owner/CEO

When you apply for the account(s), you authorize Huntington to obtain a consumer report for the account(s) and any associated services on all account signers.

☐  NON-PERSONAL NOW ACCOUNT (check if applicable)

The above hereby applies for a Non-Personal NOW Checking Account and certifies that the above is, or the beneficial interest in such account will be held by:
a)   an individual or group of individuals
b)   a sole proprietorship or husband and wife operating an incorporated business; or
c)   an organization which is operated primarily for religious, philanthropic, charitable, fraternal, educational or other similar purposes and which is not operated for profit

Scan to Signature Card Department using MFD - Deposit



**CERTIFICATION OF FOREIGN STATUS (NOTE: A SEPARATE FORM W-8BEN-E MUST BE COMPLETED)**
Under penalties of perjury, I certify to the best of my knowledge and belief, the following information is true, correct and complete. I further certify under penalties of perjury that I am the beneficial owner (or am authorized to sign for the beneficial owner) and the beneficial owner is not a U.S. entity, therefore a foreign entity and exempt from backup withholding.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to establish your status as a non-U.S. person and, if applicable, obtain a reduced rate of withholding.**

Signature _____ Date _____
An Authorized Signer of the account is required to sign on behalf of   IYS VENTURES LLC

US Mailing Address: _____

Permanent Foreign Address: _____

```
FOR BANK USE ONLY
Prepared by: Jason Lackner
Interoffice Zip: IL137
```

FORM: SIGNATURECARDBUS (03/17)



# EXHIBIT 3

 **Huntington**

Account Number 01060242014

## Certified Copy of Limited Liability Company Resolutions to Open and Maintain a Bank Account or Safe Deposit Box

The undersigned hereby certifies to The Huntington National Bank that: I am the
MANAGER
and, as such, I am familiar with the records and proceedings of:
IYS VENTURES LLC
Member Managed LLC , a duly organized and existing limited liability company under the laws of the
State of IL.

the following is a true, accurate and compared copy of resolutions duly adopted by the LLC; and that the resolutions have not been rescinded, modified or revoked, and are in full force and effect.

RESOLVED, that:

(i) The Huntington National Bank (the "Bank") is hereby designated as a depository of the LLC;

(ii) one or more safe deposit boxes may be leased or one or more account(s) may be opened and maintained, in accordance with the rules and regulations or procedures of the Bank pertaining to such accounts as amended from time to time, and in the name of the LLC with the Bank;

(iii) any of the individuals whose names are set forth in (iv), below or, whose genuine signatures appear on separate cards dated and filed with the Bank, (collectively the "Authorized Signatories" and individually an "Authorized Signatory") are hereby authorized to act individually on behalf of the LLC and in its name to:

  a.  sign checks, drafts, notes, bills of exchange, acceptances, or other orders for payment of funds from any account maintained by the LLC;

  b.  indorse checks, drafts, notes, bills, certificates of deposit, or other instruments owned or held by the LLC for deposit in any such account, or for collection or discount by the Bank and such indorsement may be written or imprinted with an authorized facsimile a ("Stamp") in the name of the LLC without the designation of the person making such indorsement (the LLC shall be fully responsible for any and all payments made by the Bank in reliance upon said Stamp and agrees to indemnify and hold harmless the Bank from any claims, demands, expenses, losses or damages suffered or incurred by the Bank arising out of the misuse or unlawful or unauthorized use by any person of such Stamp);

  c.  identify, approve and guarantee the indorsements of any and all checks and drafts drawn by the LLC;

  d.  waive demand, protest, and notice of protest, or dishonor of any check, draft, note, bill, certificates of deposit or other instruments made, drawn, or indorsed by the LLC;

  e.  act for the LLC in the transaction of all other business (whether or not it is of the kind, nature or character specified in this certificate) on the LLC's behalf with the Bank, including but not limited to executing contracts and delegating person to engage in transaction in connection with such contracts;

  f.  open and maintain an account in the name of the LLC (any account so opened shall be bound by the provisions of this certificate);

  g.  open or lease a Safe Deposit Box in the name of the LLC;

  h.  certify to the Bank the names of the Authorized Signatories and shall certify such change to the Bank, and the Bank shall be fully protected in relying on such certification and shall be indemnified and held harmless from any claims, demands, expenses, losses or damages resulting from or arising out of the Bank honoring the signature of any individual so certified, or refusing to honor the signature of any individual not so certified;

  i.  delegate other person(s) to perform any of the foregoing acts;



(iv) Name of Authorized Signatories:

MUWAFAK RIZEK

FURTHER RESOLVED, that:
(i) the Bank is authorized to honor, receive, certify, or pay all instruments signed in accordance with this certificate even though drawn or indorsed to the order of any Authorized Signatory signing the same, tendered for cash, or in payment of a personal obligation or for deposit into a personal account of said Authorized Signatory and the Bank is not required or obligated to inquire into the circumstances of the issuance or use of any instrument signed in accordance with this certificate, or the application, or disposition of such instrument, or the proceeds thereof;
(ii) overdrafts, if any, shall not be considered to be a loan; and
(iii) the provisions of this certificate shall remain in full force and effect until written notice of its amendment or rescission shall have been received by the Bank and the Bank has a reasonable amount of time to act upon such notice, and that receipt of such notice shall not affect any action taken by the Bank prior thereto.

FURTHER RESOLVED, that the undersigned be, and hereby is, authorized and directed to certify to the Bank the foregoing resolutions and that the provisions thereof are in conformity with the governing documents of the LLC.

I further certify that there is no provision in the governing documents of the LLC limiting the power of the LLC to pass the foregoing resolutions and that the same are in conformity with the governing documents of the LLC.

IN WITNESS WHEREOF, I have hereunto subscribed my name this ___7___ day of ___June___ , 20_22_.

⊠ LLC has only one member or manager, second confirming signature is not required.

Note: If the member or manager is an entity indicate the name of the entity, and the name and title of the individual signing on behalf of the entity.

_____
Signature

Muwafak Rizek
_____
Name and Title

If the person signing above is designated as an Authorized Signatory and is not the only member or manager another manager, member or officer of the LLC must also sign the following further confirming this certificate as follows:

_____
Signature

_____
Title:

FORM: LLCRESOLUTION (08/15)



# EXHIBIT 4

# Business Signature Card



**Huntington**

Welcome.

Date: June 7, 2022

Time: 10:31 AM ET     Acct #   01060242014

**Account Title:**     IYS VENTURES LLC

**Address:**   7924 KEYSTONE RD, ORLAND PARK IL 60462-5166     Phone: **716-417-1144**   **SSN/EIN:**  832162420

I/We hereby acknowledge receipt of (i) Huntington's Business Deposit Account Agreement and disclosures, and (ii) Huntington's Business Online Access and Bill Pay Agreement, and agree to be bound by all terms and conditions, as amended from time to time. I/We represent this account will be used for business purposes.

---

**TAXPAYER IDENTIFICATION NUMBER CERTIFICATION** (Substitute W-9) (Not applicable to IOLTA/IOTA accounts)
Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. UNLESS THE FOLLOWING LANGUAGE IS STRICKEN, I am not subject to backup withholding because:
      (a.)  I am exempt from backup withholding, or
      (b.)  I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or
      (c.)  the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. Person (including a U.S. resident alien), and
4. I am exempt from FATCA reporting.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

---

**Authorized Signers** (Please sign in black ink.)

Signature
Name:   MUWAFAK RIZEK     Date  6/7/2022
Title:   Pres/Owner/CEO

When you apply for the account(s), you authorize Huntington to obtain a consumer report for the account(s) and any associated services on all account signers.

☐   NON-PERSONAL NOW ACCOUNT (check if applicable)
The above hereby applies for a Non-Personal NOW Checking Account and certifies that the above is, or the beneficial interest in such account will be held by:
a)   an individual or group of individuals
b)   a sole proprietorship or husband and wife operating an incorporated business; or
c)   an organization which is operated primarily for religious, philanthropic, charitable, fraternal, educational or other similar purposes and which is not operated for profit

Scan to Signature Card Department using MFD - Deposit



**CERTIFICATION OF FOREIGN STATUS (NOTE: A SEPARATE FORM W-8BEN-E MUST BE COMPLETED)**
Under penalties of perjury, I certify to the best of my knowledge and belief, the following information is true, correct and complete. I further certify under penalties of perjury that I am the beneficial owner (or am authorized to sign for the beneficial owner) and the beneficial owner is not a U.S. entity, therefore a foreign entity and exempt from backup withholding.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to establish your status as a non-U.S. person and, if applicable, obtain a reduced rate of withholding.**

Signature _____ Date _____
An Authorized Signer of the account is required to sign on behalf of   IYS VENTURES LLC
US Mailing Address: _____
Permanent Foreign Address: _____

```
FOR BANK USE ONLY
Prepared by: Obaid Haleem
Interoffice Zip: IL137
```

The Huntington National Bank is Member FDIC. ⬛®, Huntington®, and ⬛Huntington.Welcome.® are federally registered service marks of Huntington Bancshares Incorporated.

FORM: SIGNATURECARDBUS (11/21)

# EXHIBIT 5



Account Number 01060242027

## Certified Copy of Limited Liability Company Resolutions to
## Open and Maintain a Bank Account or Safe Deposit Box

The undersigned hereby certifies to The Huntington National Bank that: I am the
MANAGER
and, as such, I am familiar with the records and proceedings of:
IYS VENTURES LLC
Member Managed LLC , a duly organized and existing limited liability company under the laws of the
State of IL.

the following is a true, accurate and compared copy of resolutions duly adopted by the LLC; and that the resolutions have not been rescinded, modified or revoked, and are in full force and effect.

RESOLVED, that:

(i)   The Huntington National Bank (the "Bank") is hereby designated as a depository of the LLC;

(ii)  one or more safe deposit boxes may be leased or one or more account(s) may be opened and maintained, in accordance with the rules and regulations or procedures of the Bank pertaining to such accounts as amended from time to time, and in the name of the LLC with the Bank;

(iii) any of the individuals whose names are set forth in (iv), below or, whose genuine signatures appear on separate cards dated and filed with the Bank, (collectively the "Authorized Signatories" and individually an "Authorized Signatory") are hereby authorized to act individually on behalf of the LLC and in its name to:

   a.  sign checks, drafts, notes, bills of exchange, acceptances, or other orders for payment of funds from any account maintained by the LLC;

   b.  indorse checks, drafts, notes, bills, certificates of deposit, or other instruments owned or held by the LLC for deposit in any such account, or for collection or discount by the Bank and such indorsement may be written or imprinted with an authorized facsimile a ("Stamp") in the name of the LLC without the designation of the person making such indorsement (the LLC shall be fully responsible for any and all payments made by the Bank in reliance upon said Stamp and agrees to indemnify and hold harmless the Bank from any claims, demands, expenses, losses or damages suffered or incurred by the Bank arising out of the misuse or unlawful or unauthorized use by any person of such Stamp);

   c.  identify, approve and guarantee the indorsements of any and all checks and drafts drawn by the LLC;

   d.  waive demand, protest, and notice of protest, or dishonor of any check, draft, note, bill, certificates of deposit or other instruments made, drawn, or indorsed by the LLC;

   e.  act for the LLC in the transaction of all other business (whether or not it is of the kind, nature or character specified in this certificate) on the LLC's behalf with the Bank, including but not limited to executing contracts and delegating person to engage in transaction in connection with such contracts;

   f.  open and maintain an account in the name of the LLC (any account so opened shall be bound by the provisions of this certificate);

   g.  open or lease a Safe Deposit Box in the name of the LLC;

   h.  certify to the Bank the names of the Authorized Signatories and shall certify such change to the Bank, and the Bank shall be fully protected in relying on such certification and shall be indemnified and held harmless from any claims, demands, expenses, losses or damages resulting from or arising out of the Bank honoring the signature of any individual so certified, or refusing to honor the signature of any individual not so certified;

   i.  delegate other person(s) to perform any of the foregoing acts;



(iv)  Name of Authorized Signatories:

MUWAFAK RIZEK

**FURTHER RESOLVED, that:**
(i)   the Bank is authorized to honor, receive, certify, or pay all instruments signed in accordance with this certificate even though drawn or indorsed to the order of any Authorized Signatory signing the same, tendered for cash, or in payment of a personal obligation or for deposit into a personal account of said Authorized Signatory and the Bank is not required or obligated to inquire into the circumstances of the issuance or use of any instrument signed in accordance with this certificate, or the application, or disposition of such instrument, or the proceeds thereof;
(ii)  overdrafts, if any, shall not be considered to be a loan; and
(iii) the provisions of this certificate shall remain in full force and effect until written notice of its amendment or rescission shall have been received by the Bank and the Bank has a reasonable amount of time to act upon such notice, and that receipt of such notice shall not affect any action taken by the Bank prior thereto.

**FURTHER RESOLVED,** that the undersigned be, and hereby is, authorized and directed to certify to the Bank the foregoing resolutions and that the provisions thereof are in conformity with the governing documents of the LLC.

I further certify that there is no provision in the governing documents of the LLC limiting the power of the LLC to pass the foregoing resolutions and that the same are in conformity with the governing documents of the LLC.

IN WITNESS WHEREOF, I have hereunto subscribed my name this _____7_____ day of ____June____ , 20_22_

☑ LLC has only one member or manager, second confirming signature is not required.

Note: If the member or manager is an entity indicate the name of the entity, and the name and title of the individual signing on behalf of the entity.

_____
Signature

MUWAFAK Rizek
_____
Name and Title

If the person signing above is designated as an Authorized Signatory and is not the only member or manager another manager, member or officer of the LLC must also sign the following further confirming this certificate as follows:

_____
Signature

_____
Title:

FORM: LLCRESOLUTION (08/15)



# EXHIBIT 6

# Business Signature Card



**Huntington**

Welcome.

Date: June 7, 2022

Time: 10:31 AM ET                    Acct #   01060242027

**Account
Title:**          IYS VENTURES LLC

**Address:**      7924 KEYSTONE RD, ORLAND PARK IL 60462-5166       Phone: **716-417-1144**   **SSN/EIN:** 832162420

I/We hereby acknowledge receipt of (i) Huntington's Business Deposit Account Agreement and disclosures, and (ii) Huntington's Business Online Access and Bill Pay Agreement, and agree to be bound by all terms and conditions, as amended from time to time. I/We represent this account will be used for business purposes.

**TAXPAYER IDENTIFICATION NUMBER CERTIFICATION**  (Substitute W-9) (Not applicable to IOLTA/IOTA accounts)
Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. UNLESS THE FOLLOWING LANGUAGE IS STRICKEN, I am not subject to backup withholding because:
      (a.) I am exempt from backup withholding, or
      (b.) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or
      (c.)  the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. Person (including a U.S. resident alien), and
4. I am exempt from FATCA reporting.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

**Authorized Signers** (Please sign in black ink.)

Signature _____   Date  6/7/2022
Name:      MUWAFAK RIZEK
Title:       Pres/Owner/CEO

When you apply for the account(s), you authorize Huntington to obtain a consumer report for the account(s) and any associated services on all account signers.

☐   NON-PERSONAL NOW ACCOUNT (check if applicable)
The above hereby applies for a Non-Personal NOW Checking Account and certifies that the above is, or the beneficial interest in such account will be held by:
a)   an individual or group of individuals
b)   a sole proprietorship or husband and wife operating an incorporated business; or
c)   an organization which is operated primarily for religious, philanthropic, charitable, fraternal, educational or other similar purposes and which is not operated for profit

Scan to Signature Card Department using MFD - Deposit



**CERTIFICATION OF FOREIGN STATUS (NOTE: A SEPARATE FORM W-8BEN-E MUST BE COMPLETED)**
Under penalties of perjury, I certify to the best of my knowledge and belief, the following information is true, correct and complete. I further certify under penalties of perjury that I am the beneficial owner (or am authorized to sign for the beneficial owner) and the beneficial owner is not a U.S. entity, therefore a foreign entity and exempt from backup withholding.
**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to establish your status as a non-U.S. person and, if applicable, obtain a reduced rate of withholding.**

Signature _____  Date _____

An Authorized Signer of the account is required to sign on behalf of   IYS VENTURES LLC

US Mailing Address: _____

Permanent Foreign Address: _____

---

**FOR BANK USE ONLY**
Prepared by: Obaid Haleem
Interoffice Zip: IL137

---

The Huntington National Bank is Member FDIC. 🦁®, Huntington®, and 🦁Huntington Welcome.® are federally registered service marks of Huntington Bancshares Incorporated.

FORM: SIGNATURECARDBUS (11/21)

# EXHIBIT 7



## Important Information About Procedures For Opening A New Account

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person that opens an account. What this means for you: When an entity or person opens an account, we will ask for the name, address, Employer Identification Number (EIN) or, if applicable, a Taxpayer Identification Number (TIN) and date of birth, and other information that will allow us to identify the entity or person. We may also ask to see identifying documentation for the entity or person.

This **Business Deposit Account Agreement** is the Agreement for the business checking, savings, or money market account you open with us (Account). The business can be any legal entity (including associations) and agrees to the terms of the Account by: (i) signing the signature card, (ii) electronically agreeing to the Account Documents, or (iii) conducting any transaction with your Account. This Agreement may refer to other documents provided to you such as rate sheets, the Business Account Charges Form, disclosures, amendments or other documents that govern your Account and related products and services. These documents are collectively referred to as the "Account Documents" and are a part of the Agreement for your Account. This Business Deposit Account Agreement is sometimes referred to as the "Rules and Regulations" in your Account Documents, and the business opening the Account is sometimes referred to as "you" or "your".

1. **FRAUD PREVENTION AND SECURITY**
   a. Fraud Prevention
      To help prevent fraud and other losses, we strongly encourage you to follow these guidelines:
      i. Do not provide any account information (like account numbers, Personal Identification Numbers (PINs), or online credentials) to anyone, particularly callers, even if they claim to be a Huntington colleague
      ii. Do not write driver's license or Social Security Number (SSN) on your checks
      iii. Call us immediately if:
         (1) your Debit Card or checks do not arrive within ten (10) business days of your order
         (2) you suspect or believe your Debit Card or any check is lost, stolen, or missing
         (3) there is a transaction on your statement or online that you do not recognize
      iv. Store blank and cancelled check copies in a safe place, such as a locked drawer
      v. Shred unused deposit slips, transaction receipts, cancelled checks, and statements for your account before discarding them

   b. Security
      We are committed to providing you a secure and reliable experience with us, and to demonstrate our commitment to you we:
      i. Provide you with security alerts when you change your mailing address
      ii. Utilize specialized hardware, software, and firewalls to combat security breaches
      iii. Require multi-factor authentication for some transactions that we deem to carry a higher risk of fraud
      iv. Utilize 128-bit SSL encryption when you communicate with us over the internet through our online channels

      We ask you to follow these fraud prevention guidelines to help protect your account, and both the fraud prevention guidelines and security measures we take help ensure a better experience with us and reduce losses. You can also use other tools we provide, such as banking online and paperless statements, to help monitor your accounts and keep your information secure.

2. **MAKING DEPOSITS**
      You may make deposits to your Account through the channels and during the times we make them available by following the steps required for that channel. If you don't know what steps are required, please ask us and we will provide them to you.

   a. Check Endorsements
      You must endorse your check(s) by signing the back of the check in the designated location. In some cases, we may accept checks that are made payable to you, without endorsement and treat them as though they were endorsed correctly.

b.  Our Right To Refuse Deposits
    All non-cash deposits (for example, checks) must be made in blue or black ink and are subject to our review. We may refuse all or part, or adjust, any deposit for any reason, at any time, even after you have completed your deposit transaction (for example, we discover a missing signature while processing a check).

    We may refuse to cash a check you present to us, but instead require you to deposit the check to your Account. We have no obligation to accept deposits to a closed Account, including direct deposits. For example, if your employer or the social security administration sends a direct deposit to your closed Account, it will be rejected.

c.  Collecting Deposits
    When you make a non-cash deposit, we will collect the money for those item(s) on your behalf from the issuing bank. We will not be responsible for losses caused by you or others in the collection process. We may credit your Account for the amount of deposited items before we collect the money. However, subject to applicable federal law and our Funds Availability Policy, we may wait until we have actually received the money for your deposited items before we credit your Account.

d.  Returned Deposited Items
    If we credit your Account for a deposited item, we may later deduct the amount of any item from your Account if we are unable to, or have reason to believe we will be unable to, collect the money from the applicable account holder. We may also charge you a fee if this happens and the item is returned to us unpaid.

e.  Deposits Made In Foreign Currency
    If you make a deposit in foreign currency, we will process the transaction in U.S. dollars. The final amount deposited to your Account may be reduced by applicable currency exchange charges and will be based on the currency exchange rate we determine is in effect when we are paid.

    If a deposit in a foreign currency is returned, currency exchange rates and charges applicable at the time of return may reduce the amount returned. You will be responsible if the amount returned is less than the amount credited to your Account.

f.  Substitute Checks
    Only in limited circumstances, such a re-depositing a returned deposit, may you deposit a substitute check (a copy of an original check). If you deposit a substitute check, you are responsible for paying us the amount of any losses, costs and other damages that result from your deposit.

g.  Indemnity
    You agree to indemnify us and hold us harmless from any liability, loss or expense (including reasonable attorneys' fees) arising from a deposited item that is:
    i.    returned to us for an alleged breach of warranty under applicable law or other reason not caused by us. Examples include claims of: (a) forgery; (b) unauthorized items; (c) improper endorsement; (d) alteration; (e) counterfeit items; (f) unauthorized substitute checks; and (g) illegible items;
    ii.   not completed in blue or black ink;
    iii.  a substitute check that violates this Agreement; or
    iv.   delayed in return because of the condition of the item that occurred before we accept it (in other words, something that happened to the item before we accepted it).

h.  Night Depository
    If you make use of our night depository facilities where currency, commercial paper, checks or other negotiable items for deposit or payment by you ("Property") may be placed you agree:
    i.    To place only Property and instructions for handling the Property in the night depository facilities. The Property and instructions must be in a secure device such as a sealed envelope, tamper resistant pouch or locked bag (Depository Bag).
    ii.   To follow any instructions we provide you, to take all precautions as may be necessary to insure Property leaves the receptacle and drops down the chute, and to prevent unauthorized persons from tampering with the night depository facilities, for example, by locking the receptacle and removing the key. If Property is not found in the night depository facilities by us, it shall be conclusively presumed that Property was not placed in it.

iii. To notify us if any equipment we have given you to use is lost or stolen.
iv. We shall not be responsible or liable at any time for the operation, safety, or condition of the night depository facilities or any equipment we have given to you. In using the night depository facilities, you assume all risks. We do not insure Property placed in the night depository facilities. We will not be responsible or liable for any loss of Property caused by fire, flood, water damage, vandalism, burglary or acts of God.
v. You can elect on the Night Depository Resolution (Resolution) to have either us open or hold the Depository Bag. You also authorized us to deliver Property or equipment to you or any authorized representative you designate. In the absence of an election on the Resolution, you agree we can open the Depository Bag. If we open the Depository Bag, we will begin to process the Property once the Property has been delivered to our teller during Banking Hours, as posted in the Banking Office where you used the night depository facilities. If you elect for us to hold the Depository Bag, we will remove the Depository Bag from the night depository facilities during Banking Hours, as posted in the Banking Office where you used the night depository facilities, and place the Depository Bag in a secure location until your authorized representative claims the Depository Bag. In that scenario, you (or your authorized representatives) must appear at the branch to identify and claim any Property on the next banking day following each use of the night depository facilities. If you do not do this, we may take any steps that we deem necessary, including placing a lien on such Property for safekeeping or depositing such Property into any account you have with us.
vi. We do not have any obligation to determine what Property or if any has been received by us or deposited in your account.  You agree to keep a list of Property you provide to us. You shall accept our count of the Property as final.
vii. No relationship of debtor or creditor between us and you shall arise unless or until we have opened the Depository Bag and deposited the Property to your account.
viii. We may withdraw the night depository facilities from use at any time without notice to you. You agree to return to us any equipment we have furnished to you upon our request, termination of your account, or use of the night depository facilities.

**3. LIMITS, WITHDRAWALS AND CHECKS**
a. Limits
For savings and money market accounts, federal law also requires us to limit you to a total of no more than six (6) transfers and withdrawals, or a combination of them, in any calendar month or statement cycle of at least four weeks to another account of yours with us or to a third party by certain methods from your Account. These methods are by (i) preauthorized or automatic transfer, (ii) telephone agreement, order or instruction or (iii) check, draft, debit card or similar order payable to third parties. We do not necessarily offer any or all of these methods of withdrawal from your Account. If you exceed these limits, we may refuse to permit the excessive withdrawal(s), terminate your preauthorized, automatic, or third party transfer and payment privileges, transfer your account to a non-interest bearing product, or close your Account.

Unless noted below, our interest bearing business checking accounts are negotiable order of withdrawal accounts. Even though you may make withdrawals from your Account at any time, under federal law we may require you to give us up to seven (7) days prior notice of withdrawal for these Accounts. Further, federal law restricts the depositors permitted to have such accounts, and generally these are individuals, nonprofit organizations, government units, and fiduciary accounts if all of the beneficiaries are otherwise eligible.

Our Huntington Unlimited Plus Business Checking account, Huntington Unlimited Business Checking account, Huntington Business Checking 100 account, Commercial Interest Checking account, Hybrid Checking account, Escrow Solutions, IOLTA accounts, IOTA accounts, and other non-interest bearing checking accounts are demand deposit accounts, and the preceding paragraph does not apply to them.

We may limit the manner of any withdrawal, particularly if we believe the withdrawal is fraudulent, illegal, or poses security risks.

b. Timing of Withdrawals
We consider withdrawals as having been made on the business day we post it to your Account.

c. Checks You Write
i. General Terms

(1) Your checks must comply with financial industry standards.
(2) You must fill out your checks in blue or black ink.
(3) We may deduct from your Account the amount of any check you have written even if it is presented before the date written on the check, if there is no date on your check, or if the date on the check is more than 6 months old. We may also refuse to pay these checks.
(4) We may charge a fee to the person to whom you wrote a check if that person tries to cash the check at one of our branches and he or she does not have an Account with us.
(5) We may refuse to pay any check if there is not enough money in your Account.
(6) We may process and are not obligated to honor, or notify you of, restrictive language placed on your checks or other items such as "void after 90 days," "paid in full," "two signatures required," "void over $100" or similar statements.
(7) You agree that we are acting within reasonable banking standards by processing checks and other items through automated systems where most items are not individually examined.
(8) Some accounts (such as savings accounts) do not utilize checks.
(9) We process checks by automated means and you acknowledge that we have no duty to examine each item presented for payment.

d.  Stop Payments
You may not stop payment on a check we issued such as an official, cashier's or teller's check. However, you can request that we stop payment of a check or other transactions by calling us at 1-800-480-2001 or by visiting a branch. Any person authorized to act on your account (for example, a signer or debit cardholder) can place a stop payment order. We are not responsible for stopping a payment if we have not had a reasonable time to act on your stop payment order, if you have not provided us enough information (such as name of the payee) to execute the stop payment, or if we have paid or become responsible for the check or item. You also agree to indemnify us and hold us harmless from any liability or loss we incur (including reasonable attorneys' fees) because we complied with your stop payment order.

A stop payment order will expire in six months unless renewed by you.

If we pay a check or other transaction where a valid stop payment order was in effect, your account will be debited for the amount of the transaction and your stop payment fee will not be refunded unless you contact us.

**4.  INTEREST INFORMATION**
The following terms apply to savings, money market and checking accounts that earn interest.

a.  Rate Information and Balance Computation Method
The initial interest rate(s) and annual percentage yield(s) (APY) we pay on your Account, and minimum balances to earn each rate, are shown on the rate sheet provided to you when you opened your Account. We may change the interest rate(s) and annual percentage yield(s) at any time at our discretion without notice to you.

We compute interest at a daily periodic rate of 1/365th (1/366th in a leap year) of the applicable annual rate for each day. For savings accounts, interest will be compounded and paid on a quarterly basis, and for money market and checking accounts that earn interest, interest will be compounded and paid on a monthly basis. Interest will be paid by adding it to your Account (less any amount required to be withheld, such as income tax withholding).

If your account is an IOLTA or IOTA account, in which case the interest will be paid (after deducting all applicable service charges and fees as permitted) periodically to the appropriate agency. You agree that you are responsible for the payment of all service charges and fees applicable to your IOLTA or IOTA account which are not deducted from the interest earned on the account because deduction is prohibited or because the charges and fees exceed the interest.

If you close your Account before interest is paid for the statement period, we will not pay you the accrued interest for that statement period. See the section "Limits, Withdrawals and Checks".  We will not pay interest on any amount we withdraw from your Account and hold elsewhere in response to garnishments, attachments, levies, support orders, court orders, or other process involving your Account.

We use the daily balance method to calculate the interest on your Account. This method applies a daily periodic rate to the principal balance in your Account at the end of each day, less the amount of any items for which we have not begun to accrue interest as described below, to determine the interest earned for that day.

We then add together the interest earned for each day in the statement period to determine the amount of interest to pay you for that statement period.

On any interest bearing business checking account you have the right to elect not to earn interest, but you must let us know of this choice.

b.  When Interest Begins to Accrue on Non-Cash Deposits
Interest begins to accrue no later than the business day we are deemed to receive credit for the deposit of non-cash items (for example, checks). However, we are not required to pay interest on items that are returned for insufficient funds or for another reason, even if we have begun to accrue interest on that item. We may debit your Account for interest that we have previously paid on such returned items.

c.  Minimum Balance to Earn Interest
The principal balance you must have in your Account at the end of the day to qualify to earn any interest for that day is stated in the rate sheet provided to you when you opened your Account. If you qualify, we compute interest for that day using the current interest rate for which your principal balance at the end of the day qualifies you.

d.  Hybrid Checking
For each month, if the balances maintained in your Hybrid Checking account exceed what is needed to offset service charges, interest is earned on those excess balances. To determine the excess balance (Excess Balance) for the month, we take the average available balances for that month and subtract the balances required to offset monthly service charges. Please note the Excess Balance is labeled Net Available Balance in your account analysis statement. To determine the balance level required to offset all monthly service charges, you must multiply the total service charges for that month by a multiplier, as calculated by us using the following formula, which we may change or adjust at any time without notice to you. The multiplier is calculated by dividing the number of days in a year (366 for a leap year) by the result of the Earnings Credit Rate multiplied by the number of days in the statement cycle. The multiplier is rounded to the nearest whole number.

If you have an Excess Balance in your account at the end of each month, we will compute interest for that month, using the current interest rate for which your Excess Balance at the end of the month qualifies you. If your Excess Balance is zero, you will not earn interest for that month, and if your Excess Balance is negative you will not earn interest and may encounter service charges.

We calculate interest on a monthly periodic rate applied to the Excess Balance in the account at the end of each month, and interest will be paid the following month by adding it to your account unless you indicate it should be paid to another account. Interest will be compounded monthly. Any account transferred into the Hybrid Checking account that has accrued but unpaid interest will forfeit that accrued interest because the Hybrid Checking account calculates Excess Balances for the entire statement period.

Infrequently, some service charges cannot be offset with an earnings credit even though Excess Balances may earn interest. Please contact us for questions on those service charges or specifics of how to determine average available balance.

The interest rate, annual percentage yield, the multiplier, the average available balance, and the way in which we calculate the multiplier and the average available balance may change at any time at our discretion without notice to you. We may determine different rates for different balance tiers.

Earned but previously unpaid interest will not be paid to your account after you tell us or we tell you your account is closing. If you have multiple accounts tied as a group, and the account you identified as the main group account is closing, earned but previously unpaid interest will not be paid to any of the accounts (even those tied accounts that remain open) after you tell us or we tell you the account is closing.

**5. FEES**

You agree to pay the fees applicable to your Account. You authorize us to deduct all fees from your Account, whether or not that causes an overdraft in your Account. If we decide to waive a fee, the terms of the Account Documents will not change and we are not required to waive that fee again in the future.

You are responsible for any monthly fees at the time you open your Account and at the beginning of each monthly statement period following Account opening. Monthly fees are deducted from your Account at the end of each statement period or, for closed Accounts, at the time an Account is closed, even if a full statement period has not occurred.

Fees for a transaction may not be displayed at that time and may appear in the aggregate on your periodic statement. Minimum or average daily balance requirements are calculated for the days the Account was opened during each statement period.

Fees related to specific transactions may be deducted from your Account at any time.

**6. OVERDRAFTS/RETURNS AND FEES, OVERDRAFT PROTECTION**

a. Overview

If there is not enough money in your Account to cover a transaction we may, either: (1) allow the transaction to go through and cause your Account to become overdrawn or; (2) return the transaction. In either case, we may charge you a fee as explained below. <u>Remember, our decision to pay or return the transaction is at our discretion, and you have no right to overdraw your Account, even if we have previously paid a transaction into overdraft.</u>

You can avoid overdrafts and/or returns if you practice good Account management and maintain enough available money in your Account to cover all transactions to be paid. To determine if you have enough money available, you must consider all of your transactions, including those which have not been presented to us, such as checks, withdrawals, transfers, purchases, payments or other debits. Special rules may apply for certain pending transactions (see "Special Rules for Pending Transactions"). We don't always know about all transactions that may be presented for any given business day until we finish processing at the end of that business day. This means only you know all of your transactions that may affect your Account balance for that business day.

b. Overdraft Protection

Overdraft Protection allows you to link any eligible checking account to another eligible deposit account (savings, money market account, credit line, credit card) you have with us. The account you choose to link to your checking account is called the funding account. When you don't have enough money in your checking account to cover a transaction, the available money or credit in the funding account will be transferred to your checking account. You may link only one funding account to a checking account. A funding account cannot be linked to more than one checking account.

By choosing Overdraft Protection, you authorize us to transfer funds from your funding account to your checking account to cover an overdraft balance in your checking account at the end of the business day. Transfers are based on the amount of money or credit we determine is available in your funding account from our records on the day of the transfer. All transfers are subject to availability of money or credit in the funding account and any other applicable conditions as discussed below.

i. Types of Funding Account Transfers

(1) Transfers from Savings, Money Market Accounts and Credit Lines Transfers from an eligible savings or money market account or credit line funding account will normally be in multiples of $100. For example, if you overdraw your checking account by $128, we will transfer $200 from your funding account. If less than a multiple of $100 is available from your funding account, we will transfer whatever is available in your funding account, and if you overdraw your checking account in an amount that is greater than the amount available in your funding account, the entire amount available in your funding account will be transferred.

(2) Transfers From a Credit Card
Transfers from an eligible credit card funding account will normally be for the exact amount you overdraw your checking account, but only up to the available cash limit.

Remember that the terms and conditions for your Funding Account still apply, such as interest or transaction limitations.

c. Overdraft Options
We may pay a transaction when there isn't enough money in your Account, and these transactions include, for example ATM and Debit Card, Checks, Electronic Payments, and Transfers.

<u>Remember, the decision to pay, return or decline the transaction is at our discretion regardless of the elections you make</u>. This decision is based on a variety of factors such as the length of our relationship with you, deposit frequency, deposit amounts, or history of bankruptcy to name a few. You have no right to overdraw your Account and just because we allow you to do so does not mean you will be able to overdraw in the future.

If you overdraw your Account, you must pay us immediately for the amount of the overdraft and any associated fees. You agree that we may apply any deposits made to your Account to any overdraft balance, and we may apply that deposit to fees before principal. We will not be responsible for damages or wrongful dishonor if any transaction is returned or otherwise not paid because your Account does not have enough available money.

**7. SPECIAL RULES FOR PENDING TRANSACTIONS**
a. Overview
Generally debit card purchases and ATM transactions have a two-step process that may impact the money available in your Account to pay other items. These transactions usually begin with an electronic authorization request, which is followed by an electronic settlement request within a few days. The amount of the authorization request will reduce the money available in your Account to cover other transactions, but sometimes the settlement request is more than the authorization request. Also, we use authorization requests and other pending transactions made until 1:00 a.m. ET to determine the money available in your account to cover transactions. These authorizations or other pending transactions may cause an overdraft in your Account or cause other transactions to be returned. **However, we ignore any pending authorization requests or transactions for purposes of deciding if we will charge an Overdraft Fee or a Return Fee.**
The example below illustrates this.

**What this means for you:**

- The authorization request or pending transaction reduces the money available in your account and impacts our decision to pay or return an item; but
- The authorization request or pending transaction will NOT cause an Overdraft Fee or a Return Fee.

**Consider the following example:** Assume you start the day with an Account balance of $110, during the day you make a debit card purchase of $95 that we authorize as a pending transaction. Later that night during overnight processing, a check for $90 you wrote a few days ago is presented to us for payment. The pending debit card authorization reduces the money available in your Account to $15, which is not enough to pay the $90 check. We will, depending on criteria we establish, do one of the following:

- **Pay the check** and not charge you an Overdraft Fee, since there would have been enough money in your Account to pay the check (ignoring the $95 pending debit card authorization). On the next business day, assuming no other transactions, if the $95 debit card purchase is presented to us for final settlement, generally we are required to pay it under debit card network rules. Your Account will be overdrawn by $75 and we will charge an Overdraft Fee; or
- **Return the check,** but not charge you a return fee, since there would have been enough money in your Account to pay the check (ignoring the $95 pending debit card authorization).

**NOTE:** In the examples above, if the check had been for $250 (more than the money available in your Account) if we pay or return that check, you would be charged an Overdraft Fee or Return Fee.

When the debit card purchase or ATM transaction is finally settled, it may cause an overdraft on your Account if there is not enough money in your Account at the time of settlement, and this may cause an Overdraft Fee.

b. Notice of Insufficient Funds
Generally, if we return an item or pay an item into overdraft, we will send you a Notice of Insufficient Funds, even if we do not charge you a Return Fee or an Overdraft Fee.

This notice provides the details of your transactions for the day in which you did not have enough money available in your account including:

- "Outstanding Authorizations and Pending Transactions" (authorization requests (mentioned above) or credits that have not yet posted to your account);
- An "Account Summary" section. Which aggregates your pending and posted transactions; and
- A "Transaction Detail" section, which includes each transaction from that day. You can use the description above, the Account Summary section, and the Transaction Detail section to determine the balance we use to pay or return an item and the balance we use to charge a Return Fee or an Overdraft Fee.

c. Pending Credits

Please note that even though a deposit made during a business day may not be available that same day under our Funds Availability Policy, we may use the amount of the deposit to authorize transactions or to pay other items presented for payment from your account. We call these deposits pending credits. We also use any pending credits when determining if you will be charged a Return Fee or an Overdraft Fee, and pending credits discount for purposes of determining if you made a sufficient deposit to take advantage of 24-Hour Grace. Please note 24-Hour Grace may not apply to certain accounts or Treasury Management Services. We use pending credit made until 1:00 a.m. ET to determine the money available in your account to cover transactions.

## 8. TRANSACTION POSTING ORDER

On Business Days, we post deposits and credits first, followed by specific categories of debits, which may include checks, ACH transactions, and electronic transactions (such as Debit Card and ATM transactions). Fees and interest (if any) are posted last. Within the specific categories of debits:

- We post electronic transactions in chronological order using the date and time assigned to the transaction and that date and time could be in a different time zone from where you are conducting the transaction.
- We post checks in check number order, unless the check is cashed in the branch, in which case we post those checks first.
- We post other transactions in low-to-high order based on amount within their specific categories. We try and post debit transactions in the order in which you spent your money. Because the transactions involved in posting order can vary from customer to customer, the description above is generally how we handle transaction posting order. However, we may change our transaction posting order at any time in our discretion without notice to you.

## 9. OUR LIABILITY TO YOU

Except as otherwise provided by applicable law or by other Account Documents, you agree that:

a. If we do not properly complete a transaction as required within your Account Documents, our maximum responsibility to you will be for the amount of the transaction.

b. We are not responsible if circumstances beyond our control prevent the transaction from being completed or if the money in your Account is or may be subject to legal process or other claim.

c. We are not responsible for any consequential damages (e.g. those that are an indirect result from an event).

d. We are not responsible for any checks or items that are returned or processed late because of markings placed on the check or item before we accepted it.

## 10. STATEMENTS AND NOTICES OF ERRORS

a. Statements

We will provide you with periodic statements showing the activity on your Account through U.S. mail, or online if you choose this option. You may also request a mini-statement or an extended mini-statement at an ATM.

We will provide monthly statements if you have electronic banking transactions during the statement period. However, if your Account has a zero or positive balance and there is no activity (deposits, withdrawals, or transfers) on your Account, we may only provide a statement three months from the month in which activity last occurred on your Account. If we classify your Account as inactive, we may stop sending statements. You agree to notify us promptly if you change your address.

b.  Your Responsibility to Check for and Notify Us of Errors
    Except as otherwise provided by applicable law, rules, or other Account Documents, you must notify us within 30 days after your statement is mailed or made available to you online of any errors with your Account or as soon as possible if you see an error in your transaction history online. Errors include such things as unauthorized transactions, fraudulent activity, forgeries, alterations and missing deposits.

    Also, after we accept your deposit, we will verify the accuracy of the amount. If we find a discrepancy between the amount credited to your Account and the actual amount of the deposit, we will adjust your Account without notice to you. However, if there is an unintentional discrepancy of $5 or less where the amount deposited was less than the amount stated on your deposit receipt, you keep the difference.

    There may be other times when we do not adjust or refund you for nominal amounts (usually $1 or less) we owe you associated with your Account. Unless you ask us to correct that Error in the timeframe stated above, we may keep the money or transfer the money to the state by following state unclaimed funds requirements. We may change the thresholds above at any time without notice.

c.  How to Notify Us
    You must notify us of errors by:
    (1)  calling us at 800-480-2001 (2265); or
    (2)  writing to us at:
         The Huntington National Bank
         Attention: Customer Service
         P.O. Box 1558
         Columbus, Ohio 43216

d.  Our Liability if You Fail to Report Errors Timely
    If you fail to notify us (i) within 30 days after your statement is mailed or made available to you or (ii) as soon as possible after discovering an error online in the transaction history, we will not be responsible for the errors and will not be required to reimburse you for them. We also will not be responsible for (i) additional error(s) by the same wrongdoer or (ii) any loss that we could have avoided if you had promptly notified us.

    Note that no legal proceeding or action for errors may be brought against us more than one year after the statement showing the errors had been mailed or otherwise made available to you.

    In addition, we have available certain products designed to discover or prevent unauthorized transactions, including unauthorized checks and ACH debits, forgeries, and alterations (all such activities referred to as Fraud). While no such product is foolproof, we believe that the products we offer will reduce the risk of loss to you from Fraud. You agree that if your account is eligible for those products and you choose not to avail yourself of them, then we will have no liability for any transaction that occurs on your account that those products were designed to discover or prevent, nor will we have any duty to re-credit your account for any such losses.

## 11. ACCOUNT OWNERSHIP

a.  Payable on Death/Informal Trust Accounts

    i.   We do not allow payable on death ("POD") or informal trust Account (also known as an "in trust for" or "Totten Trust") designations on business account, except for accounts owned by sole proprietors. We will consider any attempt to designate a POD on your business account as invalid. For accounts owned by sole proprietors, the following apply.

    ii.  Informal Trust Accounts
         An informal trust account (also know as an "in trust for" or "Totten Trust") is an Account owned by a trustee but without a written trust Agreement. The beneficiaries of an informal trust Account have no right to any funds in the Account while the trustee is alive. If the trustee dies, we will transfer the Account to the beneficiaries designated on the signature card or identified in our records.

iii. Payable on Death Designation
If your account is "payable on death" ("POD") to one or more beneficiaries, the beneficiaries have no rights to your Account as long as you are alive. On your death, Huntington will pay the balance in the account to your beneficiary or beneficiaries designated on the signature card or identified in our records who are then living. If more than one beneficiary is living, we will pay to each of them in equal shares unless otherwise noted herein. We must be furnished with adequate proof of death, any necessary tax releases and proper identification, and we may first deduct any amount that any of you owe to us. If you want to change beneficiaries in the POD agreement, you must sign a specific form that we will provide to you.

iv. Special Notice for Indiana Payable on Death Accounts
If you are an Indiana resident or are opening your account in Indiana, and you make a payable on death beneficiary designation, there is some information you need to know about that designation. Special rules apply if you designate a beneficiary who is a lineal descendant of yours (in other words, a child, grandchild, or great-grandchild). If you designate a beneficiary who is a lineal descendant and that beneficiary does not survive you, that beneficiary's share of your account will pass to his or her lineal descendants in order.

(1) For example: if your daughter is one of your beneficiaries and she does not survive you, then her share of your account will pass first to her children who survive you, and if none, then to her grandchildren who survive you. If she has no lineal descendants who survive you, then her share will pass to the remaining original beneficiary(ies) you designated. If there is no surviving original beneficiary, then her share will pass to your estate.

(2) You have the right to void the above application of the law by putting the phrase "No LDPS" next to the beneficiary's name on the designation form. If you put the "No LDPS" designation next to a beneficiary's name and that beneficiary does not survive you, then his or her share of your account will pass to the remaining original beneficiary(ies) you designated. If there is no surviving original beneficiary, then his or her share will pass to your estate.

(3) The "No LDPS" only applies to a beneficiary who is your lineal descendants. This means if you designate a spouse, friend, or nephew, for example, and he or she does not survive you, that beneficiary's share of your account will pass to the remaining original beneficiary(ies), regardless of any "No LDPS" designation. If there is no such surviving original beneficiary, then his or her share will pass to your estate.

v. Invalid Beneficiary Designation
Any beneficiary designation made while you are a sole proprietor will be immediately invalid if, at any time, you incorporate or become a limited liability company, partnership, or other business entity, regardless of whether Huntington is notified of the change in your business.

b. Verification of Authorization
We may require documents and authorizations that we deem necessary (i) to verify that the person(s) opening, owning, transacting, or taking other actions on the Account, has the authority to do so and (ii) to establish the identity of any such person(s).

If, for any reason, you are unable to provide the information necessary to verify your identity, certain transactions may be restricted or your Account(s) may be suspended or closed.

c. No Special Access or Other Requests
We are not required to act on or comply with any instructions from you that request multiple signatures for transactions on your Account (referred to as "special requirements"). We may allow any of the persons designated on the signature card or our other records, to transact on your Account.

d. Transferring Ownership
Your Account cannot be transferred or assigned without our consent. We must approve any pledge of your Account (for example, transferring your Account to a lender to secure a loan) and any pledge remains subject to any rights we have under the terms of the Account Documents and applicable law. We may also require the Account to be closed and a new Account to be opened in the name of the transferee or pledge.

## 12. DORMANT ACCOUNTS AND UNCLAIMED FUNDS

Under applicable state law, the money in your account will be considered abandoned and payable to the state of the last address we have for you in our records if a specified period of time has passed and you do not: (i) Make a deposit or withdrawal; or (ii) Inquire about or take any other action in connection with your account. In addition, if you do not initiate activity in the account for a substantial period of time, we will treat the account as being dormant. In that event, you agree that, unless prohibited by law, we may charge dormant account fees on the account in addition to other charges. In addition, we may stop a) you from using the account or b) sending you periodic statements.

## 13. IF YOU OWE US MONEY

If you owe a debt to us (including any overdrafts or fees owed) whether jointly with another or individually, you agree that we may use the money in any of your Accounts to pay the debt, regardless of the source of the funds (unless prohibited by applicable law). This is our right of set-off.   If you or any owner (joint or otherwise) is indebted to us at the time of death, we are authorized to pay any withdrawals (such as checks) and exercise our right of set-off against the Account after such Account owner's death, regardless of any rights that any surviving owner, including a POD or other beneficiary, may have to funds in the Account.   We will not be responsible for any check, item, or transaction that is returned because we set-off a debt against your Account. You agree to indemnify us and hold us harmless from any claim (including reasonable attorneys' fees) arising as a result of our exercise of our right of set-off. If we charge off your Account, it may be reported to the credit reporting agencies.

To the extent permitted by law, you agree that our right of setoff applies to all funds deposited into your Account, including funds received from the Social Security Administration and other federal or state agencies. If you owe us money, we may take different collection actions based on a variety of factors, including how much money you owe us.

## 14. AUTOMATED CLEARING HOUSE (ACH) ENTRIES

Credit transactions sent to you through the Automated Clearing House network are subject to the "Governing Law" section found in these Account Documents. If the person who sent the credit transaction to your account is permitted to and requests us to return the credit transaction, we may do so and debit your account for that amount, and, in that case, that person will be deemed not to have paid you. We are not required to give you notice when we receive a credit transaction for you unless we have agreed to do so.

For all transactions sent through the Automated Clearing House, you agree to follow and be bound by the NACHA rules and guidelines, including, for example the timeframes to return debit transactions, which require a shorter notification period than that stated in the section "STATEMENTS AND NOTICES OF ERRORS".

## 15. TELEPHONE AND ELECTRONIC COMMUNICATIONS

In order for us to service or protect your Account or to collect any amounts you owe, you agree and consent that we or a third party acting on our behalf may:

a. Make telephone calls, leave messages, and/or send e-mail or text messages to you at any telephone number(s) or e-mail addresses you give to us or that we otherwise have for you or your Account, including wireless (cell phone) telephone numbers that could result in charges to you. Your communication service provider will deliver them to you as your agent.

b. Use any technology available to make telephone calls and/or send text messages to you, including but not limited to prerecorded/artificial voice messages and/or an automatic telephone dialing system.

c. Send e-mails or any other electronic communication to you at any e-mail address you give to us or that we otherwise have for you or your Account.

d. Monitor and record any telephone call or other communication between you and us.

e. Additionally, if you use other services that include electronic communications from us such as our Alerts Service, Text Banking or Mobile Banking, you understand and agree that:

    i. You are responsible if we incur an expense or loss because you gave us a phone number, e-mail address, or other delivery location that is not your own.

ii.  E-mail and text messages may not be encrypted and may include personal or confidential information. We will not be responsible for losses or damages arising from any disclosure of Account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in e-mail or text messages.

iii.  Telephone calls, e-mail and other text messages may be delayed because of your Internet service provider(s), phone carriers, or other parties.

iv.  Certain services that include telephone, e-mail or text messaging may only be available to a customer with eligible accounts and/or mobile devices.

v.  Telephone calls, e-mail and text messaging are provided for your convenience and do not replace your monthly Account statement(s), which are the official record of your Accounts.

vi.  You are responsible for all charges, including, but not limited to, fees associated with text messaging imposed by your communications service provider or others. Message and data rates may apply. Such charges include those from your communications service provider. Message frequency depends on user preferences. You can cancel certain Alerts by sending STOP to 446622 at any time. In response to your STOP message, you agree and consent that we or a third party acting on our behalf may send you a text message confirming that you have elected to cancel certain Alerts. For help or information on Alerts, send HELP to 446622. For additional assistance with Alerts, contact us at 1-800-480-2001.

vii.  Huntington Confirm It fraud alerts. You will receive **free** messages from short code number 49847. Message frequency varies and depends on card use. Mobile carriers are not liable for delayed or undelivered messages. For more information, call (800) 480-2001. Please note: You can opt out of Confirm It texts and/or automated phone calls at any time. Opting out applies specifically to your debit card number. Other cards associated with your Account will not be affected. If you are reissued a card with a new number, you will need to opt out again. To opt out of receiving Confirm It texts, text **STOP** to 49847. By texting **STOP** to 49847, you agree to one additional confirmation message stating you have opted out and will no longer receive messages from Huntington Confirm It. For help, text **HELP** to 49847. To opt out of automated phone call fraud alerts, call (800) 480-2001.

## 16. NOTICES

Except as otherwise provided in the Account Documents, notices we give you are effective when deposited in the U.S. mail addressed to the last address that we have for you, when made available to you through our online service, or when sent to the last known e-mail address that we have for you.

## 17. CLOSING YOUR ACCOUNT

We may close your Account at any time, for any reason, with or without notice to you. We will return the balance in your Account, less any fees or service charges, claims, set-offs or other amounts you owe us, unless your balance is $1 or less, in which case we will not return it to you. After your Account is closed, we have no obligation to accept deposits, pay any outstanding checks or honor any other withdrawal or transfers. You agree that we shall be relieved of any and all responsibility for refusing to honor any check or other item on a closed Account. Your obligations in the Account Documents to indemnify us survive the closing of your Account.

## 18. OTHER LEGAL TERMS

a.  Adverse Claims

If anyone notifies us of a dispute regarding your Account, we may place a hold on your Account and we will not be responsible for refusing to honor or for failing to process any transaction. We have no obligation to determine the validity of any claim before placing or keeping the hold on your Account.

b.  Illegal Transactions

You agree that you will not use your Account in any way that violates applicable law or for internet gambling and we will not be responsible for anything related to those violations or transactions if you do. We may also choose to deny any transaction if we believe there is a reason to do so, for example we believe the transaction is for internet gambling.

If we suspect any suspicious, unlawful, or illegal activities connected to your Account, we may restrict access to it, and in that case, we usually will not notify you of the activity in question.

c.   Fraud
If we suspect fraud on your Account or have reason to believe we may not be able to collect the money associated with a deposit, we may place a hold on your Account and refuse to accept deposits to the extent not prohibited by law. We will not be responsible for the return of any check, item or transaction resulting from the hold.

d.   Subaccounts
For regulatory reporting and accounting reasons, your checking account consists of two subaccounts: subaccount A and subaccount B. This internal accounting process does not affect either the appearance or the operation of your checking account in any way. All of the provisions of your Account Documents apply to both subaccounts.

Subaccount A is a checking account, and subaccount B is a savings deposit account. Periodically we review the activity in your Account to determine the amount that is NOT needed to pay checks or other debits (the "Reserved Balance"). We keep the Reserved Balance amount in subaccount B, and the amount in excess of the Reserved Balance is kept in subaccount A. We may adjust the balances between subaccount A and B by internal transfer, as we deem necessary or appropriate. We will not allow more than six transfers per monthly statement period from subaccount B to subaccount A, and if a sixth transfer is made in a monthly statement period, all funds in subaccount B will be transferred to subaccount A for the remainder of the monthly statement period.

e.   Contact Information
You are responsible for keeping any contact information you have provided us up to date, such as your address. If you give us an e-mail address or telephone number, you are responsible for keeping it functioning properly, or advising us if it does not work or if it has changed.

f.   No Waiver
If we fail to exercise any of our rights within the Account Documents, such failure will not waive any of our rights.

g.   Limitations on Actions
You must file a lawsuit against us related to your Account no later than one year after the conduct giving rise to the alleged claim occurs, otherwise you agree any lawsuit filed after that time should be dismissed, to the extent permitted by law.

h.   Collections
We may pursue collection of any negative balance on your Account in court or otherwise, or transfer that right to others. If we take legal action to collect any overdraft balance or other amounts you owe us in connection with your Account, you agree to pay our reasonable attorneys' fees and costs and expenses of collection, including but not limited to those incurred at trial and on any appeal.

i.   Change in Terms
We may change the terms of the Account Documents at any time. Unless the law requires us to send you a specific notice, we will decide what kind of notice we will give you and the method of providing the notice.

j.   Document Retention
You agree that any documents we provide in connection with your Account, including but not limited to the Account documents, statements, notices and any other documents may be provided to you electronically and you consent to receive any such documents in electronic form.

You agree that we may, in the ordinary course of business, destroy the original and/or copies of the signature card or any other Account Documents in connection with your Account after we make a record, copy, photograph, image or representation of it by electronic or other means. You agree that such destruction does not alter the intent of the parties to continue to be bound by the signature card and other Account Documents. You also agree that the electronic or other record we maintain shall be treated the same as any original document. You agree not to take any action or otherwise challenge or question the validity, enforceability or accuracy of the signature card or any Account Documents merely because any of such documents was provided in electronic form or because the original was destroyed in connection with our document retention practices.

k.  Governing Law
The Account Documents, your Account, and the services we provide in connection with your Account are governed by federal laws and U.S. regulations, and to the extent federal laws and regulations are not applicable (and only to that extent), the law of the state where your Account is located governs. Your Account is located in the branch where you opened your Account, and if you do not open your Account in a branch, your Account is located in Columbus, Ohio. We may change the location of your Account at any time. If any fees or charges are deemed to be "interest" under federal law, the law of the state of Ohio shall be applicable in determining the amount of interest permitted under federal law. To the extent there is any inconsistency between the terms of the Account Documents and any applicable law, the Account Documents will control to the extent permitted by law. If any of the provisions of the Account Documents cannot be legally enforced, they will be considered changed to the extent necessary to comply with applicable law.

**19. REAL TIME PAYMENTS (RTP®s)**
The following additional terms apply to any RTPs to or from your Account through the RTP Network. RTPs can occur 24/7 and are subject to the limits and other constraints provided by the RTP Operating Rules. RTP Operating Rules (which can be found at https://www.theclearinghouse.org/payment-systems/rtp/document-library) , the laws of the State of New York (including Article 4-A of the New York Uniform Commercial Code) and the Huntington Business Deposit Account Agreement govern RTP transactions at Huntington. If there is a conflict between the RTP Operating Rules, Article 4-A of the New York Uniform Commercial Code, and/or the Huntington Business Deposit Account Agreement, the RTP Operating Rules shall govern. By not returning RTPs deposited into your Account, you are agreeing that the RTP Operating Rules apply to and are binding upon you. The terms "Sender", "Receiver", "Sending Participant", "Receiving Participant" and "Request for Payment" as used herein are defined in the RTP Operating Rules.

a.  RTPs are settled within seconds of the transmission by the Sender, unless the payment fails or is delayed due to a review by the Receiving or Sending Participant. A review indicating fraud, regulatory or compliance issues, and/or transaction limits may result in a payment's failure or delay.

b.  RTP transactions are irrevocable and cannot be reversed by the Sender. If you want to reject an RTP payment to your Account; or block all RTP payments into your Account, please contact us at our toll-free number (800) 480-2001. While we may attempt to assist in the resolution of your request, we will have no liability for our failure to do so.

c.  All accounts (Sender and Receiver) used for RTP must be located within the United States. To the extent a Sender sends, or a Receiver receives a payment or message as part of a money transmission transaction, whether such Sender or Receiver is a payment service provider or not, the person on whose behalf the Sender sends, or the Receiver receives, must be a resident of or otherwise domiciled in the United States.

d.  We are under no obligation to honor, in whole or in part, any RTP transaction that could result in a violation of applicable law, as determined in our sole discretion.

e.  If you elect to receive payments from consumers through RTP, you will indemnify and hold us harmless against any disputes or chargebacks initiated by a consumer, including, without limitation, Regulation E disputes.

RTP® is a registered service mark of The Clearing House Payments Company L.L.C.

**20. FDIC PROVISIONS**
Special Provisions for Accounts that qualify for Pass-Through Insurance

a.  Accounts opened by federal, state, or local governments must identify an official custodian(s) for purposes of FDIC Insurance, and we may rely on the person(s) you have identified. If an account is opened by a political subdivision, you represent and warrant the criteria to qualify for a political subdivision, as defined by the FDIC, is met.

b.  FDIC Insurance
Your account qualifies for FDIC Insurance, and we may request additional information, including documents, to ensure that you qualify for the maximum amount of insurance. The FDIC may also request additional information from you, and you agree to provide the FDIC any requested information within the indicated timeframe. In the event the account qualifies for pass-through insurance, you agree to keep the records prescribed by the FDIC to meet those standards.

c.  If you have opened a deposit account on behalf of others, sometimes referred to as the beneficial owner(s) of the funds in the account (for example you are acting as an agent, nominee, guardian, executor, custodian or funds held in some other capacity), those beneficial owners may be eligible for "pass-through" insurance from the FDIC. This means the account could qualify for more than the standard maximum deposit insurance amount (currently $250,000 per depositor in the same ownership right and capacity). Your account has transactional features as defined in § 370.2(j) of the FDIC's Rules and Regulations at https://www.fdic.gov/regulations/laws/rules/2000-9200.html#fdic2000part370.2 . Accordingly, you as the account holder must be able to provide a record of the interests of the beneficial owner(s) in accordance with the FDIC's requirements as specified below.

The FDIC has published a guide that describes the process to follow and the information you will need to provide in the event we fail.  In addition, the FDIC published an Addendum to the guide, section VIII, which is a good resource to understand the FDIC's alternative recordkeeping requirements for pass-through insurance. The Addendum sets forth the expectations of the FDIC to demonstrate eligibility for pass-through insurance coverage of any deposit accounts, including those with transactional features.  The Addendum will provide information regarding the records you should keep on the beneficial owners of the funds, identifying information for those owners, and the format in which to provide the records to the FDIC upon our failure. You must be able to provide this information within 24 hours after the appointment of the FDIC as receiver in order to receive payment for the insured amount of pass-through deposit insurance coverage as soon as possible.  That information can be accessed on the FDIC's website at https://www.fdic.gov/deposit/deposits/brokers/part-370-appendix.html . You have an opportunity to validate the capability to deliver the required information in the appropriate format so that a timely calculation of deposit insurance coverage can be made, and if you would like to do so, please contact us.

You agree to cooperate fully with us and the FDIC in connection with determining the insured status of funds in such accounts at any time. In the event of our failure, you agree to provide the FDIC with the information described above in the required format within 24 hours of that event. As soon as the FDIC is appointed, a hold may be placed on your account so that the FDIC can conduct the deposit insurance determination; that hold will not be released until the FDIC determines that you have provided the necessary data to enable the FDIC to calculate the deposit insurance.  You understand and agree that your failure to provide the necessary data to the FDIC may result in a delay in receipt of insured funds and legal claims against you from the beneficial owners of the funds in the account. If you do not provide the required data, your account may be held or frozen until the information is received, which could delay when the beneficial owners would receive funds. Notwithstanding other provisions in this Agreement, this section survives after the FDIC is appointed as our receiver, and the FDIC is considered a third party beneficiary of this section.

**21. ARBITRATION**

THIS ARBITRATION PROVISION CONTAINS IMPORTANT INFORMATION ABOUT CERTAIN DEPOSIT ACCOUNTS WITH US. IT PROVIDES THAT EITHER YOU OR WE CAN START A BINDING ARBITRATION PROCEEDING TO RESOLVE ANY CLAIMS (AS DEFINED BELOW). ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, THE CLAIM IS SUBMITTED TO A NEUTRAL PARTY, AN ARBITRATOR, INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT. THE DECISION OF THE ARBITRATOR IS FINAL AND BINDING. IF YOU REJECT ARBITRATION AS PROVIDED BELOW, OR THE DISPUTE IS NOT ARBITRATED, THIS ARBITRATION PROVISION ALSO CONTAINS A JURY TRIAL WAIVER WHICH ELIMINATES YOUR RIGHT TO A TRIAL BY JURY IN COURT.

This Arbitration Provision describes when and how a Claim (as defined below) with respect to a Deposit Account may be arbitrated. For the purposes of this Arbitration Provision, the term "Deposit Account" means any deposit account or safe deposit box at The Huntington National Bank with the exception of (i) interest on lawyers trust accounts ("IOLTA accounts"); (ii) accounts holding public funds such as Public Fund Economy Checking and Public Funds Premier accounts; (iii) Commercial Interest Checking accounts; (iv) Commercial Analyzed Checking accounts; and (v) Commercial Hybrid Checking accounts.

The terms "you" and "your" mean each Deposit Account owner and any other person having any legal or beneficial interest in any Deposit Account or any authority to access any Deposit Account or Deposit Account information or conduct transactions with respect to any Deposit Account. The terms "we," "us" and "our" mean (i) The Huntington National Bank, its parent companies, wholly or majority-owned subsidiaries, affiliates, successors, assigns and any of their employees, officers and directors and (ii) any third party providing any services in connection with a deposit account if such third party is named as a party by you in any lawsuit between you and us. By opening a Deposit Account with us or accepting or using any deposit account services, you agree to all of the terms of this Arbitration Provision.

YOUR RIGHT TO REJECT: If you don't want arbitration to apply with respect to a particular Deposit Account, you may reject it by sending us a written Arbitration Rejection Notice ("Notice") which (a) states that you want to reject arbitration; (b) states your name and address; (c) provides the account number(s) for the Deposit Account(s) for which you are rejecting arbitration; and (d) you sign. For accounts with joint ownership, either of you may send a Notice. The Notice must be sent by certified mail, return receipt requested, to The Huntington National Bank, Deposit Account Arbitration, Attention: Customer Service, P.O Box 1558, Columbus, Ohio 43272. Upon receipt of the Notice, we will credit one of your Deposit Account for the standard cost of mailing a certified letter. These are the only procedures you can use to reject arbitration. An Arbitration Rejection Notice is only effective (i) for the Deposit Account(s) identified in the Notice and (ii) if we receive the Notice within thirty (30) calendar days after the date we first provide you with this Arbitration Provision for the Deposit Account(s) that are the subject of the Notice. Your rejection of arbitration will not affect your ability to obtain any account, product or service from us. Rejection of arbitration applies only to the Deposit Account(s) identified in the Notice. Rejection of arbitration does not affect the jury trial waiver contained in this Arbitration Provision, and the jury trial waiver will still apply if you reject arbitration.

a.  What Claims are Covered
    Except as otherwise limited by this Arbitration Provision, "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to a Deposit Account. It includes any claim, dispute or controversy concerning any fees or charges relating to any Deposit Account and any services relating to any Deposit Account, including but not limited to safe deposit box services, wire transfer services, treasury management services, on-line or telephone banking services, text or mobile banking services, automated teller machine services and debit card services. It includes not only any claim, dispute or controversy directly between you and us, but also any such matter with respect to anyone connected with you or claiming through you, such as a joint account holder, account beneficiary, trustee, guardian or any other representative or agent. "Claim" has the broadest possible meaning, and includes initial claims, counterclaims, cross-claims and third-party claims. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief).

b.  What Claims are not Covered
    A "Claim" does not include disputes about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof, including, without limitation, the Class Action and Consolidation Waiver (see below) and/or this sentence; all such disputes are for a court and not an arbitrator to decide. We will not choose to arbitrate an individual Claim that you bring against us in small claims court or your state's equivalent court, if any. But if that Claim is transferred, removed or appealed to a different court, we then have the right to choose arbitration. Furthermore, nothing in this Arbitration Provision limits or constrains any (i) right to self-help remedies, such as the right of set-off or the right to restrain funds in a Deposit Account, (ii) individual judicial action by a party that is limited to preventing the other party from using a self-help remedy and that does not involve a request for damages or monetary relief of any kind, (iii) right or obligation to interplead funds in the event of a dispute, (iv) right to exercise any security interest or lien in property, (v) obligation to comply with legal process, or (vi) right to obtain provisional remedies with respect to funds or property, such as injunctive relief, seizure, attachment or garnishment by a court having appropriate jurisdiction.

c.  How Arbitration is Started

Either you or we may start the arbitration of any Claim. Arbitration is started by giving written notice to the other party of the intent to start the arbitration. Except as otherwise provided by the Federal Arbitration Act, this notice may be given before or after a lawsuit has been started over the Claim or with respect to other Claims brought later in the lawsuit. If you start the arbitration, you must notify us at the following address:

> The Huntington National Bank
> Deposit Account Arbitration
> Attention: Customer Service
> P.O. Box 1558
> Columbus, Ohio 43272

If we start the arbitration, we will notify you in writing at your last known address we have on file. Arbitration of a Claim must comply with this Arbitration Provision and, to the extent not inconsistent or in conflict with this Arbitration Provision, the applicable rules of the arbitration administrator.

d.  Choosing the Administrator

The party starting the arbitration proceeding must choose either the American Arbitration Association, www.adr.org , 800-778-7879 or JAMS, www.jamsadr.com , 800-352-5267 as the administrator. However, if you are the party starting the arbitration proceeding, you may, subject to our agreement, choose a different arbitration agency or arbitrator that qualifies with the requirements of this Arbitration Provision to act as administrator. In all cases, the arbitrator(s) must be a lawyer with more than 10 years of experience. However, no arbitration may be administered by an arbitration agency or arbitrator that will not follow, or has any policies or procedures materially inconsistent with, the terms of this Arbitration Provision. If, for any reason, the chosen arbitration agency or arbitrator is unable or unwilling or ceases to serve as the administrator, or does not qualify or ceases to qualify as an administrator under the terms of this Arbitration Provision, the parties shall, within 20 days after learning of such inability, unwillingness, cessation or disqualification, agree on another arbitration agency or arbitrator that does qualify under the terms of this Arbitration Provision. In the absence of such agreement, either party may apply to a court of competent jurisdiction for the court to appoint an arbitrator or arbitration agency; provided, however, that such arbitrator or arbitration agency must conduct the arbitration in accordance with this Arbitration Provision.

e.  COURT AND JURY TRIALS PROHIBITED AND OTHER LIMITATIONS ON LEGAL RIGHTS

If arbitration is started with respect to a Claim, or if a court compels a Claim to be arbitrated under this Arbitration Provision, all of the following apply:

i.   There will be no right to try that Claim in court.

ii.  There will be no jury trial on that Claim.

iii. There will be no discovery, except as allowed by the arbitration rules of the administrator or this Arbitration Provision.

iv.  We and you are prohibited from participating in a class action or class-wide arbitration with respect to that Claim (the "Class Action and Consolidation Waiver"). This means that neither we nor you can be a representative or member of any class of claimants or act as a private attorney general or in any other representative capacity in court or in arbitration with respect to that Claim. This also means that the arbitrator has no power or authority to conduct any class-wide arbitration. In addition, this means that claims brought by or against one or more of you may not be joined or consolidated in the arbitration with Claims brought by or against any other depositor or person connected with a different Deposit Account (unless such persons are joint accountholders or beneficiaries on your Deposit Account and/or other Deposit Accounts held by you).

v.   Except as allowed by this Arbitration Provision and the Federal Arbitration Act, the arbitrator's decision will be final and binding.

vi.  Other rights that you or we would have in court may also not be available in arbitration.

f.  Effect of Class Action and Consolidation Waiver
    If the Class Action and Consolidation Waiver is invalidated or not enforced in a court proceeding, then this entire Arbitration Provision (except for this sentence and the Jury Trial Waiver) shall be null and void. Nothing in this paragraph shall affect the right of any party to appeal any invalidation or non-enforcement of the Class Action and Consolidation Waiver. The parties acknowledge and agree that under no circumstances will a class action be arbitrated. The Class Action and Consolidation waiver does not apply to any lawsuit or administrative proceeding filed against us in court by a state or federal government agency even when such agency is seeking relief on behalf of a class of consumers including you. This means that we will not have the right to compel arbitration of any claim brought in court by such an agency.

g.  Location of Arbitration
    Any arbitration hearing that you attend must take place at a location reasonably convenient to your residence.

h.  Cost of Arbitration
    Each administrator charges fees to administer an arbitration proceeding. This may include fees not charged by a court. At your written request, we will pay all filing, hearing and/or other fees charged to you by the administrator or arbitrator in an individual arbitration after you have paid an amount equivalent to the fee, if any, for filing such Claim in state or federal court (whichever is less) in the judicial district in which you reside. If you have already paid a filing fee for asserting the Claim in court, you will not be required to pay that amount again. In addition, the administrator may have a procedure whereby you can seek a waiver of fees charged to you by the administrator or arbitrator. We will pay any fees or expenses that we are required to pay by law or the administrator's rules or that we are required to pay for this Arbitration Provision to be enforced. Notwithstanding any provision in the deposit agreement or any other applicable agreement or any right we may have under applicable law, (i) we will pay your reasonable attorneys', experts' and witnesses' fees with respect to any Claim in the arbitration on which you prevail, whether you or we start the arbitration, or as required by applicable law, but otherwise those fees will be your obligation, and (ii) we will not ask you to pay or reimburse us for any of our attorneys', experts' and witnesses' fees in connection with the arbitration, regardless of which party prevails in the arbitration.

i.  Governing Law
    This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the Federal Arbitration Act and applicable statutes of limitations and claims of privilege recognized at law. In addition to the Federal Arbitration Act, this Arbitration Provision is governed by other federal laws of the United States of America. To the extent federal law does not apply, the law of the state governing your Deposit Account applies. The arbitrator is authorized to award all remedies permitted by the substantive law that would apply if the action were pending in court. At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

j.  Right to Discovery
    In addition to the parties' rights to obtain discovery pursuant to the arbitration rules of the administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under the arbitration rules of the administrator. The arbitrator shall have discretion to grant or deny that request.

k.  Arbitration Result and Right of Appeal
    Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the Federal Arbitration Act. However, if the amount of the Claim exceeds $100,000, any party can appeal the award to a three-arbitrator panel administered by the administrator, which shall reconsider any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall mean the panel of arbitrators if an appeal of the arbitrator's decision has been taken. Subject to applicable law, costs of such an appeal will be borne by the appealing party regardless of the outcome of the appeal.  However, we will consider any good faith, reasonable request for us to pay all or any part of those fees if you are the appealing party.

l.   Notice and Cure; Special Payment

Prior to initiating a Claim, you may send us a written Dispute Claim Notice. In order for a Dispute Claim Notice to be valid and effective, it must: (a) state your name, address and the account number for the deposit account(s) with us that is (are) the subject of your claim; (b) be signed by you; (c) describe the basis of your Claim and the amount you would accept to resolve the Claim; (d) state that you are exercising your rights under the "Notice and Cure" paragraph of the Arbitration Provision; and (e) be sent to us by certified mail, return receipt requested, at The Huntington National Bank, Deposit Account Arbitration, Attention: Customer Service, P.O Box 1558, Columbus, Ohio 43272. This is the sole and only method by which you can submit a Dispute Claim Notice. Upon receipt of a Dispute Claim Notice, we will credit one of your Deposit Accounts for the standard cost of a certified letter. You must give us a reasonable opportunity, not less than 30 days, to resolve the Claim. If, and only if, (i) you submit a Dispute Claim Notice in accordance with this paragraph on your own behalf (and not on behalf of any other party); (ii) you cooperate with us by promptly providing the information we reasonably request; (iii) we refuse to provide you with the relief you request before an arbitrator is appointed; and (iv) the matter then proceeds to arbitration and the arbitrator subsequently determines that you were entitled to such relief (or greater relief), you will be entitled to a minimum award of $7,500 (not including any arbitration fees and attorneys' fees and costs to which you will also be entitled as provided by this Arbitration Provision). We encourage you to address all Claims you have in a single Deposit Dispute Claim Notice and/or a single arbitration. Accordingly, this $7,500 minimum award is a single award that applies to all Claims you have asserted or could have asserted in the arbitration, and multiple awards of $7,500 are not contemplated.

m.   Rules of Interpretation

This Arbitration Provision shall survive (i) the termination or closing of the Deposit Account or related services, (ii) any changes to the Deposit Account or related services, (iii) any legal proceeding, (iv) any use of the right of set-off or any other self-help remedy or other remedy or action, (v) any transfer or assignment of the deposit account, and (vi) any bankruptcy of any party (to the extent consistent with applicable bankruptcy law). Subject to paragraph 6, if any portion of this Arbitration Provision is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this Arbitration Provision, provided that such remaining portions are not then materially inconsistent with the terms of this Arbitration Provision prior to such determination of invalidity or unenforceability. In the event of a conflict or inconsistency between this Arbitration Provision and the applicable arbitration rules, this Arbitration Provision shall govern.

n.   Jury Trial Waiver

TO THE EXTENT PERMITTED BY APPLICABLE LAW, IF A DISPUTE IS RESOLVED IN COURT RATHER THAN ARBITRATION, YOU AND WE HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED UPON OR ARISING OUT OF ANY CLAIM, DISPUTE OR CONTROVERSY RELATING TO ANY OF YOUR DEPOSIT ACCOUNTS OR OTHER SERVICES COVERED BY THIS ARBITRATION PROVISION.

Member FDIC. ⬛®, Huntington®, and ⬛ Huntington®, and 24-Hour Grace® are federally registered service marks of Huntington Bancshares Incorporated. © 2022 Huntington Bancshares Incorporated. The 24-Hour Grace system and method is patented. US Pat. Nos. 8,364,581, 8,781,955, 10,475,118, 10,748,209, and others pending.

FORM: RRBUSCHECKING (11/21)



## THE HUNTINGTON NATIONAL BANK
## NOTICE FOR BUSINESS OVERDRAFT PROTECTION ACCOUNTS

The Federal Deposit Insurance Corporation ("FDIC") is requiring all banks to provide certain disclosures to their customers regarding sweep features linked to deposit accounts in the event the bank fails and is taken over by the FDIC. The requirement to provide this disclosure is general for all banks, and is not related in any way to the current or expected condition of any bank.

If you have chosen a Business Overdraft Protection Account, funds in your checking account are periodically swept out of your checking account in order to pay down the balance of the Business Overdraft Protection Account you have with us.

Funds in your checking account, prior to being swept out of your checking account, are insured up to the applicable FDIC insurance limits, which is limited to $250,000 combined with other funds on deposit with Huntington by the same depositor in accordance with FDIC's aggregation rules. Please ask us if you have any questions.

If the FDIC takes over a bank, the FDIC has indicated it will complete all internal transfers, but will attempt to block transfers from coming into or going outside of the bank.

If the FDIC takes over the bank, funds swept from your checking account to your Business Overdraft Protection Account you have with us are not FDIC-insured, but the FDIC will recognize your claim for the reduction of the balance for the Business Overdraft Protection Account you have with us by the amount of the swept funds.

Member FDIC. ® and Huntington ® are federally registered service marks of Huntington Bancshares Incorporated.
© 2022 Huntington Bancshares Incorporated.

FORM: BUSFDICODP (05/19)



## ELECTRONIC BANKING CARD ADDENDUM FOR BUSINESS CUSTOMERS

**What This Agreement Covers**

This agreement states the terms and conditions that apply when you perform transactions with your electronic banking card(s) issued pursuant to this agreement. The types of transactions available are shown on the "Request to Issue or Cancel Electronic Banking Card(s)" form or in other materials we provide to you from time to time. This agreement also covers additional types of electronic banking transactions that we make available under this agreement from time to time. The terms and conditions in this agreement are in addition to those that apply to any deposit account which may be accessed by a card issued under this agreement. They are also in addition to any other agreement covering electronic banking transactions or services not covered by this agreement.

**General Definitions**

When used in this agreement, the following terms have the meanings described below:

- "you" and "your" means the proprietorship, partnership, corporation, limited liability company, association, or other business entity that signs this agreement.

- "we", "us", and "our" means The Huntington National Bank.

- "card" means any access card we have issued to an Authorized User under this agreement, and includes the card number whether used with or without the physical card.

- "Secret Code" means the four digit code we have issued to an Authorized User under this agreement.

- "ATM" means automated teller machine.

**Authorized Users**

You must designate, in accordance with our procedures, the persons to whom we will issue cards and Secret Codes. Each such person is called an "Authorized User." If you want to revoke or change a person's Authorized User status, you must notify us of such revocation or change in accordance with our procedures. We must have a reasonable time to act on your notice before it becomes effective. You must appoint, in accordance with our procedures, one or more representatives who are permitted to designate new Authorized Users or revoke the authority of any existing Authorized Users. Each Authorized User will have the authority to perform all transactions covered by this agreement, unless: (a) we allow limitations on the authority; and (b) you identify, in accordance with our procedures, the appropriate limitations applicable to that Authorized User at the time of designation or change in status. Each Authorized User may individually perform any transaction regardless of the amount (up to the available balance in the associated deposit account) or whether he/she is otherwise an authorized signer on any accounts that are accessed.

**Authorized Transactions**

Any transaction recognized by us as being performed by an Authorized User's card and/or Secret Code will be an authorized transaction. This is so even if the person using the card and/or Secret Code (a) exceeds his/her authority; (b) does not have your authority; (c) has had his/her authority changed or revoked; or (d) • is not the same person as the Authorized User. You authorize us to honor and you agree to be bound by any such transaction. Notwithstanding the foregoing, we agree that you will not be responsible for certain fraudulent use of a card or Secret Code, as follows:

- The fraudulent use must be by someone other than: (i) you, (ii) the Authorized User issued the card, or (iii) any of your employees, agents or representatives.

- You must have reported to us, in accordance with our procedures, that the card and/or Secret Code was lost or stolen, or was otherwise fraudulently used.

- We must have had a reasonable time to take the steps necessary to block use of the card and/or Secret Code by commercially available means.

- The fraudulent use must occur after you have notified us and we have had a reasonable time to block the use, as indicated above.

You are still responsible for fraudulent use below applicable floor limits, or which we otherwise cannot block using commercially available means.

**Cards and Secret Codes**

We will send to you the cards for each of your Authorized Users along with any Secret Codes that are not preselected by Authorized Users. We reserve the right to limit the number of cards and Secret Codes issued. Each card will have its own Secret Code. An Authorized User must use a card and/or a Secret Code to access the services we provide under this agreement. You agree to recover and return to us any cards that were given to a person who ceases to be an Authorized User.

**Security Procedures**

By entering into this agreement and using the services provided, you agree to comply with all of our present and future security procedures with respect to transactions and services covered by this agreement. This includes, but is not limited to, protection of cards and Secret Codes. Our security procedures are contained in this agreement and in other written procedures we may provide to you. You acknowledge receiving a copy in writing of our current security procedures. You agree that our current security procedures are commercially reasonable in the context of your business operations. We may at any time change our security procedures. We may advise you of such changes to the extent they affect your use of transactions and services under this agreement, but failure to do so will not affect your obligations or our rights. You agree to give all of our security procedures the highest level of confidentiality and to ensure that each card and Secret Code is not used by or accessible to anyone other than the Authorized User to whom it was issued.

**Lost or Stolen Card or Secret Code**

You must notify us immediately if you believe or suspect:

- any card or Secret Code has been lost, stolen, misused, misplaced or improperly disclosed;

- money is missing from an account;

- a statement shows fraudulent activity; or

- there has been any other breach of security.

To notify us, call us at 1-800-525-5678 or write to The Huntington National Bank, Card Security, P.O. Box 1558, Columbus, Ohio 43216. You agree to review promptly all statements that can be accessed by cards, and to report immediately any discrepancy you find. We assume no responsibility to discover or audit any possible breach of security or unauthorized disclosure or use of cards or Secret Codes by you, any Authorized User, or any of your employees, agents, or representatives.

**Transactions**

We may change from time to time the accounts that may be accessed by use of ATMs or other terminals, devices, or services covered by this agreement. We may also change from time to time what transactions will be available to each account. We reserve the right, in our sole discretion, not to accept a requested transaction for any reason. All transactions are subject to our verification. We assume no responsibility for advising you that a requested transaction has not been made. We may without notice limit the number of daily transactions, or types of transactions, and impose amount limits on transactions. Upon receipt of a request for authorization of a transaction made with a card, you authorize us to deduct the amount immediately from the available balance in your account.

**Business Purpose**

You represent to us that: (a) all accounts accessible pursuant to this agreement were established only for business purposes; (b) the transactions performed using the cards and/or Secret Codes will be only for business purposes; and (c) you are a business entity or otherwise intend to use the transactions and services covered by this agreement only for business purposes.

**Charges**

You agree to pay our fees and charges in affect from the time to time for transactions performed under this agreement.

**Account Limitations**

Transactions under this agreement may be subject to any transaction limitations applicable to the account(s) with respect to which the transaction is made.

**Stop Payment Orders**

You may not place a stop payment order on any transaction covered by this agreement.

**International Transactions**

If a card or Secret Code is used for an international transaction, the transaction may be in a currency other than U.S. Dollars. The transaction is an international transaction if the network that presents the transaction to us processes it as occurring outside of the United States, or its territories, possessions or facilities (such as a U.S. military base, U.S. embassy, or U.S. consulate). The transaction is also an international transaction regardless of location if the transaction was in a currency other than U.S. Dollars. We will post an international transaction in U.S. dollars based on Mastercard International's conversion procedure which is based on rates observed in the wholesale market or government-mandated rates, where applicable. The currency conversion rate that Mastercard uses for a particular transaction is the rate for the applicable currency on the date that the transaction occurred. However, in limited situations, particularly where transaction submissions to Mastercard for processing are delayed, the currency conversion rate that Mastercard uses may be the rate for the applicable currency on the date that the transaction is processed. Also, networks through which an international transaction occurs may charge fees that are added to the transaction amount. As a result, the amount posted to your account may be a different amount than the original amount of the transaction. There may be restrictions or prohibitions that prevent use of the card or Secret Code for certain international transactions or for transactions involving certain countries. We charge an international transaction fee that is a percentage of the amount posted to the account for an international transaction. See the applicable Business Account Charges Form for the applicable percentage.

**Other Networks**

The types of transactions available on ATMs or other devices may depend on the location or type of ATM or other device. It may also depend on whether or not we own the ATM or other device or what network it is in. We may, at our option, from time to time without notice, make certain transactions available on ATMs or other devices that we do not own. We do this through other ATM or electronic banking networks. These networks may impose additional or different terms and conditions, including but not limited to additional fees and different transaction limits. By using your card and/or Secret Code at such ATMs, you agree to such terms and conditions. You also agree to indemnify, defend, and hold us harmless from and against any losses we suffer as a result of your use or attempted use of such ATMs or other devices.

**Limitations on Our Liability**

We shall not be liable to you, any Authorized User, or anyone else for:

- damages or injury resulting in whole or in part from any criminal or tortious act committed by a third party at an ATM or otherwise:

- errors, failures, or delays in transmission and/or processing of transactions as a result of:

    - acts of God, fire, flood, adverse weather conditions or other catastrophes, wars, riots, acts of the public enemy, or acts of governmental authority;

    - labor difficulties or strikes;

    - hardware or software failure or destruction, or other equipment problems;

    - the unavailability, interruption or malfunction of communication facilities or utilities;

- the inability to perform a transaction because of insufficient funds or credit in the account, or because the account is closed or is otherwise not in good standing;

- refusal of a merchant or other third party to honor a card or Secret Code;

- restrictions on the account caused by legal process or other claim;

- delays or failures to act by you or any Authorized User; or

- any other act or omission beyond our control.

We shall be liable only for our own gross negligence or willful misconduct.

WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SERVICES WE PROVIDE YOU UNDER THIS AGREEMENT, INCLUDING. WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**Indemnification**

You agree to indemnify and hold us harmless from and against any and all claims, demands, expenses (including reasonable attorney fees and costs), losses, or damages claimed by any third parties (including but not limited to any Authorized User) arising out of any transaction or attempted transaction covered by this agreement, or your breach of this agreement.

**Error Detection**

Notwithstanding any security procedure which may from time to time be in effect for detecting errors in transactions covered by this agreement, we shall have no duty to discover or report to you any such errors. Neither shall we be liable to you for the failure of such security procedure to detect such errors so long as we have applied such security procedures in a commercially reasonable manner.

**Changing the Terms of This Agreement**

We have the right to make changes or additions to this agreement at any time. This includes changes or additions to the fees and charges applicable to the transactions and services covered by this agreement. If notice of any change or addition is required by law, we will give you any notice the law requires.

**Notices**

Except as otherwise provided in this agreement, all notices from us will be effective when (a) we mail or deliver them to the last address that we have for you in our records, or (b) when we make such notices available to you through Business Online.

**Terminating This Agreement**

We may terminate this agreement, or some or all of the services we provide under this agreement, at any time. You are required to destroy any card when we ask you to. In addition, you must destroy any card linked to any account that is closed. You may terminate this agreement at any time by notifying us in writing, destroying all cards, and no longer using any of the services covered by this agreement.

**Survival**

All warranties, indemnities, confidentiality requirements, representations, acknowledgements and understandings will survive the performance and termination of this agreement.

**Assignment**

We reserve the right to assign or delegate this agreement and our responsibilities under this agreement, or any part of them, to any affiliate or to any other third party who assumes any deposit account which you access with a card.

**Law That Applies**

This agreement is subject to federal and Ohio law. If any of the terms of this agreement cannot be legally enforced, they will be considered changed to the extent necessary to comply with applicable law.

**Entire Agreement**

This agreement is the entire agreement and understanding between you and us with respect to the subject matter of this agreement and supersedes all prior oral discussions and writings. If there is a conflict between what one of our employees says and the terms of this agreement, the terms of the agreement shall control.

**Attorney Fees**

If we become involved in legal action to defend or enforce this agreement, you agree to pay our reasonable attorney fees and costs, to the extent not prohibited by law.

Member FDIC. ® and Huntington® are federally registered service marks of Huntington Bancshares Incorporated. © 2022 Huntington Bancshares Incorporated.

FORM: ELECBANKCRDADDENDUM1 (07/21)

# EXHIBIT 8



# TREASURY MANAGEMENT SERVICES AGREEMENT

This Treasury Management Services Agreement (this "**Agreement**") is entered into by and between The Huntington National Bank ("**Bank**," "**we**," "**our**," or "**us**"), a national banking association with its main office located at Huntington Center, 41 South High Street, Columbus, Ohio 43287, and each Company as identified on the Authorization and Agreement for Treasury Management Services or other document requesting treasury management services ("**Authorization**") and governs the treasury management services described in Parts II through XVI below (each a "**Service**"; collectively, the "**Services**") to be provided by us. The terms "you" and "your" refer to each Company identified on the Authorization.

**Business Security Suite:** We have available certain products designed to discover or prevent unauthorized transactions, including unauthorized checks and ACH debits, forgeries, and alterations. While no such product is foolproof, we believe that the products we offer will reduce the risk of loss to you from fraud.

**You agree that if your account is eligible for those products and you choose not to avail yourself of them, then we will have no liability for any transaction that occurs on your account that those products were designed to discover or prevent, nor will we have any duty to re-credit your account for any such losses.**

**Huntington also recommends that all customers initiating Payment Orders use the following Security Procedure(s) based on the type of payment and method of submission:**
**Payment Center (submit via Digital Tool):** Two unique User IDs assigned to two unique users. If you decline these Huntington recommendations, please understand that you will be solely responsible to design and implement verification methods prior to submitting Payment Orders to Huntington via Huntington-provided applications or direct transmission.

**Integrated Payables:** Two unique User IDs assigned to two unique Administrative Users who can approve batches (Company Program Administrator or Administrative User with Final Approver permission). User ID #1 used to enter the payment request and User ID #2 subsequently used to approve the request.

**Payment Center (submit via Payments Automation/File Transmission):** Payments Automation ID used to submit a payment request via direct file transmission and a unique User ID assigned to a human user used to subsequently approve each payment via the Payment Center online application.

**Direct ACH File Transmission:** ACH File Control Totals submitted via Direct ACH File Manager accessed via online application or by separate file transmission.
**Phone-In Wire Transfer (using PIN):** Two unique PINs assigned to two unique callers: PIN #1 used to phone in the wire request and PIN #2 subsequently used to approve the request.

**If you decline these Huntington recommendations, please understand that you will be solely responsible to design and implement verification methods prior to submitting Payment Orders to Huntington via Huntington-provided applications or direct transmission. Therefore, Company acknowledges their authentication responsibility for Payment Orders manually input into or transmitted to a Huntington system. Huntington will be responsible for processing the Payment Order as received.**

You may be required to sign additional agreements (i.e., amendments) or complete other Implementation Documentation before certain Services will be made available to you. Unless otherwise expressly provided, to the extent any terms or provisions of this Agreement directly conflict with the terms or provisions of any such additional agreements or Implementation Documentation, the terms and provisions of those additional agreements or Implementation Documentation shall control with respect to the Services they cover. Unless otherwise expressly provided, to the extent any provisions of the General Terms and Conditions set forth in Part I directly conflict with any other Part, the provisions of such other Part shall control with respect to Services described in that Part. You must maintain and designate checking/demand deposit accounts with us (each, an "**Account**"), which we will use for debiting or crediting with respect to all payments, debits, and deposits and related adjustments and charges. Except as otherwise provided, you must have collected and available funds on deposit in your Account(s) sufficient to cover your obligations under this Agreement.

® and Huntington® are federally registered service marks of Huntington Bancshares Incorporated.
Member FDIC. © 2022 Huntington Bancshares Incorporated.
Revised 08.01.22



CONTENTS

PART I:      GENERAL TERMS AND CONDITIONS.............................................................................3
PART II:     ACCOUNT RECONCILEMENT SERVICES ......................................................................8
PART III:    AUTOMATED CLEARING HOUSE ORIGINATION SERVICES....................................9
PART IV:     AUTOMATED SWEEP SERVICES.................................................................................12
PART V:      BUSINESS SECURITY SUITE SERVICES ...................................................................16
PART VI:     CASH DEPOSIT AND FULFILLMENT SERVICES.......................................................19
PART VII:    CONTROLLED DISBURSEMENT SERVICES..............................................................21
PART VIII:   EBILL PRESENT & PAY..................................................................................................22
PART IX:     ELECTRONIC DEPOSIT SERVICES ...........................................................................25
PART X:      ESCROW SOLUTION SERVICES.................................................................................27
PART XI:     INFORMATION REPORTING SERVICES.....................................................................28
PART XII:    INTEGRATED PAYABLES .............................................................................................30
PART XIII:   LOCKBOX SERVICES....................................................................................................31
PART XIV:    REAL TIME PAYMENTS…..............................................................................................33
PART XV:     WIRE TRANSFER SERVICES.......................................................................................35
PART XVI:    ZERO BALANCE ACCOUNTING SERVICES...............................................................37
PART XVII:   GLOSSARY OF TERMS ................................................................................................39



## PART I: GENERAL TERMS AND CONDITIONS

**Section 1. <u>Our Services</u>.** We will provide you with each of the Services that you choose to use on the Authorization and any addendum or amendment thereto, or any subsequent Authorization, subject to the terms and conditions of this Agreement. We may offer additional services to you, which additional services may be represented by separately executed agreements that may incorporate the terms and conditions of this Agreement. Our Business Deposit Accounts Rules and Regulations and deposit account disclosures (i.e., Funds Availability Schedule) governing your Accounts ("**Account Rules**") shall continue to apply. In the event of any direct conflict between this Agreement and the Account Rules, the terms of this Agreement shall govern, but only to the extent reasonably necessary to resolve the conflict. Capitalized terms used in this Agreement that are not defined in the text are defined in the Glossary in Part XIV. You shall use the Services solely to carry on your lawful business, and you shall not use any of the Services to process or facilitate transactions for or on behalf of any third party without obtaining our prior written consent.

**Section 2. <u>Fees: Funds Availability: Overdrafts</u>.** You agree to pay us the applicable fees and charges disclosed to you for use of the Services. We reserve the right to change any fees at any time. Any new fees will take effect with the next account analysis or statement period after we send notice to you that a change in fees has occurred, unless some other effective date is set forth in such notice. Unless other arrangements are made with us, including reduction in fees through account analysis and compensating balances as calculated by us, you agree that we are authorized to charge the fees and charges to any of your Account(s) when due. You shall be responsible for payment of all sales, use or excise, value added, utility or other similar taxes relating to your use of the Services. Deposits made using any of the Services are subject to our Funds Availability Schedule. With respect to any Service, we may, at our sole discretion, allow an overdraft to occur in your Account. Except as we agree or advise you otherwise in writing, you must repay us immediately, without demand, the amount of such overdraft plus any overdraft fees, charges or interest. In such cases, the fact that we previously allowed an overdraft to occur does not obligate us to do so in the future. For purposes of satisfying your payment obligations, we may consider any overdraft line of credit or other arrangement you have with us.

**Section 3. <u>Communication Methods: Online Services</u>.** You will select during the implementation process for any Service a means of communicating with us for use of that Service and for executing transactions in connection with such Service, including telephone, facsimile, email, and electronic transmission (a "**Communication Method**"). Information and instructions may be sent and received by you using such Communication Method. Certain Services may require you to use a Web Portal or may otherwise not have all Communication Methods available for use. The terms of the agreements governing any Web Portal we provide are hereby incorporated herein. In the event of any direct conflict between this Agreement and agreements governing a Web Portal, the terms of the Web Portal agreement shall control, but only to the extent reasonably necessary to resolve the conflict. A Web Portal shall be deemed a Communication Method under this Agreement.

You are responsible for obtaining, installing, maintaining and operating all hardware, software, and internet access necessary and appropriate to access Services. You must obtain or have appropriate firewalls, anti-spyware software, anti-viral software, network security, and environmental security to prevent unauthorized access to Services through your facilities, networks, or equipment. You will be solely responsible for any loss, liability or damage relating to phishing, pharming or similar scams. You are responsible, at your sole cost and expense, for obtaining and maintaining your communications link to Services and to ensure that your use of such communications link is in compliance with applicable requirements, including any requirements of telecommunications companies and authorities.

**Section 4. <u>Security Procedures: Your Responsibility</u>.** You agree to comply with all of our Security Procedures with respect to Services covered by this Agreement. Our Security Procedures are contained in this Agreement and in other written procedures we may provide to you, whether via a separate writing or via a Web Portal. Our Security Procedures may include the issuance of online login ids, passwords, or personal identification numbers ("**Passwords**"). You agree that your use of the Services constitutes your acceptance of the Security Procedures (including the use of Passwords) as commercially reasonable in the context of your business operations. You agree to give all of our Security Procedures the same level of confidentiality you would give to your own Security Procedures and ensure that Passwords are not used by or accessible to anyone other than those individuals to whom they were issued. You agree that the Security Procedures are designed to prevent unauthorized access and not to detect errors in transactions. Notwithstanding any Security Procedures that may from time to time be in effect for detecting errors in transactions undertaken pursuant to any of the Services, we shall have no duty to discover or report to you any such errors, and neither shall we be liable to you for the failure of such Security Procedures to detect such errors.

You agree you shall be liable for all use of the Services under this Agreement and any and all transactions made, authorized, or blocked when we receive required information or instructions in accordance with our Security Procedures, including but not limited to, use of Passwords assigned to your employees, even if the person sending information or instructions has exceeded his/her authority; (ii) does not have authority from you; (iii) has had his or her authority changed or revoked; or (iv) is not the same person as the employee whose Password is being used. If you permit any Affiliate or other Person to access one of our Services through any Communication Method or Password, we will not be responsible or liable for such Affiliate or Person's use or misuse of our



Services or access to Accounts for which you did not authorize that Affiliate or Person to have access and you agree to be liable for any such use of the Services. We may and will treat all instructions and information received by us through this arrangement as provided by and for the benefit of you and subject to all our rights under this Agreement with respect to the pertinent Services.

**Section 5. <u>Confidentiality of Passwords and Access Devices</u>.** You acknowledge and agree that Passwords are strictly confidential and should only be disclosed to the Master User or Authorized Users (as defined in Part XIV) to whom they were assigned. You must instruct the Master User and all Authorized Users that they should not disclose their Passwords to anyone, including your other employees. You agree to establish and maintain procedures reasonably adapted to assure the confidentiality of the Passwords and to be solely responsible for the security of Passwords. We are not responsible or liable for any loss or damages in connection with transactions made using Services if supplied with required Passwords.

If you believe a Password for a Master User has become known by unauthorized persons (whether or not employed by you), then you must contact us immediately by telephone during a Business Day and we will, as soon as practical, remove the compromised information from the system, and issue new Passwords in accordance with our security requirements. You must also re-issue any Passwords for Authorized Users used to perform unauthorized transactions. If you believe a Password for an Authorized User has become known by unauthorized persons (whether or not employed by you), you must (i) immediately remove the compromised Password from access to the Services, (ii) issue a new Password to the Authorized User(s) whose Password was compromised, and (iii) immediately notify us of any unauthorized transactions. We reserve the right to change or suspend Passwords at any time upon notice.

**Section 6. <u>Your Duty to Review and Inspect</u>.** You are responsible for promptly reviewing and inspecting any and all invoices and Records (as defined in Part XIV). Except as otherwise provided in the description of a particular Service, you agree to notify us of any errors or discrepancies with regards to fees or invoice charges within thirty (30) days after the invoice or Records which contain such errors or discrepancies are received by you or otherwise made available to you (including through any Web Portal). You must immediately notify us of any transactional errors or discrepancies. If you fail to notify us of such error or discrepancy within the afore-mentioned time periods in which such information or Records is received by you or otherwise made available to you by us (including through any Web Portal), then you shall be precluded from asserting such error or discrepancy against us. Notwithstanding the foregoing, we reserve the right to, but are not obligated, in our sole discretion, adjust transaction records for good cause at any time.

**Section 7. <u>Financial Review</u>.** You shall, upon our request, promptly provide us with financial information and statements as we determine to be reasonably necessary or appropriate. Such information may include, but shall not be limited to, audited financial statements, including balance sheets, income statements, statements of retained earnings, and consolidated statements of changes in financial position, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year and all prepared in accordance with GAAP consistently applied. Notwithstanding the foregoing, if you are a publicly traded entity, you shall, upon our request, provide or make available to us your most recent publicly available annual consolidated statements of financial condition in lieu of the aforementioned financial information.

**Section 8. <u>Indemnification</u>.** You will indemnify and hold us harmless from and against any and all Losses arising out of or related to any claims and demands made, asserted, or threatened by any person (whether an individual or other legal entity) that is not a party to this Agreement which may be incurred by us relating to or arising out of this Agreement; other than those arising out of our gross negligence or willful misconduct. In addition, if we become involved in legal action to defend or enforce this Agreement against you, you agree to pay our reasonable attorneys' fees and costs if we prevail in any such action, to the extent not prohibited by law. The preceding two sentences may not apply if you are a public funds customer (e.g. government or public university) and the governing state law or rule, regulation or regulatory opinion prohibits indemnification by such entities.

You also agree to reimburse us for any and all fees, penalties, fines, costs or the like assessed against us by the National Automated Clearing House Association ("NACHA") for any violation of the ACH Rules, or by any Governmental Authority with jurisdiction over us, that is incurred by us due to actions we take under this Agreement as instructed by you.

**Section 9. <u>Limitation of Liability</u>.** Notwithstanding any provision of this Agreement providing to the contrary, our liability to you for failure to exercise ordinary care resulting in a delay in executing, improper execution of, or failure to execute a transaction shall be limited to actual damages sustained by you that are a direct result of our failure to exercise ordinary care in providing the service. Failure to exercise ordinary care shall not be inferred by reason of a loss of a Check, deposit, transaction, or Entry, or any other Item. We shall not be responsible for your acts or omissions, those of your Vendor (as defined in Section 22 of this Part), agent or employee, any other party providing services to you, or any other person or entity, including, without limitation, Fed Wire, SWIFT, Telex, any automated clearing house, or any other financial institution. We shall not be responsible for any Loss arising from or in connection with any inaccuracy, act or failure to act on your part or on the part of any person not within our reasonable control. We shall not be responsible for any charges imposed by any Vendor or other third party not retained by us as our Processor (as defined in Section 23 of this Part). Our liability hereunder for interest losses will be calculated by using a rate equal to the average Federal Funds rate at the Federal Reserve Bank in Cleveland, Ohio and any such compensation shall be limited to the amount of interest lost for a period not exceeding thirty (30) days following your receipt of the confirmation advice, account



statement or when we have otherwise made such information available to you (whichever comes first) less any interest actually earned on the funds. Except as expressly provided in this Agreement, we shall not be required to act upon any notice or instruction received from you or any other person with respect to any matter.

IN NO EVENT WILL WE BE LIABLE FOR A N Y SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE FROM SUBSEQUENT WRONGFUL DISHONOR RESULTING FROM OUR ACTS OR OMISSIONS PURSUANT TO THIS AGREEMENT OR LOST PROFITS WHETHER OR NOT WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE.

**Section 10. <u>Disclaimer of Warranties</u>.** EXCEPT AS PROVIDED IN ANY APPLICABLE SERVICE DESCRIPTION, WE MAKE NO REPRESENTATIONS, WARRANTIES, EXPRESS OR IMPLIED, IN LAW OR IN FACT, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE SERVICES OR EQUIPMENT USED IN CONNECTION WITH THE SERVICES TO BE PROVIDED BY US. NO DESCRIPTIONS OR SPECIFICATIONS, WHETHER OR NOT INCORPORATED INTO THIS AGREEMENT, NO PROVISION OF MARKETING OR SALES MATERIALS AND NO STATEMENT MADE BY ANY SALES REPRESENTATIVE IN CONNECTION WITH THE SERVICES SHALL CONSTITUTE REPRESENTATIONS AND WARRANTIES OF ANY KIND.

**Section 11. <u>Events Beyond Our Control</u>.** We will be excused from any delay or prevention in performance, and will not be responsible or liable for any loss of information, errors or delays in transmission and/or processing of your transactions, damage, cost, loss, or liability, arising out of causes beyond our reasonable control, including, but not limited to, strike, lockout, war, lack of energy, riot, insurrection, fire, flood, unavoidable accident, acts of God, acts of nature or any cause which is attributable to a third party, governmental acts or regulations, legal constraint, computer malfunction including, but not limited to, computer viruses, equipment breakdown, electrical or mechanical failure, or the enactment, or the issuance or operation of any adverse governmental law, ruling, regulation, order or decree. We will not be responsible for any error, delay or loss of information caused by any other person or entity not a party to this Agreement. In the event of any errors or delays by us, we will only be responsible to use ordinary care to correct any such errors or resume transmissions of information required to be made by us as soon as reasonably possible.

**Section 12. <u>Termination of Service</u>.** Either of us may terminate this Agreement, or suspend or terminate any of the Services provided, at any time upon notice to the other party, effective thirty (30) days after such notice is received. In addition, we may terminate this Agreement, or suspend or terminate any Service, immediately without notice (or immediately with notice if legally required), in the event (i) of fraud, suspected fraud, suspected illegal or suspicious activity, safety and soundness considerations, bankruptcy, receivership, merger, business necessity, regulatory compliance, administrative order, judicial order, or breach of this Agreement; (ii) in our good faith opinion your financial condition has become impaired or deteriorated; (iii) your non-use of the Service(s) for a period of six (6) months or more; or (iv) your default on any agreement or instrument between you and us or our Affiliate, or from you in our favor or our Affiliate's favor, but we will use commercially reasonable efforts to provide notice after termination if permitted by Applicable Law. The applicable Services will terminate automatically without notice in the event (a) your Account(s) associated with any of the Services is/are closed, (b) of termination of a Processor contract which is necessary for the performance of the Services, or (c) either we are prohibited by Applicable Law from performing the Services or you are prohibited by Applicable Law from receiving the Services. In the event of any termination, all fees incurred in connection with the effected Services on or before termination will become immediately due and payable. If the funds in the Account used by a particular Service(s) does not have adequate funds available, we may use any other Account to collect any immediately due and payable amounts. No termination by either of us shall relieve the other from responsibility as to any Check drawn, presented, or paid prior to termination of any Service; or, termination initiated but not executed prior to the effective date of termination. We shall have no obligation to provide any Service or execute any transaction or transfer that was not initiated or transmitted prior to the effective date of termination. If you fail to submit necessary documentation, provide necessary access to your business (if applicable), or undertake necessary training (if applicable) during the implementation process for a Service, the Service may be terminated or suspended without notice.

**Section 13. <u>Severability</u>.** If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable as written, that provision will be interpreted so as to achieve, to the extent permitted by Applicable Law, the purposes intended by the original provision, and the remaining provisions of this Agreement will continue intact.

**Section 14. <u>Governing Law; Venue; Waiver of Jury Trial</u>.** Except with respect to the UCC, this Agreement is governed by the laws of the State which governs your Accounts according to the Account Rules, without regard to its conflicts of laws rules. You hereby submit to the exclusive jurisdiction of such State's state and federal courts, and waive any objection to venue and forum non-convenience with respect to actions brought in such courts. Each of you and us expressly and irrevocably waive our right to trial by jury in any matter arising out of or related to this Agreement or any Service.

**Section 15. <u>Complete Agreement</u>.** This Agreement, together with (i) the Account Rules, (ii) any Web Portal agreements, and (iii) any amendments and/or Implementation Documentation, constitute the entire agreement between you and us. Any



representations, promises or conditions in connection therewith not set forth in the foregoing or in a writing signed by all affected parties will not be binding. In the event performance of the Services in accordance with the foregoing would result in a violation of any present or future statute, regulation or government policy to which we are subject, then the foregoing will be deemed amended to the extent necessary to comply with such statute, regulation or policy.

**Section 16. Modification; No Waiver.** We reserve the right to modify, at any time and in our sole discretion, without your consent, and without notice to you unless required by law, any of the terms and conditions set forth in this Agreement, and we may notify you of such changes in writing or by electronic means (including via a Web Portal). Except as otherwise provided in this Agreement or as otherwise stated in the notice (if sent), any modification by us will be effective when we send notice to you. You may modify this Agreement only with signed written consent from us. Except for changes made in accordance with this Section, no deviation, whether intentional or unintentional, shall constitute an amendment or modification of this Agreement, nor constitute a waiver by us of any rights in this Agreement. No delay or omission on our part in exercising any right hereunder shall operate as a waiver of such right or any other right.

**Section 17. Assignment; Parties.** We may at any time assign or delegate our rights or duties under this Agreement. You may not assign your rights or obligations under this Agreement in any way without our prior written consent. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. No other person or entity is deemed to be a third-party beneficiary of this Agreement or any of the Services.

**Section 18. Notices.** Except as otherwise provided in this Agreement, all notices concerning the administration of the terms of this Agreement between you and us that are sent by either you or us shall be in writing and, if to you, addressed to the primary mailing address as shown on our records at such time, and if to us, addressed to our Treasury Management Client Services office at such address as we specify in writing. Any such notice will be effective either on the date it is actually received by the receiving party or five (5) days after it is mailed by first class mail whichever is earlier; provided, however, that any notice sent by you terminating this Agreement or a Service shall be rendered ineffective if you use or avail yourself of any such terminated Service after the date of termination contained in any such notice.

Additionally, you and we each acknowledge and agree that certain notices and communications concerning the operation of Services may be provided by you or us to the other by telephone, fax or electronic means (including email) in accordance with the information provided by the receiving party as specifically set forth in this Agreement or in our Implementation Documentation. Any such notice or communication provided by fax or electronic means will be effective upon verified or successful transmission thereof to the receiving party, and any such notice given by telephone will be effective upon the receiving party's receipt thereof. Unless specifically stated otherwise, each of you and us may rely on such notices or communications given by fax or electronic means as though they are originals. Notwithstanding any terms in this Part to the contrary, any addition, deletion or change to any Services requested by you must be submitted in a form acceptable to us, and no such requested addition, deletion or change will become operative or effective until we confirm to you that such addition, deletion or change has been implemented, which we agree to do within a reasonable period of time.

**Section 19. Representations and Warranties.** You warrant and represent that (a) you are duly organized, validly existing, and in good standing in the jurisdiction in which you are organized; (b) there are no provisions of any law, or any certificate of incorporation, certificate of organization, by-laws, operating agreement, partnership agreement, or any agreement of any kind, nature or description binding upon you which prohibits you from entering into or performing under this Agreement; (c) your execution and performance of this Agreement has been duly authorized; (d) the person(s) executing this Agreement on your behalf is authorized by you to do so; (e) this Agreement is a binding obligation of yours; (f) all Accounts accessible pursuant to the Services were established only for business purposes; and the transactions made with respect to those Accounts will only be for business purposes; and (g) you are authorized to accept for deposit any Checks deposited in your Account(s) or an Account of your Affiliate using any of the Services. You will be deemed to repeat all of the foregoing warranties and representations each time we perform Services under this Agreement. We will be entitled to rely on any written notice or other communication believed by us in good faith to be genuine and to have been signed or authorized by an authorized representative of yours.

**Section 20. Compliance.** The Services are subject to all applicable laws, rules, and regulations, including, without limitation, the Uniform Commercial Code, the Bank Secrecy Act, as well as the rules and regulations of any money transfer systems, clearing houses, or Processors used by us in providing the Services. You and we agree to be bound by all applicable laws, rules, and regulations, as amended from time to time.

**Section 21. License, Copyright, Patents, Trademarks and Other Intellectual Property Rights.** You acknowledge that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Services and any versions thereof, including all Implementation Documentation and instructions relating thereto, are and shall remain our sole property or that of our Processors. You shall not during or at any time after the

expiration or termination of this Agreement in any way question or dispute our ownership thereof. In the event that new inventions, designs or processes evolve in performance of or as a result of the use of any of the Services, you acknowledge that the same



shall be our property, unless otherwise agreed in writing by us. If applicable, we grant you a license to use the Web Portals in connection with the Services provided hereunder during the term of this Agreement.

**Section 22. <u>Vendor</u>.** Any third party servicer or vendor, including any value added networks ("**Vendor**") used by you in connection with any of the Services shall be deemed to be your agent, and you will be liable for (i) any Vendor's failure to comply with any Security Procedures or operating requirements relating to the Services hereunder, (ii) for all fees, costs and expenses owed to each Vendor for its services, and (iii) for any claims, damages, costs and expenses incurred as a result of any Vendor's failure to perform, or delay or error in performing, its services. This paragraph shall survive termination of this Agreement.

**Section 23. <u>Processor</u>.** You acknowledge and agree that we may arrange for some parts of the Services to be performed or provided by a third party service provider, vendor or processor (each a "**Processor**"). Our use of a Processor shall not relieve us of our obligations under this Agreement, and, we and any Processor shall only be responsible for the acts or failures to act by such Processor to the same extent we would incur responsibility therefore under this Agreement if we had so acted or failed to act. You agree not to bring a claim or any form of legal action against any Processor and agree to hold any such Processor harmless in connection with this Agreement and acknowledge that any such claims will be brought only against us.

**Section 24. <u>Unfair, Deceptive or Abusive Acts or Practices</u>.** Where you or your third parties utilize the Services provided herein to display or otherwise present content to consumers, and you create, add, modify or otherwise modify such display or content (your "**Modifications**"), you acknowledge and agree that we shall not be responsible for your Modifications. Notwithstanding the foregoing, you further agree that Modifications shall be clear, concise and not misleading. If we receive notice that the Modifications may be or is violative of this provision, as determined in our sole discretion, you agree to amend or cease use of the Modifications upon our request.

**Section 25. <u>Survival</u>.** All warranties, indemnities, limitations of liability, and confidentiality requirements will survive the performance and termination of this Agreement.

**Section 26. <u>Recording</u>.** We are authorized (but not obligated) to electronically record and retain telephone conversations between you (and your purported authorized representatives) and us.

**Section 27. <u>Headings</u>.** The headings used in this Agreement are for reference and convenience purposes, only, and shall not in any way limit or affect the meaning or interpretation of any of the terms hereof.

**Section 28. <u>Acceptance</u>.** You may accept the terms and conditions of this Agreement by signing the Authorization for this Agreement. Delivery of an executed Authorization via facsimile transmission or other similar method of electronic transmission shall be effective as if it were delivery of a manually delivered, original, executed counterpart thereof. Additionally, your use of any Service shall be deemed an acceptance of all the terms and conditions in this Part I and the Part for that particular Service.



**PART II: ACCOUNT RECONCILEMENT SERVICES**

**Section 1. <u>Disbursement Reconcilement and Deposit Reconcilement Services</u>.** We will provide Deposit Reconcilement Services and/or Disbursement Reconcilement Services to you as set forth in this Part. The Services to be provided to you may consist of any or all of the following as selected by you on the Implementation Documentation:

For Deposit Reconcilement Services: deposit reconciliation, which includes a report of multiple locations depositing into a single Account.

For Disbursement Reconcilement Services:

      A.     Partial reconciliation, which will include a list of Checks paid and items posted by us.

      B.     Full reconciliation that will include a list of both the paid Checks and the outstanding Checks still on file (information provided as to outstanding Checks is contingent upon information supplied by you).

**Section 2. <u>Check/Deposit Stock</u>.** In ordering Checks and/or deposit tickets, you agree to use the specifications provided by us. Your Check(s) must be business sized (8" X 3 3/8"), not personal or consumer sized. If, for any reason, your Checks or deposit ticket stock are substituted with blank stock or stock other than your stock, you hold us harmless from any Losses arising out of the use of such stock. We reserve the right to charge a reject rate or additional fees for any items rejected (i.e., Check quality causing manual intervention) over 2% of the items processed per month. Upon completion of a serial number digit sequence of Check stock, you will not re-use or recycle the same check serial number until at least three (3) months have passed.

**Section 3. <u>Check Issue Data</u>.** If you have full reconciliation you will provide the check issue file information prior to the checks posting for proper reconciliation.



**PART III: AUTOMATED CLEARING HOUSE ORIGINATION SERVICES**

**Section 1. ACH Origination.** We will act as an Originating Depository Financial Institution with respect to Entries initiated by you pursuant to this Agreement and the ACH Rules. Unless otherwise defined in this Part, Part I or Part XIV, all capitalized terms in this Part shall have the meanings ascribed to them in the ACH Rules.

**Section 2. Settlement Account.** You must maintain an appropriately designated deposit account (the "**Settlement Account**") with us for settlement of your ACH transactions. Changes to your Settlement Account may only be made by us through established procedures and the use of set-up forms outlined within the Implementation Documentation. We may, without prior notice or demand, obtain payment of any amount due and payable (including both fees for services and transaction settlements) to us under this Part by debiting your Settlement Account, and shall credit the Settlement Account for any amount received by us for which we have previously received payment from you. You shall maintain a balance of available funds in the Settlement Account or receive credit approval for exposure limits sufficient to cover your settlement obligations. In the event there are not sufficient available funds in the Settlement Account to cover your obligations, you acknowledge that we may debit any other Accounts with us and maintained by you or that we may set off against any amount we owe to you, in order to obtain payment of your obligations.

**Section 3. Transmittal of Entries by You; Transaction Limits.** You shall transmit Entries to us to the location(s) and in compliance with the formatting and other requirements set forth in the ACH Rules and as specified by us. You may transmit Entries using one of the secure Communication Methods as permitted by us from time to time, including, but not limited to, our Web Portals or direct transmission, as set forth in the Implementation Documentation. The total dollar amount of Entries transmitted by you to us on any one day or on consecutive days shall not exceed the transaction limits set by us from time to time.

**Section 4. Processing, Transmittal and Settlement by Us.** Except for On-Us Entries (defined further in this Section) or rejected Entries, we shall (i) process Entries received from you which conform with the instructions provided by us, (ii) transmit such Entries as an Originating Depository Financial Institution to the Federal Reserve Bank or any other ACH Operator, and (iii) settle for such Entries as provided in the ACH Rules. Funds transfers will be originated based on the Entries transmitted or otherwise communicated to us by you, or on your behalf using a Third-Party Service Provider (a "**TPSP**") which shall be deemed your Vendor under this Agreement (regardless of any referral by us). Each such Entry shall be deemed a "Payment Order." You agree that any Entries or Payment Orders originated by you or your TPSP will be solely for your own account and not for the benefit of a third party, unless you are a Third Party Sender You agree to be obligated and liable for any Payment Order submitted by you or by a TPSP on your behalf. The types of funds transfers that you wish to originate will be documented in our Implementation Documentation and must have our approval before you may use the ACH Services. If you are a Third Party Sender, you agree to enter into a Third-Party Processing Agreement with us, in addition to this Agreement. Please note that we do not provide or support ACH Services to a Third Party Sender which has an agreement with another Third Party Sender to act on behalf of an Originator but does not have a direct agreement with us (a "nested Third Party Sender").

    (a)    General Requirements for Payment Orders.

    (i)    *Compliance with Laws.* You acknowledge and agree that each Payment Order, whether submitted by you or a TPSP, will comply with all Applicable Law. You further acknowledge and agree that we may limit or restrict the type of Entries that you may originate. The specific types of Entry limitations are set forth in the Implementation Documentation or other notice we have separately provided to you. Upon our request therefore, you will promptly furnish to us evidence of your compliance with Applicable Law relating to any Payment Order or resulting funds transfer.

    (ii)    *Compliance with Bank's Requirements; Accuracy of Information.* We may, from time to time, prescribe rules or requirements relating to the format of Payment Orders, cut-off times for delivery of Payment Orders for processing, and other administrative rules relating to funds transfers, Payment Orders and the Services governed by this Part. You agree to comply with such rules and requirements. We have no obligation to (a) process or act on any Payment Order that is not received in compliance with this Agreement or the Implementation Documentation or (b) correct, adjust or reverse any Payment Order received, resulting from non-compliance with the terms of this Agreement. You are solely responsible for the accuracy and completeness of all Payment Orders and for obtaining and documenting all authorizations and consents for any and all Payment Orders (and the related funds transfers) as required by Applicable Law (including ACH Rules), and for undertaking appropriate identity verification and other matters as may be required by Applicable Law. You may elect to use a third-party verification or compliance provider, which shall be deemed your Vendor under this Agreement (regardless of any referral by us). We are not responsible for detecting errors in any Payment Order and are entitled to rely on any Payment Order and other information in the form received from you. Any Payment Order received by us after the cut-off time established by us may be treated by us as being received on the next succeeding Business Day. In the event of a discrepancy between our records and your records with respect to any Payment Order, our records will be presumed to be correct.

    (b)    Security Procedures. Your use of the ACH service constitutes your acceptance of our Security Procedures as a commercially reasonable means of authenticating a Payment Order communicated to us by you or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any Payment Order. Any Payment



Order communicated by you or on your behalf shall be effective as your Payment Order, and shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such Payment Order is received in accordance with the applicable Security Procedures, and if we accept such Payment Order in good faith. In addition, if any Payment Order was actually communicated or authorized by you or you otherwise benefited from such Payment Order (or resulting funds transfer), then you will be obligated to pay us the amount of the related funds transfer without regard to whether we complied with the Security Procedures. We may, in our discretion, use additional procedures to verify the authenticity of any Payment Order. You agree to implement any other reasonable authentication or Security Procedures established by us. You expressly agree that the funds transfers and Payment Orders communicated by a TPSP via direct connection with us or our ACH Operator shall be deemed in compliance with the Security Procedures and commercially reasonable.

(c)     Compliance with Security Procedures. If you choose to communicate any Payment Order (including any cancellation thereof) to us in a manner that varies from the established Security Procedures, and if we accept such Payment Order in good faith, then you agree to be bound by such Payment Order, whether or not authorized, and you will be deemed to have refused the Security Procedures that we offer and recommend as "commercially reasonable," and be obligated to pay us the amount of such Payment Order (or resulting funds transfer). However, we have no obligation to accept any Payment Order that is not communicated in compliance with the established Security Procedures. We are not responsible for refusal to act upon any Payment Order received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order in accordance with the Security Procedures have failed or where such action is delayed until verification can beobtained.

(d)     Rejection of Payment Orders. We have the right to reject, and refuse to accept, any Payment Order for any reason, including your failure to maintain a sufficient balance of collected funds in an Account; *provided, however,* that in rejecting, or refusing to accept, any Payment Order, we shall act in good faith and use our reasonable business judgment. We will have no liability to you or any Affiliate based on such rejection or refusal of any Payment Order. If we determine that processing or honoring any Payment Order would cause the Settlement Account to be overdrawn, we may, but have no obligation to, execute the Payment Order and (i) create an overdraft in Settlement Account or (ii) transfer to the Settlement Account from another Account, funds sufficient to cover the deficiency in the Settlement Account. If any Payment Order is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a corrected Payment Order to us.

(e)     Cancellation or Amendment of Payment Order. You have no right to cancel or amend any Payment Order after it has been received by us. However, to the extent permitted by Applicable Law (including ACH Rules), we will use reasonable efforts to act on your request to cancel any such Payment Order before we process it, but we will have no liability if such cancellation is not affected. To the extent permitted by Applicable Law, we will also use reasonable efforts to, upon your request, reverse an Entry after we have processed such Entry, but we will have no liability if such reversal is not affected.

(f)     Transmittal and Settlement of On-Us Entries. We will transmit each Entry (other than an Entry where we, or at our option, our Affiliate, is also the Receiving Depository Financial Institution ("**RDFI**") (an "***On-Us Entry***")) that complies with this Agreement to the ACH network before the applicable deadlines if you timely deliver to us a complete and conforming Payment Order. We will settle for each such Entry in accordance with the Applicable Law and industry practice. In the case of an On-Us Entry, we will credit or debit, as appropriate, the account of the Receiver in the amount thereof on the effective date contained in the related Payment Order provided that the effective date is a Business Day. You hereby acknowledge that credit given by the RDFI to the Receiver for payment made via Entry is provisional until the RDFI receives final settlement for such Entry. You are hereby notified and agree that if the RDFI does not receive final settlement, the RDFI is entitled to a refund from the Receiver in the amount of the credit to the Receiver's account, and you will not be considered to have paid the amount of the Entry to the Receiver.

(g)     Inconsistency of Name and Account Number. We are not responsible for detecting errors in any Payment Order, including the identifying number of any intermediary bank or beneficiary's bank, even if that number does not correspond to the bank identified by name. You acknowledge and agree that funds transfers may be made on the basis of account number or other identifying number (including a bank transit routing number, SWIFT BIC or CHIPS UID Code). We and any receiving bank (including any beneficiary's bank and any intermediary bank) may rely on the account number or other identifying number of any bank (including a bank transit routing number, SWIFT BIC or CHIPS UID Code), person or bank account specified in the Payment Order even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to pay the amount of the Payment Order (or resulting funds transfer) to us is not excused in those circumstances.

**Section 5. Payment by You.** You authorize us to debit your Settlement Account to initiate Entries based on the Payment Orders received by us, and you agree to pay to us the amount of each Entry no later than the date the Entry is processed by us as set forth in the Implementation Documentation, and you hereby authorize us to charge your Account for payment of each Entry, including, but not limited to, any reversed or returned debit Entry. You agree to be obligated and liable for any Payment Order submitted by a TPSP as if such Payment Order was submitted directly by you. We may in our sole discretion (i) refuse to originate



any credit Entry or any batch of credit Entries for which adequate funds are not on deposit in your Settlement Account at the time the Entry is to be sent, even though such credit Entry may have already been received or accepted for processing, (ii) at any time without prior notice require you to pay the aggregate sum of the credit Entries in any batch or any credit Entries before you send such Entries to the ACH network, or before crediting a Receiver's account in the case of an On-Us Entry ("Prefunding", as further described in the Implementation Documentation). If we request that you Prefund a batch of credit Entries, and you fail to so pay for such Entries, then we are not obligated to process any of those Entries or send any Entries to the ACH network or debit or credit the account of a Receiver in the case of an On-Us Entry. If any Entry, including a reversed or returned debit Entry, creates an overdraft in the Settlement Account, then you agree to promptly pay us on demand and in immediately available funds, the amount of any such overdraft and any applicable overdraft fees.  The foregoing payment obligations will survive termination of this Agreement and this Part.

**Section 6. <u>Notice of Returned Transfers</u>.** We will endeavor to notify you through one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation of the receipt of a returned Entry, but we will have no liability to you based on the fact that such notice was not given at an earlier time. Provided that we have complied with the terms of this Agreement in connection with such an Entry, we will have no liability to you based on the return thereof.

**Section 7. <u>Data Retention; Audit</u>.** You shall retain data on file adequate to permit remaking of Entries for seven (7) days following the date of their transmittal to us as provided herein, and shall provide such data to us upon our request.  Also, upon our request, you agree to promptly provide copies of information maintained by you as required by Applicable Law.  In addition, upon request and during reasonable business hours, you agree that we, our regulators, and our auditors shall have access to your records relating to your use of the ACH services as required herein, and by Applicable Law, to evaluate your compliance with Applicable Law.  Failure to allow such access shall be deemed a material breach of this Agreement.

**Section 8. <u>Your Representations and Warranties</u>.** You represent, warrant and covenant that (i) any Payment Order submitted by you to us, or on your behalf by a TPSP, authorizes us to initiate Entries in accordance with the terms thereof;
(ii)  all Payment Orders and resulting funds transfers, and the origination thereof, comply with this Agreement and all Applicable Law, and all authorizations therefor will be obtained and all notifications related thereto will be provided by you before any Payment Order is communicated to us; (iii) any and all Payment Orders are and shall be accurate and complete; (iv) you will maintain all records relating to Transfers as required by Applicable Law; and (v) you shall originate Payment Orders only for your Accounts and not as agent or on behalf of any other third party, and you will notify us of your use of any TPSP or any other Vendor for the ACH services and you shall be responsible for the acts of any such Vendor as if they were your own. You shall be deemed to make on your own behalf, and on behalf of any TPSP, the same warranties to us with respect to Payment Orders and funds transfers as (A) we are deemed to make under the Applicable Law and the ACH Rules with respect thereto and (B) as you would make in connection with items endorsed and deposited to any of your Accounts under the UCC. Moreover, with respect to On-Us Entries, you shall be deemed to make the same warranties with respect thereto as we are deemed to make under Applicable Law with respect to Entries that do not constitute On-Us Entries. Each time a Payment Order is communicated or  delivered by you or your TPSP to us, you reaffirm the representations and warranties set forth in this Section.

**Section 9. <u>Cross Border Entries</u>.** To the extent permitted by us, cross  border Entries are transmitted by us in U.S. dollars and converted to the local currency for receipt in the foreign country at the exchange rate determined by our Processor on the date determined by our Processor, unless you have specifically agreed with the Receiver to send U.S. dollars and the Receiver has an account able to accept such currency.  All risk of fluctuation in the applicable exchange rate is borne by you. In the event of a returned cross border Entry, consumer payments will be credited to you at the originated U.S. dollar amount; corporate payments will be credited to you at the exchange rate determined by our Processor at the time of return.

**Section 10. <u>Notification of Change</u>.** We shall notify you of all Notifications of Change received from the ACH operator relating to Entries previously transmitted by you via the method selected by you, and repair any Entries at such time, for which we will charge a fee. You agree to promptly reflect such changes in your own records pay the applicable fee we charge for such repair.  The fee will apply each time we have to repair an Entry for you.



**PART IV: AUTOMATED SWEEP SERVICES**

**Section 1. <u>Automated Sweep Services</u>.** Pursuant to this Part, you may choose to establish Automated Funds Investment ("**AFI**") or Automated Credit Sweep ("**ACS**") services in connection with your Account(s). For AFI, you may designate multiple Accounts to have the service (hereafter, the "**AFI Account(s)**"). For ACS, you may designate only one Account for the service (hereafter, the "**ACSA**").

**Section 2. <u>Definitions</u>.** For purposes of this Part the terms below shall be defined as follows:

A. "**Available Balance**" means the book or ledger balance minus uncollected funds and hold items.

B. "**Daily Activity Report**" means the written daily confirmations of securities purchase transactions for the repurchase agreement or collateralization option provided to you via our Web Portal or other agreed Communication Method.

C. "**Minimum Transfer Amount**" means an amount initially established by us that represents the minimum amount required before we will transfer funds to the ACSA from your line of credit, or from the ASCA to your line of credit. Before a transfer occurs to or from the ASCA, the Available Balance in your ASCA must vary from the Target Balance by at least the Minimum Transfer Amount. The Minimum Transfer Amount is subject to change at our discretion and we will notify you of such change.

D. "**Money Market Fund**" means any of the money market mutual funds as made available from time to time by us as part of the AFI services.

E. "**Sweep Amount**" means the Available Balance in your AFI Account in excess of the Target Balance, which is available to be transferred from your AFI designated Account(s) to the Sweep Target Account. However, funds will only be transferred to Sweep Target Account if they meet the Variance Amount.

F. "**Sweep Target Account**" means the deposit or investment option to and from which funds are swept in connection with the AFI services pursuant to the procedures described in Section 3 of this Part.

G. "**Target Balance**" means an account balance which will be mutually established by you and us prior to any sweep transactions occurring and which represents the amount of money you elect to remain in each AFI Account after the Sweep Amount is transferred using the AFI services, or the money you elect to remain in the ACSA before or after transfers to or from your line of credit, as applicable. In no event will the Target Balance be less than a minimum amount we will establish from time to time by notifying you.

H. "**Variance Amount**" means an amount initially established by mutual agreement of you and us of the minimum transfer amount to and/or from the AFI Account(s). Before a transfer from a particular AFI Account occurs, the Available Balance in that AFI Account must exceed the Target Balance by the Variance Amount. The Variance Amount is subject to change at our discretion and can vary depending upon your sweep option and other factors. In no event will the Variance Amount be less than a minimum amount we will establish from time to time by notifying you.

**Section 3. <u>Automated Funds Investment Service</u>.** At the end of each Business Day, we will automatically transfer the Sweep Amount to or from your AFI Account(s) and your Sweep Target Account according to our procedures as described in this Section and the Implementation Documentation. You appoint us and we accept the appointment to act as agent for you for the purpose of depositing, withdrawing, transferring and investing funds as described in this Section.

*A* **Sweep Target Account Options.** At the time you establish AFI services, you will choose from one of the Sweep Target Account options offered by us from time to time. You designate the Sweep Target Account option to which its funds are swept based upon your risk tolerance. You must designate only one Sweep Target Account option for the AFI Account(s). *If you invest Public Funds, you must determine which Sweep Target Account option is permissible under applicable state or federal law.*

*1. Repurchase Agreement (NOT FDIC INSURED)*

In the event that you select this option, this Agreement shall constitute a written repurchase agreement as required by law. Each Business Day, we will automatically debit the Sweep Amount from your AFI Account and will transfer to you, as noted on our records, securities with a market value equal to or greater than the Sweep Amount. The securities are held in our account with a Federal Reserve Bank or such other financial institution as we determine, which may be us. The transfer of the securities to you shall be reflected in the Daily Activity Report. We will repurchase the securities from you on the next Business Day. The repurchase price is the Sweep Amount plus the return provided by us as indicated on the Daily Activity Report. We do not retain any right to substitute securities.



We are acting solely as agent for you pursuant to this option in connection with the securities transfer and repurchase transactions described above. Such transactions are intended by both you and us to be sales and purchases. However, if any such transaction is determined to be a loan by you to us, we hereby pledge and grant to you, as security for the performance of our obligation to repay the loan, a security interest in the securities transferred to you.

Such security interest shall automatically attach upon withdrawal of the Sweep Amount from your AFI Account(s) by us pursuant to this Agreement. In the event of a bank failure or default by us in repurchasing the securities, you have the right to direct us to sell the securities and apply the proceeds in satisfaction of our obligation to repurchase. If the value of the securities transferred to you is less than the repurchase price to be paid by us, you may be deemed an unsecured creditor of ours for such deficiency.

FUNDS HELD FOR INVESTMENTS MADE IN THE REPURCHASE AGREEMENT OPTION, AND THE SECURITIES TRANSFERRED TO YOU, ARE NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, THE HUNTINGTON NATIONAL BANK, OUR AFFILIATES OR ANY OTHER BANK, AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC) OR GUARANTEED IN ANY WAY BY THE U.S. GOVERNMENT OR ANY AGENCY THEREOF.

Our repurchase agreement collateral pool from which securities transferred to you are purchased consists of investment grade debt securities issued by private corporations and private label collateralized mortgage obligations. All securities will be rated by Standard and Poor, Moody's, or Fitch as A or higher. This collateral pool also includes single and/or multi-family mortgages, home equity loans, credit card receivables and other debt issuances which have been securitized and structured to create short, intermediate, and long term mortgage-backed and asset-backed securities. These securities generally have an expected weighted average life maturity of less than five (5) years.

**The collateral pool for public funds customers consists solely of treasury notes and debt securities issued by the U.S. Treasury, and federally guaranteed or sponsored agencies such as FHLB, FNMA, FFCB, FHLMC or SLMA; however, we transfer securities from the collateral pool with a market value equal to or greater than 102% of any public funds Sweep Amount.**

2. *FDIC Insured Money Market Account* (the "**Money Market Deposit Account**")

Please note that automated funds transfers between your AFI Account and the Money Market Deposit Account are subject to federal regulations which impose limits as set forth in the "Rules and Regulations for Business Checking Accounts and Business Money Market Accounts." Upon the sixth withdrawal from your Money Market Deposit Account, your entire balance will be transferred to an AFI Account for the remainder of that statement period. If this limit is exceeded, you or we have the right to adjust the Target Balance and the Variance Amount for your AFI Account in order to reduce the number of automated transfers, or you or we can terminate your AFI service.

**3.** *Money Market Mutual Funds* **(*NOT FDIC INSURED*)**

If you select one of the Money Market Funds made available by us from time to time, there is no assurance that a fund will be able to maintain a stable net asset value of $1.00 per share. The rate of return is not guaranteed. We will endeavor to forward to you any proxies, financial statements or other literature received by us in connection with or relating to the shares held in the investment, but we shall be under no obligation to forward such proxies, financial statements or other literature. Your interest in the Money Market Funds may not be transferred, participated, assigned or hypothecated and any such transfer participation, assignment, or hypothecation shall be of no force or effect.

You acknowledge that shares of the above Money Market Funds (i) are not insured by the FDIC; (ii) are not deposits or other obligations of ours and are not guaranteed by us; and (iii) are subject to investment risks, including possible loss of the principal invested. Our sole duty with respect to the Sweep Target Account and the agency relationship with you is to execute purchases and redemptions of shares in the Money Market Funds as you have ordered pursuant to this Agreement. We have not made, and will not make, any recommendations with respect to the nature or investment quality of the Money Market Funds or shares therein, and expressly disclaim any responsibility for your decision to invest in the fund, which decision you represent has been made and will be made without our participation or advice. No officer or representative of ours is or shall be authorized to provide any information to you about the funds other than by the delivery of a prospectus or other related material.

If we decide to terminate a Sweep Target Account option that you have chosen, then we will provide advance notice to you of such termination effective thirty (30) days after we send notice unless a shorter time period is required due to closing of an investment firm. During such thirty (30) day period, you must choose another available Sweep Target Account option or terminate the AFI service.



*For the Money Market Funds and the FDIC Insured Money Market Account Options*. If, after posting all credits and debits, the Available Balance in your AFI Account(s) is below the Target Balance by an amount equal to or greater than the Variance Amount and if there are sufficient funds in the Sweep Target Account, funds are swept back into the AFI Account from the Sweep Target Account to increase the AFI Account balance to the Target Balance.

**B. Interest and Dividends.**

(i) For the Repurchase Agreement Sweep Target Account Options. At the opening of the next Business Day, the available balance in your AFI Account(s) will reflect the amounts in your Sweep Target Account so that the funds are immediately available to you for intra-day banking needs. Interest, or rate of return, is calculated on the Sweep Amount and is credited as a separate transaction to your AFI Account(s) at the end of the next Business Day.

(ii) For FDIC Insured Money Market Account Sweep Target Account Option. The Money Market Deposit Account will earn interest as described in, and is otherwise subject to, the terms set forth in our Account Rules. Interest is credited as a separate transaction to your Money Market Account monthly.

(iii) For Non-FDIC Insured Money Market Fund Options (Including those affiliated with The Huntington National Bank). All income earned on the investment will be termed "Dividends." Dividends shall be calculated at a rate determined by the fund, net of all service and transaction charges imposed by (i) the fund, (ii) its custodian and/or (iii) its transfer agent. Such Dividends shall also be calculated net of our fees pursuant to our current fee schedule which may be amended as set forth in Part I. Dividends are credited as a separate transaction monthly. We may also receive investment management and other administrative fees with respect to your shares of the money market funds from such funds, their distributors or investment advisers. These fees are set forth in the prospectuses of the money market funds.

**C. Changing Investment Options.** You may change your Sweep Target Account option only by completing and delivering to us the appropriate form approved by us, and you must notify us by contacting your account officer or Treasury Management representative. Changes in the Sweep Target Account option may require opening a new Sweep Target Account and closing the existing Sweep Target Account. In such case, you authorize us to deposit, withdraw or otherwise transfer money, or to purchase or sell securities, as required to accomplish the change to your Sweep Target Account.

**D. End of Year Reporting Requirements.** We are required to report to the Internal Revenue Service (IRS) interest or other income paid in connection with the Repurchase Agreement, taxable Money Market Funds, and FDIC Insured Money Market Accounts. We will provide you an IRS Form 1099 if you elect to sweep funds to any of the Sweep Target Account options described in the prior sentence any time during the tax year.

**Section 4. Description and Terms of Automated Credit Sweep Services.** In order to maintain your Target Balance in your ACSA, you authorize us to draw on your revolving line of credit ("**LOC**") from time to time and deposit such advances to your ACSA, and debit your ACSA from time to time to make payments on your LOC. ACS services are available only with lines of credit with maximums and minimums as established by us from time to time. Even if the principal amount of your LOC falls below any minimum principal amount we have so established, you may not lower your Target Balance below any minimum we have established.

After the end of each Business Day, we will post all credit and debit transactions to your ACSA, and we will calculate your Available Balance.

(i) If your Available Balance is above the Target Balance by an amount greater than or equal to the Minimum Transfer Amount, we will debit the amount by which such balance exceeds the Target Balance and apply such amount to repayment of your LOC in accordance with the promissory note and/or loan agreement executed by you.

(ii) If your Available Balance is less than the Target Balance by an amount that is greater than or equal to the Minimum Transfer Amount, you authorize us to draw on your LOC in the amount necessary to attain a balance equal to the Target Balance (up to the LOC maximum principal amount), and we will credit such advance to the ACSA.

(iii) If the Available Balance is above or below the Target Balance by an amount less than the Minimum Transfer Amount or if the Available Balance equals the Target Balance, no transfers to or from your LOC are made.

If you desire to use funds from multiple checking/demand deposit accounts for purposes of determining your Available Balance, you may do so only by using our Zero Balance Accounting service (described in Part XII). In such instance, the Concentration Account used in connection with that Service will be designated as the ACSA used to determine your Available Balance.

**Section 5. Important Notice about FDIC Insurance Coverage in Connection with your Automated Sweep Services**

The Federal Deposit Insurance Corporation ("**FDIC**") is requiring all banks to provide certain disclosures to their customers regarding sweep features linked to deposit accounts in the event the bank fails and is taken over by the FDIC. The requirement to provide this disclosure is general for all banks and is not related in any way to the current or expected condition of any bank.



If the FDIC takes over a bank, the FDIC has indicated that it will complete all internal transfers but will attempt to block transfers from coming into or going outside of a bank.

Currently the applicable FDIC insurance limits for deposits with us are combined with other funds on deposit with us by you in accordance with the FDIC's aggregation rules ("**Applicable FDIC Insurance Limits**"). Funds in your checking account prior to being swept out are insured up to the Applicable FDIC Insurance Limits.

If the FDIC takes over the Bank, funds swept from your checking account to another loan or credit account you have with us are not FDIC insured, but the FDIC will recognize your claim for the reduction of the balance of such other loan or credit account you have with us by the amount of the swept funds.

If you have selected our AFI services, where funds in your checking account are periodically swept into one of the following options that you have selected:

- Into an FDIC-insured money market deposit account with us; or
- Into a non-FDIC-insured investment product.

If the FDIC takes over the bank, funds swept from your checking account to an <u>FDIC-insured money market deposit account</u> with us continue to be FDIC-insured up to the Applicable FDIC Insurance Limits. Funds in the FDIC-insured money market deposit account in excess of the Applicable FDIC Insurance Limits are treated by the FDIC as uninsured deposits.

If the FDIC takes over the Bank, funds swept from your checking account to a <u>non-FDIC-insured investment product</u> will be treated by the FDIC as follows:

- *Sweeps to a Mutual Fund*. Funds swept to a mutual fund are not FDIC-insured if the sweep is completed, but the FDIC will recognize your claim for the value of your ownership interest in the mutual fund. If the sweep is not completed, the FDIC will treat the funds as if they remain in your checking account. The funds in your checking account will be insured up to the Applicable FDIC Insurance Limits and funds in excess of the Applicable FDIC Insurance Limits will be treated by the FDIC as uninsured deposits.

- *Repurchase Agreement Sweep*. Funds swept to the Repurchase Agreement option are not FDIC-insured, but the FDIC will recognize your claim for the value of your interest in the securities. If the value of your interest in the securities is less than the amount of our repurchase obligation, the FDIC will treat such deficiency amount as a general unsecured obligation of ours. If the sweep is not completed, the FDIC will treat the funds as if they remain in your checking account. The funds in your checking account will be insured up to the Applicable FDIC Insurance Limits and funds in excess of the Applicable FDIC Insurance Limits will be treated by the FDIC as uninsured deposits.



**PART V: BUSINESS SECURITY SUITE SERVICES**

Our Business Security Suite services permit you to return Checks and Entries which do not match the Check issue data or Entry data provided by you in advance, among other services described in this Part.

**Section 1. <u>Check Positive Pay Services</u>.** Each Business Day, you shall provide us a report listing the Checks drawn on your Account(s) that day (hereinafter the "**Check Register File**") using an agreed upon Communication Method and in the timeframe specified by us. Each Check Register File submitted shall accurately list all Checks drawn on the Account(s), by check number, dollar amount and any other criteria communicated by us to you, since the last Check Register File was submitted. If you have signed up for the "Payee Positive Pay" option, you must also provide the exact payee name for all Checks in the Check Register File. You agree that we may delay activation of or suspend services unless and until you provide test files to verify that the service is functioning as required and we notify you that the service is active.

Each Business Day, we will process Checks presented against the Account(s) through the check collection system in accordance with our normal procedures. In addition, we will compare the Checks presented against the Account(s) to the Check Register File provided by you. We will pay each Check that matches a Check listed on the Check Register File and charge the respective Account(s). We will create a list (hereinafter an "**Exception List**") of any Checks presented for payment against the Account(s) which do not match a listing on the Check Register File (hereinafter "**Exception Checks**") Exception Checks may include stale-dated Items (using the time period elected by you for a Check to qualify as "stale dated" in the Implementation Documentation and on the face of the Check). If you use our Payee Positive Pay option and the payee name or a reasonable variation thereof does not match the Check Register File, those checks will become Exception Checks and become part of the Exception List. If you have signed up for the "Pay but Correct" option, you may correct Exception Checks for the Check number or dollar amount. If you correct the amount, it must match the written (not numeric) amount of the Check. The Exception List may also contain items that were originated by us as Checks but were converted into an Entry. We will make the Exception List available to you through one of the Communication Methods now or hereafter made available by us as early as is reasonably practical on the next Business Day after the Checks are presented. On the same Business Day an Exception List is made available, you agree to review the Exception List and instruct us, prior to the cut-off time disclosed to you, which Exception Checks to pay and which Exception Checks to return unpaid. In the event that we experience system issues where an Exception List was created that includes all Checks attempting to clear your account, whether or not they appear on the Check Register File, you will then be responsible to make a decision whether to pay or return each item by the cut-off time disclosed to you. We will not be liable for any items over $10,000 that you fail to decision by the cut-off time disclosed to you. If you decision a Check to be returned, you agree the default return reason will be "Refer to Maker". If you select an alternative return reason, you agree that the return reason selected is accurate**.**

If you do not instruct us by the cut-off time using an approved Communication Method on each day Exception Checks are presented, then we will return the Exception Checks unpaid and reverse the provisional debit against the Account(s).

Regardless of any pay decision by you, we have no obligation to pay any Check for which there is a stop payment order or which would create an overdraft. Each Check we pay in accordance with the provisions of this Section shall be deemed properly payable, and you waive any right to assert that any such Check was not properly payable, including with respect to any Check which is a counterfeit, is altered, bears a forged or unauthorized signature, or was otherwise not validly issued.

You may elect to receive notifications from us ("**Alerts**") regarding pending Exception Checks via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply.

**A. Teller Positive Pay.** Teller Positive Pay allows a teller in our branches to compare a Check that someone is attempting to cash with your Check Register File, and, notwithstanding other provisions in this Agreement, refuse to cash the item if: (i) the Check presented is not listed in the Check Register File, (ii) we do not receive a Check Register File, (iii) the Check is stale-dated (using the time period elected by you for a Check to qualify as "stale dated" in the Implementation Documentation and on the face of the Check, (iv) the Check is above any maximum dollar limit set by you, (v) there is a stop payment placed on the Check, or (vi) the Check has been previously paid. Although an Exception List will be provided to you in connection with Teller Positive Pay, you will be unable to use the Exception List to review and make payment decisions

***Please note that you must specifically elect to receive Teller Positive Pay***. If you do not elect to turn on Teller Positive Pay or you subsequently turn off Teller Positive Pay, any Check presented at our branches to be cashed could be cashed despite the information in the Check Register File or a default setting or instructions to return any check not listed in the Check Register File. During the time in which you do not turn on or elect to turn off Teller Positive Pay, you assume all risk for any Checks cashed at our branches, even if not contained in a Check Register File.



**Section 2. <u>Reverse Positive Pay</u>.** Reverse Positive Pay is useful in situations in which you wish to prevent fraud and misuse of an Account(s), but cannot efficiently send us a Check Register File. With Reverse Positive Pay, we provide you with a list on each Business Day which provides images of or lists of Check(s) (by check number and dollar amount) presented to us for payment on your Account(s) (hereinafter an "**Exception List**"). This Exception List will be made available to you using an agreed upon Communication Method and in the time-frame specified by us.

On the same Business Day an Exception List is made available to you, you agree to review the Exception List and instruct us, prior to the cut-off time disclosed to you, of your decision on each Check (*i.e.,* whether to return or pay the Check or pay the Check for a different amount). If you correct the amount, it must match the written (not numeric) amount of the Check.  If you decision a Check to be returned, you agree the default return reason will be "Refer to Maker"**.**  If you select an alternative return reason, you agree that the return reason selected is accurate**.**

If you do not instruct us as to your decision for any individual Check, or the entire Exception List, by the cut-off time using the approved Communication Method on the day the Exception List is presented, we will pay those Check(s) in the Exception List as presented and finalize the provisional debit against the Account(s). In these instances, we will deem your failure to decision any Check as an express authorization by you that such Check be timely paid and charged to the Account(s), regardless of whether such Check is in fact properly payable, and such inaction by you shall constitute a waiver and release by you of any and all claims you may then or in the future have that such Check was not properly payable, including with respect to any Check which is counterfeit, is altered, bears a forged or unauthorized signature, or was not otherwise validly issued. However, we have no obligation to pay any Check for which there is a stop payment order or which would create an overdraft.

**If you elect our Reverse Positive Pay service, you acknowledge and agree that Checks presented to our tellers for cash or immediate credit which are issued, or allegedly issued, by you on your Account(s) will not appear in the Exception List and may be paid by us, and you   agree such Checks are properly payable, and you shall not subsequently contest the validity thereof.**

You may elect to receive Alerts regarding a pending Exception List via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply.

    A.   **Teller Block.  Teller Block prevents the cashing of Checks at the teller line.  If you select the Teller block service, payees may only be able to deposit Checks at the teller line.**   Please note that you will also be prevented from transacting counter checks, withdrawal slips and debit memos at the teller line.

**Section 3. <u>ACH Positive Pay</u>.** ACH Positive Pay services allow you to provide us instructions to (i) block all Entries from posting to your designated Account(s) with us, or (ii) permit individual Entries to post to your designated Account(s) with us.  If you sign up for ACH Positive Pay, we will block all Entries (whether credit or debit) that attempt to post to your Account(s). In order to permit individual Entries, you must provide us, in a timely manner, with all of the required information (as communicated by us), and if  you  do  not  provide us  with all  of  the required information, we will  continue to block such Entry. However, we   will not comply with any instruction to block an Entry that represents the reversal of an Erroneous Entry. The term "**Erroneous Entry**" is defined for purposes of this Section as an Entry that (i) is a duplicate of an Entry previously initiated by the Originator or Originating Depository Financial Institution; (ii) orders payment to or from a person not intended to be credited or debited by the Originator; or (iii) orders payment in a dollar amount different than was intended by the Originator.

You are responsible for reviewing those Entries that are blocked or permitted as required for review of transactions under this Agreement. You may elect to receive notifications from us ("**Alerts**") regarding pending Entries via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply. Unless you sign up for Alerts, we assume no responsibility for advising you regarding pending Entries.

If you send us the required information to allow an Entry or change an Entry (an "**Instruction**") on a Business Day prior to our established cut-off time, and before the Settlement Date of that Entry, we will begin to process such Instruction on that Business Day. If you send us an Instruction after the established cut-off time on a Business Day, but before the Settlement Date of the Entry, we will begin to process such Instruction on the next Business Day. After the Business Day of the Settlement Date of an Entry, we will not follow any Instruction regarding such Entry. The "**Settlement Date**" is the date funds are exchanged between banks with respect to an Entry as reflected on the books of the Federal Reserve Bank.

**Section 4. <u>Check Block Services</u>.** Our Check Block service will automatically return all Checks presented against your Account(s). If you select Check Block, you agree not to issue Checks in connection with the designated Account(s).   We will



return all Checks presented against such Accounts (each, an "**Exception Check**"). However, we will permit any electronic debit, which includes, but is not limited to, Entries (including checks converted to Entries), wire transfers, or other electronic debits, unless specifically blocked or returned pursuant to other services described in this Part.  Please note that you will also be prevented from transacting counter checks, withdrawal slips and debit memos at the teller line.

**Section 5.  Wire Block Services**.  Wire Block services allow you to provide us instructions to (i) block all incoming, outgoing or all Payment Orders from posting to your designated Account(s) with us.  However, we will not comply with any instruction to block a Payment Order that represents a reject of an "**Erroneous Entry"**.  The term "Erroneous Entry" is defined for purposes of this Section as a Payment Order that (i) is a duplicate of a Payment Order previously submitted by you; (ii) orders of payment to or from a person not intended to be credited or debited by you; or (iii) a Payment Order in a dollar amount different than was intended by you.

**Section 6.  Limitation of Liability.**  In no event shall we be liable for any Losses relating  to paying a  Check that was  not properly payable, wrongful dishonor of a Check, or our or your actions  with respect to payment or return of any Check  (under the UCC or otherwise), or our failure to honor any Entry, including return or rejection of  any ACH Debit Entry, to  the extent such payment or return was completed in accordance with the terms of this Part. You agree that we exercise ordinary care whenever we rightfully pay or return a Check, Exception Check, or Entry consistent with the terms of this Part or your instructions. You expressly agree that your failure to timely direct us to return any presented Checks in accordance with the terms hereof will constitute acceptance by you of such presented Checks and each such presented Check will be properly charged against the Account on which it is drawn and we shall have no liability in connection with such presented Checks.



## PART VI: CASH DEPOSIT AND FULFILLMENT SERVICES

**Section 1. Vault Services.** Our Vault services allow you to hire a Vendor to (i) deliver coin, currency, and Checks to us for deposit to your Account ("**Deposit**") or (ii) to order currency or coins ("**Order**") from a vault owned or operated by us ("**Vault**") to be delivered to you by the Vendor. Orders and Deposits will be debited and credited to an existing Account. As used in this Part, "**Vendor**" means a certified armored carrier that is acceptable to us and meets our requirements for transporting coins, currency, and Checks between you and the Vault. In the event that your Vendor ceases to meet such requirements, we may suspend the Vault services until your Vendor meets such requirements.

In addition, you may place Deposits into a Safe on your premises, the contents of which will be delivered to our Vault by the Vendor. As used herein, a "**Safe**" is a safe that utilizes "smart safe" technology, which you must obtain from an approved third party or us, and which will remain our property located at your premises. Notwithstanding that the Safe is our property, you are responsible for any loss or theft of the Safe, and its contents, while the Safe is in your physical possession or on your premises.

A. **Deposits.** The Vendor will pick up and deliver Deposits to the Vault. We may accept Deposits which have been prepared in accordance with our instructions from anyone who purports to be an agent of the Vendor or you. We are not liable for any loss of Deposits in connection with Vault services until they have been delivered to the Vault. We may refuse or not accept a Deposit for any reason at any time; provided, however, that in refusing any Deposit, we shall act in good faith and use our reasonable business judgment. Other than Deposits placed in a Safe, you will receive credit on the next Business Day after we receive, verify, and accept a Deposit at our Vault. For Deposits made via an envelope placed in the Safe you will receive credit on the Business Day we receive, verify, and accept the Deposit at our Vault. However, at our reasonable sole discretion, we will provide provisional credit to you for U.S. denominated currency placed in a Safe on the Business Day you place such currency in the Safe, and such credit will become final once we receive, verify, and accept the Deposit at our Vault. All credits (including advance credits from the Safe) are subject to our verification. We may adjust your Account, whether higher or lower, in connection with reconcilement of Deposits made at the Vault. We may establish limits for the amount of coin and currency that can be placed in the Safe, and we will communicate those limits to you.

B. **Orders.** We may provide an Order to anyone who purports to be an agent of the Vendor or you. Your Account will be debited for the amount of the Order on the day the Order is packed for release to the Vendor. Orders placed for delivery on Saturday, Sunday, or Monday are debited from your Account on the previous Business Day. You must place Orders by the time designated by us from time to time to receive next Business Day delivery. If you do not meet that deadline, we may not process the Order until the following Business Day. Orders exceeding $25,000 (or other amount set by us from time to time) will be debited from your Account on the Business Day such coin and currency is available for release from the Vault to your Vendor. We are not liable for any loss or delay in delivery of Orders and are not a guarantor of any delivery day or time. We may refuse to process an Order for any reason at any time; including, but not limited to, insufficient funds in your Account.

C. **Representations and Warranties.** You represent and warrant to us that: (i) you are the payee or holder of any Checks deposited; (ii) any Checks deposited do not contain image replacement documents, as that term is defined in 12 U.S.C. § 5001 *et seq.* and corresponding regulations ("**IRDs**"); (iii) any Checks included are in such form that we can create electronic files or IRDs that conform to all standards prescribed by 12 U.S.C. § 5001 et seq. and corresponding regulations; (iv) the Deposit does not contain any fraudulent or counterfeit items; (v) no depository bank, drawee, drawer, or endorser will reject presentment or return any Check, or a copy or other paper or electronic version of any Check such that we, a bank, drawer, drawee, or endorser will be asked to make payment based on a check, draft, or other negotiable instrument that a bank, drawee or endorser has already paid; and (vi) Checks are drawn on a financial institution in the United States and are payable in United States currency.

You agree not to deposit items via Vault services that are "ineligible items", as that term is defined by the Board of Governors of the Federal Reserve.

D. **Automatic Termination.** If you fail to use the Vault services for a period of thirteen (13) months, the Vault services will be automatically terminated.

**Section 2. Electronic Coin and Currency Orders.** Huntington provides coin and currency ordering via the telephone as part of its Vault Services. Huntington also supports the use of certain Vendors for coin and currency ordering or other enhancements of Vault Services. By utilizing a Vendor, you agree to the following additional terms:

(i) You acknowledge that we are not responsible or liable for your Vendor, and that your Vendor is responsible for the delivery of services and the hosting of any data provided by you. You will enter into a separate agreement with your Vendor, as your agent for delivering coin and currency order files to us.

(ii) We make no representations or warranties with respect to your Vendor or Vendor's services. You acknowledge that use of a third party Vendor is at your own risk.



(iii)     As such, you release and forever discharge Huntington, its directors, officers, employees and agents from any and all claims, losses, expenses, damages, costs or other liability which may result from the use of Vendor or our fulfilling coin and/or currency orders in response to transactions received through your Vendor; and, you will indemnify and hold us and our Affiliates, directors, officers, employees and agents harmless from and against all losses, expenses, damages, costs and liabilities, including internal and external counsel fees, that may arise out of your use of Vendor or our fulfilling coin and/or currency orders in response to transactions received through your Vendor. Notwithstanding the foregoing, you will have no obligation to indemnify if the losses, expenses, damages, costs or other liability results from our gross negligence or willful misconduct.

**Section 3. <u>Additional Terms and Conditions Unique to SafeCash Manager</u>.** Other than as specifically altered in this Section, all provisions of Section 1 still apply to use of the SafeCash Manager service. If you elect to receive the SafeCash Manager service, you must complete or provide any documents, authorizations, or information we or our approved provider requests and needs for implementation of Services. You are responsible for connectivity to the internet for use of online reporting services provided by SafeCash Manager. You must provide a location to operate the Safe in compliance with its operations manual provided to you. You must allow the approved provider access as necessary to your premises for installation of the Safe, and your premises must be prepared for the Safe prior to its installation.

**Service Term; Termination of SafeCash Manager.** You will automatically be obligated for a service term (and payment for such term) of 60 months ("**Initial Service Term**"). After expiration of the Initial Service Term, your obligation for SafeCash Manager services shall renew automatically each month ("**Successive Service Term**") until you or we terminate it. If you choose to terminate SafeCash Manager prior to expiration of the Initial Service Term, or we terminate SafeCash Manager for cause during the Initial Service Term, you are obligated to pay us the amount of the any fixed monthly fees times the number of months left of the Initial Service Term for each Safe. If we choose to terminate SafeCash Manager without cause prior to expiration of Initial Service Term, you are only obligated to pay for fees associated with SafeCash Manager incurred prior to and during the month of termination. Each time you obtain a Safe from us, or our approved Provider, the Initial Service Term shall commence for that Safe. After termination of SafeCash Manager, all Safe(s) must be returned to us by our Provider. You are obligated to use our Provider to de-install if the Safe(s) is owned by us. You are responsible for all costs associated with de-installing of the Safe(s) (freight, replacement parts, labor, deletion of customer information) which are billed to you.

**A. Equipment Warranty and Maintenance.** We will pass through warranties regarding the Safe received from our approved provider. The approved provider warrants that the equipment will be free from defects in material and workmanship and will substantially conform to the approved provider's published specifications for twelve (12) months (the "**Warranty Period**") after shipment to you. The approved provider will repair or replace, at its option and expense, items of equipment that do not meet this warranty provided you report the problem to approved provider, or us, during the Warranty Period. The approved provider may fulfill warranty obligations at an approved provider designated site or depot. If you return the equipment to the approved provider site for warranty repair, shipping will be at your expense and risk. The approved provider will return the equipment at approved provider expense and risk if the equipment was defective. Replaced items under a warranty event become the approved provider's property. This warranty does not extend to damage caused by normal wear and tear, accident, misuse, disaster, improper supplies or alterations, attachments, parts, or repairs not provided or authorized by the approved provider, and is not in lieu of a maintenance agreement.

Maintenance is in addition to the warranty and covers damage caused by normal wear and tear, but does not cover accidental damage, misuse, disaster, improper supplies or alterations, attachments, parts, or generalized repairs.
Maintenance also does not include equipment which must be updated, for example, modems which become outdated and are no longer operative. Maintenance services by the approved provider are in addition to the fees for Vault Services and/or the SafeCash Manager.

**Section 4. <u>Limitation on Liability</u>.** In addition to the limitations on liability set forth in Part I of this Agreement, you agree that, absent a breach of the standard of care set forth in this Agreement, our verification of the amount of any Deposit made using the services in this Part shall be binding and conclusive upon you, absent manifest error by us, and our liability for any discrepancies or shortages in the amount of any Deposit verified by us shall be limited to the amount of such discrepancy or shortage. Further, we shall have no liability for any discrepancy or shortage in the amount of an Order and the amount of cash received by you from any such Order, it being understood that it is the duty of your Vendor to review and approve the amount of any Order prepared for you prior to such Order leaving our Vault. You agree to fully cooperate in the investigation of any alleged loss or discrepancy.



## PART VII: CONTROLLED DISBURSEMENT SERVICES

**Section 1. <u>Description and Terms of Disbursement Services</u>.** We will identify each controlled disbursement account designated by you (each, a "**CDA**") by providing you a specified Controlled Disbursement Routing Number ("**CDRN**"), which you must use on all Checks issued from the CDAs. You must order checks for each CDA by using the MICR line specification sheet provided by us in connection with each CDA and depicting the CDRN. You shall not use such line specification sheet in connection with ordering Checks for any other Account(s) with us that you have not designated as a CDA. You agree to destroy all unused Checks used in conjunction with a CDA before you designated such Account as a CDA. If you or we terminate Controlled Disbursement services, you agree to immediately stop using and destroy any Checks with the CDRN. You must re-purchase Checks without the CDRN if you continue to use the Account without Controlled Disbursement services. If you continue to use the CDRN on Checks after termination of Controlled Disbursement services for more than one hundred twenty (120) days, we will close your Account and return all Checks attempting to clear the closed Account.

Each Business Day, we will ascertain the amounts payable on all Checks drawn on your CDAs and presented to us for payment and report such information to your (the "**Report**") on that Business Day. We will make the Report available to you via a Communication Method that we may, at our sole discretion, change from time to time. The Report will not include the amount of any Checks presented to us for payment which have been either rejected by our check processing equipment or by Federal Reserve check processing equipment. The Report may, but will not be required to, include electronic payment transactions.

Each Business Day you must access the Report via an agreed Communication Method and determine the total dollar amount required to pay all Checks presented for payment (the "**Presentment Amount**") for each CDA and fund each CDA with the Presentment Amount each Business Day with immediately available funds in accordance with our Funds Availability Policy. You will designate one method to fund all CDAs with the Presentment Amount as set forth on the Implementation Documentation by the applicable cut-off time.

**Section 2. <u>Overdrafts and Charges</u>.** If you fail to fund the CDA with the Presentment Amount for any reason whatsoever, and each CDA individually does not contain enough collected funds to cover the Presentment Amount, we will deem the CDA in an overdraft position ("**Overdrawn**"). At such time, we may charge the CDA any applicable overdraft or non-sufficient funds fees, whether or not we pay or dishonor any or all Checks. We reserve the right to dishonor and return any and all Checks drawn on a CDA (i) if the CDA is Overdrawn, or (ii) that, if cleared, will make the CDA Overdrawn.



## PART VIII: EBILL PRESENT & PAY

**Section 1. eBill Present & Pay Service.** The eBill Present & Pay Service ("**EBPP**") provides electronic presentment of invoices and the collection of payments on such invoices via the web (the "**Web**"), your customer service representative ("**CSR**"), interactive voice response ("**IVR**") system and/or short message system (a "Text"). Automated Clearing House ("**ACH**") and credit card transactions are the acceptable forms of payment. Therefore, in using this Service, you agree to abide by ACH Rules and applicable credit card rules.

**Section 2. Invoice Presentment.** We will provide a webpage which is branded with your company name and logo for your payers to login and view invoices and/or make payments. You shall transmit invoice information to us to the location(s) and in compliance with the formatting and other requirements specified by us. You may transmit invoice information using one of the Communication Methods as permitted by us from time to time, including, but not limited to, our Web Portals or direct transmission, as set forth in the Implementation Documentation.

**Section 3. Payment Channels.** You have the option to select one or more of the following payment channels in which to collect payments from your payers: Web, CSR, IVR and Text. You will also have options available with regards to each payment channel as set forth in the Implementation Documentation.

**Section 4. Payment Processing.** Once your payers create ACH and credit card entries, we will periodically (at least once each Business Day) generate and send files for settlement. Generally, the funds will be available to you on the next Business Day. We will transmit to you, in an agreed upon format, payment information and other data received from your payer through the Web, IVR and Text channels. You must maintain an appropriate designated deposit account (the "**Settlement Account**") with us for settlement and returns of ACH and credit card payments. We may, without prior notice or demand, obtain payment of any amounts due and payable (including fees for services and transaction settlements) to us under this Part by debiting your Settlement Account, and we shall credit the Settlement Account for any available funds received from your payers. You shall at all times maintain a balance of available funds in the Settlement Account sufficient to cover your settlement obligations. In the event there are not sufficient available funds in the Settlement Account to cover your obligations, you acknowledge that we may debit any other Accounts maintained by you with us or that we may set off against any amount we owe to you, in order to obtain payment of your obligations. In addition, we may require a minimum balance to be maintained in the Settlement Account at all times in order to cover any fees and returns (the "**Target Balance**"). We may set the initial Target Balance at any time. We further reserve the right to unilaterally amend the Target Balance upon five (5) Business Days' notice to you.

**Section 5. Processing, Transmittal and Settlement by Us.** We shall (i) process data received from you that conforms with the formatting and other requirements specified by us, (ii) electronically present the data as invoices to your payers; (iii) provide payment channels, which you have selected, to your payers; (iv) collect and settle such payments into the Settlement Account; and (v) provide additional information from the payer to you, as you have selected. You agree that any invoices originated by you will be solely for your own account and not for the benefit of a third party.

    (a)   Your Obligations.

     (i)   *Compliance with Laws.* You acknowledge and agree that use of the Service is for a legitimate business purpose and each invoice will comply with all Applicable Law. You further acknowledge and agree that we may limit or restrict the type of invoices that you may originate. The specific types of limitations are set forth in the Implementation Documentation or other notice we may separately provide to you. Upon our request, you will promptly furnish to us evidence of your compliance with Applicable Law relating to any invoice or resulting payment.

     (ii)   *Compliance with Bank's Requirements; Accuracy of Information.* We may, from time to time, prescribe rules or requirements relating to the format of invoices, cut-off times for delivery of payments for processing, and other administrative rules relating to invoices, payments and the Services governed by this Part. You agree to comply with such rules and requirements. We have no obligation to (A) process or act on any invoice that is not received in compliance with this Agreement, the Implementation Documentation or such rules and requirements; or (B) correct, adjust or reverse any invoice received from you that is not in compliance with the terms of this Agreement, the Implementation Documentation or such rules and requirements. You are solely responsible for the accuracy and completeness of all transmitted data and invoices and for obtaining and documenting all authorizations and consents for any and all invoices and payments (and the related funds transfers) as required by Applicable Law, and for undertaking appropriate identity verification and other matters as may be required by Applicable Law. We are not responsible for detecting errors in any transmitted data, invoice or payment and are entitled to rely on any invoice and other information in the form received from you. Any payment received by us after the cut-off time established by us may be treated by us as being received on the next succeeding Business Day. In the event of a discrepancy between our records and your records with respect to any payment, our records will be presumed to be correct.

    (b)   Security Procedures. Your use of the Services constitutes your acceptance of our Security Procedures as a commercially reasonable means of authenticating the data communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, the data communicated to us. Any data or invoice communicated by or on your behalf shall be effective as your instruction, and shall be enforceable against you,

**Huntington**

whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such data and/or invoice is received in accordance with the applicable Security Procedures, and if we accept such data or invoice in good faith.

In addition, if any data or invoice was actually communicated or authorized by you or you otherwise benefited from such invoice (or resulting payment), then you will be obligated to pay us the amount of the related payment without regard to whether we complied with the Security Procedures if we receive notice of a return. We may, in our discretion, use additional procedures to verify the authenticity of any transmitted data, invoice or payment. You agree to implement any other reasonable authentication or Security Procedures established by us.

    (c)    <u>Rejection of Data Transmissions and/or Invoices</u>. We have the right to reject, and refuse to accept, any transmitted data, invoice or payment for any reason; *provided, however,* that in rejecting, or refusing to accept, any transmitted data, invoice or payment we shall act in good faith and use our reasonable business judgment. We will have no liability to you or any Affiliate based on such rejection or refusal. If we reject any transmitted data, invoice or payment, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice. If any data transmission, invoice or payment is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit the data or invoice, or supply the necessary documentation for the payment.

    (d)    <u>Cancellation or Amendment of Data Transmissions and/or Invoices</u>. You have no right to cancel or amend any data transmission or invoice after it has been received by us. However, to the extent permitted by Applicable Law, we will use reasonable efforts to act on your request to cancel or amend any such data transmission or invoice before we process it, but we will have no liability if such cancellation or amendment is not effected. To the extent permitted by Applicable Law, we will also use reasonable efforts to, upon your request, reverse a payment after we have processed the payment, but we will have no liability if such reversal is not effected.

    (e)    <u>Inconsistency of Name and Account Number</u>. We are not responsible for detecting errors in any payment instruction from your payers, including the identifying number of any [bank], even if that number does not correspond to the bank identified by name. You acknowledge and agree that payments may be made on the basis of account number or other identifying number (including a bank transit routing number). We and any receiving bank (including any beneficiary's bank) may rely on the account number or other identifying number of any bank (including a bank transit routing number), person or bank account specified in the payment even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to return the amount of the payment (or resulting funds transfer) to us is not excused in those circumstances.

**Section 6. <u>Notice of Returned Transfers</u>.** We will endeavor to notify you through one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation of the receipt of a returned payment, but we will have no liability to you based on the fact that such notice was not given at an earlier time. Provided that we have complied with the terms of this Agreement in connection with such a return, we will have no liability to you based on the return thereof.

**Section 7. <u>Data Retention: Audit</u>.** You shall retain data on file adequate to permit remaking of transmittal data or invoices for seven (7) days following the date of their transmittal to us as provided herein, and shall provide such data to us upon our request. Also, upon our request, you agree to promptly provide copies of information maintained by you as required by Applicable Law. In addition, upon request and during reasonable business hours, you agree that we, our regulators, and our auditors shall have access to your records relating to your use of these Services as required herein, and by Applicable Law, to evaluate your compliance with Applicable Law. Failure to allow such access shall be deemed a material breach of this Agreement.

**Section 8. <u>Your Representations and Warranties</u>.** You represent, warrant and covenant that (i) any transmittal data or invoices submitted by you to us, or on your behalf by a Third Party Service Provider ("**TPSP**"), authorizes us to present invoices to your payers; (ii) all transmitted data or invoices, as well as resulting payments, comply with this Agreement and all Applicable Law, and all authorizations therefor will be obtained and all notifications related thereto will be provided by you before any invoice is communicated to us; (iii) any and all transmitted data and/or invoices are and shall be accurate and complete; (iv) you will maintain all records relating to the transmitted data and invoices as required by Applicable Law; (v) you shall originate invoices only for legitimate business purposes and not as agent or on behalf of any other third party, (vi) you will notify us of your use of any TPSP or any other Vendor for these Services and you shall be responsible for the acts of any such Vendor as if they were your own; and (vii) you shall invoice and apply payments to payer invoices or accounts in accordance with Applicable Law. You shall be deemed to make on your own behalf, and on behalf of any TPSP, the same warranties to us with respect to all Payment Orders and funds transfers related to your invoices as (A) we are deemed to make under the Applicable Law and the ACH Rules with respect thereto and (B) as you would make in connection with items collected and deposited to any of your Accounts under the UCC and applicable credit card rules.

**Each time an invoice is communicated or delivered by you or your TPSP to us and each time you receive a payment into your Settlement Account, you reaffirm the representations and warranties set forth in this Section.**



**Section 9.  License, Copyright, Patents, Trademarks and Other Intellectual Property Rights.** You have the right, title and ownership to grant, and hereby grant us, a license to use your company name, logo, copyright, trademarks, trade names and other of your intellectual property rights (the "**Marks**") in connection with EBPP during the term of the Service.   You will indemnify and hold us and our Processors harmless from and against any and all claims that use of the Marks as authorized by you, infringes upon the rights of another.


**Section 10.   Modification of Users and Termination of EBPP.**  You are responsible to notify us of the removal or modification of a Master User, Authorized User and/or termination of the EBPP Service.  ***Updating the Web Portal is not sufficient notification of changes to your EBPP Service***.  Likewise, you are responsible to notify us of the removal or modification of a Master User, Authorized User and/or termination of the Web Portal Service, with respect to your EBPP Service.  ***Updating the EBPP Service is not sufficient notification of changes to your Web Portal.***   Transactions which take place after the modification or termination of a Master User, Authorized User or termination of the EBPP Service will be subject to our review and resolution thereof shall be in our sole discretion.



## PART IX: ELECTRONIC DEPOSIT SERVICES

**Section 1. Remote Deposit Capture and Image Cash Letter.** We allow you to scan your Checks with equipment and software that we provide to you ("**Remote Deposit Capture**" or "**RDC**"), or that you own ("**Image Cash Letter**" or "**ICL**"), in order to create image files that you will send to us and that we may accept for deposit into your Account(s). You will access RDC and ICL and make deposits through an approved Communication Method in accordance with our Security Procedures.  Deposits will be sent to us in the form of an electronic file containing images of Checks ("**Electronic File**").

**A. Electronic Files or IRDs.** You will create for deposit an Electronic File where you are the payee or the holder of the Checks. We may create Image Replacement Documents from such Electronic File. The terms "Substitute Check" and "Image Replacement Document" ("IRD") may be used interchangeably and have the same meaning as defined by 12 U.S.C. § 5001 *et seq*. and corresponding regulations. We may refuse to process or return IRDs or the Electronic File for any reason at any time before accepting such IRDs or Electronic Files for deposit; provided, however, that in returning, or refusing to process, any deposit, we shall act in good faith and use our reasonable business judgment. Your deposits are deemed made when we accept IRDs or Electronic Files for deposit. We in our discretion may notify you that we will or will not accept IRDs or Electronic Files for deposit. Until we accept the Electronic File or IRDs, any information contained in the Electronic Files or IRDs belongs to and is your sole responsibility. Any information from Checks or items contained in the software belongs to and is your sole  responsibility. Any physical Check in your possession or your agent's belongs to and is your sole responsibility.

When you make deposits via RDC or ICL with Electronic Files, you represent to us and agree that:

(i) you are the payee or holder of the Checks;

(ii) the Electronic Files contain exact images of the front and back of the Checks which you seek to deposit;

(iii) the Electronic Files enable us to create IRDs that meet the definition of "Substitute Check" and conform to all standards prescribed by 12 U.S.C. § 5001 et seq. and corresponding regulations;

(iv) the Electronic Files do not contain any fraudulent items;

(v) no depository bank, drawee, drawer, or endorser will receive presentment or return of an IRD, the original Check, or a copy or other paper or electronic version of an IRD or original Check such that we, a bank, drawer, drawee, or endorser will be asked to make payment based on a Check that bank, drawee or endorser has already paid;

(vi) we are able to create IRDs from Electronic Files in such a manner that subsequent endorsements will not render previous endorsements illegible;

(vii) Checks are drawn on a financial institution in the United States and are payable in United States currency; and,

(viii) you have procedures that require your employees using RDC or ICL to mark, frank, or otherwise indicate on the physical Check that it has been scanned for electronic deposit, and such marking or franking does not interfere with the MICR line, payee, date, amount (formal and informal), signature, or endorsement on the Check. A proper endorsement shall state, at a minimum, "For Remote Deposit to The Huntington National Bank".  Although we provide a virtual endorsement, the virtual endorsement does not show on the physical Check.

(ix) We reserve the right, in our sole discretion, not to accept deposits for any reason; provided, however, that in refusing to accept any deposit, we shall act in good faith and use our reasonable business judgment. You agree not to deposit via RDC or ICL "ineligible items," as that term is used by the Board of Governors of the Federal Reserve. You further agree not to deposit Remotely Created Checks (RCC) without our agreement.

**B. Availability of RDC and ICL.** You must initiate deposits before the applicable cut-off time (of which we will notify you) on a Business Day in order for us to process such deposits on that Business Day. If you initiate deposits after the applicable cut-off time on a Business Day, we will begin to process such deposits on the next Business Day. Processing of deposits by us does not mean that we have accepted deposits. The scanner(s) used in connection with RDC should be attached to the same stations throughout the use of the RDC service.

**C. Storage and Disposal.** You must limit who is permitted to access the history of deposits sent to us via RDC or ICL. You must keep records of the Checks for the length of time required by your applicable state record retention laws. You must shred any original Check after verification of deposit. Original Checks that have been deposited and verified must be destroyed within ninety (90) calendar days. Until you destroy any Check or image of the same, you must, at a minimum, keep such document in a secure locked area or in a password protected environment. If you create an image of the Check, you must create a read-only image that cannot be copied  or reproduced.

**D. RDC Scanner.** We will provide one scanner (including the manufacturer's warranty) for each location. If this scanner breaks down or otherwise becomes obsolete or unusable, you will be responsible for the cost of a replacement scanner. All other expenses or fees associated with the RDC scanner we provide, as well as any replacement scanner, will be at your expense including, but not limited to, upgrades, scanner swaps, additional or extended manufacturer's warranty and/or cleaning and maintenance supplies and service. **Audit.** In order to ensure that you are in compliance with the terms of this Part and Applicable Law, we may conduct periodic onsite visits during reasonable business hours and upon at least twenty-four (24) hours advance notice. Further, you agree to cooperate with us and provide to us any documents or information we request, including, but not limited to, your files, records, and Checks (or images of the same if the originals have been destroyed). You agree to institute reasonable internal controls at our request. Failure to comply with this section shall be a material breach of this Agreement.

**E. Reserve Account.** If, upon our review of your Account activity, we determine that abuse or unauthorized activity is or may be occurring with respect to deposits, we may require that you maintain a reserve account ("**Reserve Account**") with a minimum balance equal to the previous month's total deposits or an amount as otherwise requested by us, subject to quarterly adjustment on the first day of each quarter. You grant to us a security interest in, and lien on, the funds in the Reserve Account, to secure the prompt and full payment of all your obligations to us under this Part. We will make withdrawals from the Reserve Account for reimbursement in connection with returned deposited items (including those which are the subject of UCC warranty claims). The Reserve Account will be under our sole dominion and control, and you will have no right of withdrawal of any of the funds in the Reserve Account, notwithstanding any Account Rules for that account. After you or we terminate this Agreement or the RDC and ICL services, we will turn over remaining funds in the Reserve Account to you no later than one hundred eighty (180) days after such termination. In the event that the balance in the Reserve Account goes below the required amount for any reason, you shall immediately send us sufficient funds to bring the Reserve Account balance up to the minimum required level and we shall be permitted to debit another Account of yours to fulfill such request.

**F. Maintenance of Scanner and Supplies.** At all times, you must maintain the scanner on loan to you for use with RDC in good working order. You are responsible for all maintenance costs, which may include, but is not limited to cleaning kits, ink replacement cartridges, power cord and/or USB cord replacement.

**G. Termination of Service.** In addition to the requirements upon termination as set forth in Part I, upon any termination of the RDC service, you must return to us any scanner, power cords, cables and any other equipment (including any manuals or service records) (taken together and referred to as "**Equipment**") on loan from us in a condition satisfactory to us. You will be supplied a return shipping label to return all Equipment. If the Equipment is not received within 14 Business Days of your receipt of the shipping label, we reserve the right to charge your Account or otherwise obtain reimbursement for any unreturned, missing or damaged Equipment.



**PART X: ESCROW SOLUTION SERVICES**

**Section 1. <u>Description of Services</u>**. Our Escrow Solution Services (the "Services") provides sub-accounting through one master deposit account. You will access this Service through our Web Portal. The Services may consist of any or all of the following as selected by you:

    A.  Each sub-account may earn interest and reflect deposits and disbursements. You may elect to accrue interest or disburse interest periodically.

    B.  Each sub-account designee or beneficiary (the "sub-account holder") may access their assigned sub-account through our Web Portal, as authorized by you, in accordance with our Security Procedures.

    C.  We do not provide Services or open master or sub-accounts for a "Prohibited Business". A "Prohibited Business" includes, but is not limited to growers, manufacturers or dispensers of medical marijuana, hydroponics, illegal or synthetic drugs (such as bath salts). The list of Prohibited Businesses may be updated from time to time. Please contact your banker for a comprehensive list.

**Section 2. <u>Our Obligations</u>**. We will provide the Service in accordance with our Account Rules and this Part.

    A.  Interest, if any, for each sub-account shall be paid up to the date of closure for each sub-account.

    B.  Access to the master deposit Account is electronic. Checks will not be honored on the account and you will indemnify and hold us harmless for any Check that is returned unpaid from the master deposit Account.

    C.  We will retain Records in accordance with Applicable Law.

**Section 3. <u>Your Obligations</u>.** While we provide the ability to maintain sub-accounts, you are responsible to:

    A.  Provide identifying information for each sub-account holder. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each entity or person that opens an account or sub-account. We will ask for information that will allow us to identify the sub-account holder and may elect to decline a sub-account holder that is listed as a Specially Designated National or otherwise prevented from having an account in accordance with the Office of Foreign Assets Control or other Applicable Law.

    B.  Provide a completed Internal Revenue Service form(s) W-8 or W-9. You agree that we will be unable to credit interest to any sub-account holder until we receive and verify each sub-account holder's W-8 or W-9. You must also notify the sub-account holder if you retain all or a portion of the interest as a fee.

    C.  Comply with applicable law, rule and/or ordinances with respect to the purpose and use of each sub-account. For instance, if the sub-account is being used to account for tenant security deposits earning interest, you will be responsible to provide interest required over and above the amount offered by us.

    D.  You must be located within Ohio, Illinois, Indiana, Kentucky, Michigan, Pennsylvania, West Virginia, Wisconsin or Florida in the United States of America; or, as otherwise indicated by us.

    E.  Maintain legally required documentation with regards to your customers. We may access, upon reasonable request, your template agreement with your customer; or, specific agreements with each sub-account holder.

    F.  You acknowledge that a sub-account may not qualify for pass-through insurance through the Federal Deposit Insurance Corporation (FDIC) if you keep a portion of the interest without disclosing to the sub-account holder that the withheld portion is a fee.



**PART XI: INFORMATION REPORTING SERVICES**

**Section 1. <u>Description of Services</u>.** Our Information Reporting services make certain account, transaction, and related information available to help you control and manage your Accounts. The information may include information from the Services used by you and transactions on your Account(s), including the Records produced using one of the Services. Information Reporting can be provided through any one or more of the Communication Methods permitted by us from time to time and subscribed to by you.

**Section 2. <u>Electronic Data Interchange</u>.** We will, on your behalf, receive or send information and data electronically with respect to an Account which is accompanied by payments transmitted or received through the National Automated Clearing House Association, other electronic payment networks, and other processing systems using an established Communication Method as may be set forth on the Implementation Documentation ("**EDI**"). In providing the services described herein, we are acting only to facilitate information flow and not as the originating bank or acting as the ODFI (as defined in the ACH Rules). We shall have no liability if payments are not made or funded pursuant to such information. We will, however, increase or decrease, as applicable, the balance of the Account on the designated settlement date.

You shall at your own expense provide and maintain the equipment, software and services necessary to effectively and reliably test, transmit and receive all EDI information received or sent by us since the most recent transmission or receipt of information ("**Documents**"). If you utilize one of our Web Portals to receive/view Documents, we will provide you with the appropriate specifications in order to facilitate your compliance with this paragraph. You will be deemed to have satisfied the requirements of this paragraph if you contract with a Value Added Network ("**VAN**") acceptable to us, which provides and maintains such equipment, software and services.

Where applicable, Documents will be transmitted to you or received by us either directly or through the VAN designated by you. Transmission to your designated VAN shall constitute transmission to you hereunder. You may modify your election to use, not use, or change a VAN upon thirty (30) days prior written notice to us. You will be responsible for all costs of any VAN with which you contract. You shall be liable and agree to indemnify and hold us harmless for any claim, action, suit or liability arising out of any act or omission of your VAN. The preceding sentence may not apply if you are a public funds customer (e.g. government or public university) and the governing state law, or rule, regulation or regulatory opinion prohibits indemnification by such entities.

We shall electronically transmit to you on each Business Day, the information received even if Documents contain no information that particular day. Documents with respect to the origination side of EDI will only be sent when scheduled with you as set forth in the Implementation Documentation. The Implementation Documentation will also include the reporting methodology agreed to between you and us.

Upon receipt by you of any Documents, you shall promptly and properly transmit a functional acknowledgement in return, unless you have chosen to waive the need for acknowledgement. The acknowledgement (or waiver thereof) shall constitute conclusive evidence Documents have been properly received. If any Document is received in an unintelligible or garbled form, you shall promptly notify us in a reasonable manner and upon receipt of such notice, we shall re-transmit such Document. In the absence of such notice, we shall have no further obligation with respect to the transmission of such Document.

**Section 3. <u>Data Exchange</u>.** In connection with the Data Exchange Service, we will collect certain information with respect to Accounts (and/or, via a Processor, accounts maintained with other financial institutions), transactions involving Accounts, or accounts maintained by others for whom you have been properly authorized to access such account information, and we will make such information available to you to be viewed electronically, all as more specifically described in the Implementation Documentation. Alternatively, we may send, via a Processor, certain information with respect to Accounts, transactions involving Accounts, or accounts maintained by others with us for whom you have been properly authorized to access such account information, so that such information may be made available to you via other financial institutions with whom you bank, all as more specifically described in the Implementation Documentation.

**Section 4. <u>Visual Archive</u>.** We will provide you with a CD that contains some or all of your Records in connection with and as applicable to the use of and transactions on an Account or specific Services that you designate. As used in this Section, "Records" means images of periodic statements, paid checks, deposited checks, deposit slips, debit or credit memos, corrections, adjustments, or any document or image that is processed through item processing. The CD provided to you may or may not be encrypted as selected by you in the Implementation Documentation. We recommend that you select the option to have such CDs encrypted.

If Records are provided to you on a CD and you determine Records on the CD are distorted, illegible or the like, then you, within fifteen (15) days of receipt of the CD, must notify us. If in connection with your notification, we determine that Records are distorted, illegible, or the like, then we will send (i) a copy of the Record in question via facsimile or (ii) another CD that contains the Record in question without the distortion or the like via U.S. postal mail, without charge. If you request a copy of a Record for reasons other than poor image quality, we will send a copy of the Record in question via facsimile, and you will be charged a fee. We will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records.



**Section 5. <u>Limitation on Information Reporting Services</u>**. You understand that the information available to you in connection with any of the Information Reporting Services is updated periodically and therefore, at any point in time  may not reflect the most up to date information in our records, as more fully described in the Implementation Documentation. You acknowledge and agree that the service does not include any recommendation, guaranty, representation or warranty whatsoever.  We shall not be responsible for errors in, or delays regarding, information provided to us by other financial institutions or other non- Bank sources.



**PART XII: INTEGRATED PAYABLES SERVICES**

**Section 1. <u>Description of Services</u>**. Our Integrated Payables Services (the "Service") aggregates your treasury management payables types into a singular report.  Your Commercial Card Account Agreement and this Agreement govern the use of this Service.

**Section 2. <u>Our Obligations</u>**.  Upon your direction to make a payment, we will initiate payment to your payee via your credit card account (a "**Virtual Card**"), ACH, RTP or check as more fully described in the Commercial Card Account Agreement. We will combine the reporting of these payment types into one report.

**Section 3. <u>Your Obligations</u>.** You shall transmit payment data using our Web Portal. Huntington shall initiate the payments for Virtual Card, ACH, RTP or check payments. In order to process check payments, a test payment file, digital signature, and additional information must be completed and received by us at least 30 days prior to the requested production date in order to perform programming and set up.



## PART XIII: LOCKBOX SERVICES

**Section 1. <u>General Lockbox</u>.** With Lockbox services, you will direct your customers to send their remittances addressed to you but bearing a "Lockbox Address," assigned by us which is associated with a caller box or Post Office Box (P.O. Box) from the United States Postal Service, or other mechanism that we deem acceptable for processing remittances, and such caller box, P.O. Box, or other mechanism becomes your Lockbox Address. For purposes of this Part only: "**Records**" are images of the fronts of Checks, the front and back of remittances, correspondence, and/or envelopes; "**Source Documents**" are the original Check, remittances, correspondence, or envelopes; and "Work Processing Date" is the day on which we post the lockbox receipts to your Account.

We will collect on each Business Day mail sent to your Lockbox Address, open such mail, and process the enclosed remittances for deposit to the Account you designate (the "**Lockbox Account**") in accordance with our current processing procedures and/or your specific instructions provided to and agreed upon by us in writing. Upon set up, we will accept all payees. However, you may opt to have Checks inspected as payable to those names given by you to us or reasonable variations of such accepted by us in the Implementation Documentation ("**Acceptable Payees**"). You represent and warrant that you are, or your Affiliate is, the proper payee of each such Check regardless if you remain with accepting all payees or if you implement Acceptable Payees. If your Affiliate is the proper payee, you also warrant that such Affiliate has authorized checks payable to it to be credited to your Lockbox Account. Deposited Checks will be forwarded for collection through normal banking channels. You hereby irrevocably make and appoint us as your true and lawful attorney-in-fact to endorse your name (or an Acceptable Payee name) on all checks with the endorsement "Credit to the account of the within named payee" or words similar effect on checks received in the Lockbox.

If we process a Check not signed by the maker as instructed in the Implementation Documentation, and the Check is paid, but the account owner does not authorize payment, you agree to indemnify us, the drawee bank (which may also be us), and any intervening collecting bank for any liability or expense incurred by us or such other bank due to the payment and collection of the Check.

We do not isolate Checks which bear restrictive endorsements such as "Paid in Full," or words of similar import, and we assume no liability should such a Check be deposited, processed and paid. You hereby agree that we shall have no obligation to discover such legends or endorsements or to determine whether any deposit of remittances is in accordance with the terms and conditions of any contract between the remitter and you. If you desire to us to identify and return Checks with a restrictive endorsement, you agree that we will perform the task on a best efforts basis; and, if we fail to identify such a Check that we will not be responsible for any Losses that may occur as a result.

You may also elect to provide a periodic file containing data in a form acceptable to us (e.g., CSV or Excel) ("**Stop File**") via an agreed upon Communication Method. You may elect to send a Stop File daily, weekly or monthly. Checks which match the Stop File will be returned to you without processing. You agree that we shall have no obligation to you if we process a Check which was not included on the Stop File or is processed prior to receipt of the Stop File from you.

If you so choose, the following documentation ("**Documentation**") will be sent to you: (i) any Checks not accepted for deposit due to wrong payee, obvious alteration, restrictive endorsement, and the like, and/or (ii) any Checks that do not meet your processing instructions. We will send the Documentation to the address given by you to us. If you have Lockbox services and you instruct us to do so, we will destroy Source Documents after the work processing date as follows: five (5) days for a Retail Lockbox and fourteen (14) days for a Wholesale Lockbox. In that event, we will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records or Source Documents. Image transmissions are also available upon your request.

If Checks are returned for any reason, we shall charge your Lockbox Account, or if there are insufficient funds in the Lockbox Account, then any other Account held by you, or handle as otherwise agreed between you and us. A visual record will be made of all deposited checks as part of our ordinary check processing procedures. The record created by our ordinary check processing procedure shall be retained in accordance with Applicable Law

**Section 2. <u>Web Exceptions/Pre-Deposit Exceptions</u>.** With Lockbox Services you may elect to use Web Exceptions/Pre-Deposit Exceptions, which allows you to provide us with instructions as to which Source Documents not to process or effect collection ("**Non-conforming Items**"). We will provide Records of such Non-conforming Items using an agreed upon Communication Method and you will have three Business Days after we provide such Records to direct us via an approved Communication Method as to processing of the Non-conforming Items. If you do not notify us after those three Business Days, we will not process the Non-conforming Items and we will mail the Source Documents of Non-conforming Items to you. Regardless of whether you direct us to process or not process a Non-conforming item, after the three Business Days, the Records concerning those Non-conforming Items will no longer be available electronically. We may terminate the Web Exceptions/Pre-Deposit Exceptions feature at any time with notice to you.

**Section 3. <u>Lockbox Online Viewing</u>.** You may view, through your designated Authorized User (the "**System Administrator**"), your Account information and Records via our Web Portal or via image transmission as elected by you in the Implementation Documentation. Images are available for viewing for up to seven (7) years from the work processing date. We will assign a

unique access code, password and/or other security procedures to your System Administrator to administer the Lockbox Online Viewing services. We will also be listed as an Authorized User for you. Notwithstanding any terms in this Agreement to the contrary, the Lockbox Online Viewing services will terminate immediately if you delete or remove us as an Authorized User.

If you so choose, the following documentation ("**Documentation**") will be available to you via our Web Portal: (i) a listing of checks deposited for the Business Day's lockbox credits, and (ii) actual Source Documents (other than the original Check). We will forward Source Documents to you, unless you elect otherwise.   If you elect not to have Source Documents forwarded to you, we may destroy the Source Documents after the work processing date as follows: five (5) days for a Retail Lockbox and fourteen (14) days for a Wholesale Lockbox. In that event, we will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records or Source Documents.

Account balances listed on our Web Portals or through image transmission for visual lockbox may not have not been processed through the standard banking channels, and as such may not be an accurate reflection of your Account balance.

**Section 4. E-Lockbox:** You may obtain E-Lockbox services where you elect and authorize us to receive an electronic file from our bill payment service provider (your "**BPSP**") that we will process for you for credit to your Account. We will provide to you certain remittance information that we receive in connection with such credits using an approved Communication Method.

You will provide us with any information that we request for this service and you hereby authorize us to contact your BPSP and direct that electronic payments made to you be sent to us for further credit to your Account. You acknowledge and agree that payments made by Check to you will *not* be covered by this Section, and you will continue to receive such payments directly from your BPSP. We will credit your Account on the Business Day following receipt of the electronic file from your BPSP, and we will report information received regarding such credits from your BPSP using an agreed Communication Method. Information that we provide in connection with credits will be at our discretion. You authorize us to debit your Account in the event your BPSP issues such debit against your Account.

You recognize that credits and any associated information is provided by your BPSP and agree that we are not responsible or liable for mistakes or errors in connection with credits or associated information received by us and processed according to the terms of this Agreement. Remittance information and credits are informational only and you may not rely on such information and credits. You must rely only on your account statement for your Account balance and other information.



## PART XIV: REAL TIME PAYMENTS - RTP®

This Part is governed by the RTP System Operating Rules which can be found at https://www.theclearinghouse.org/payment-systems/rtp/document-library). By using the RTP Service, you agree to be bound to the RTP System Operating Rules ("**RTP Rules**") in addition to this Agreement.

**Section 1. RTP Payment Origination and Messages.** You may elect to send payments (a "**Payment Order**") and messages (an "**RTP Message**") to business(es) and/or consumer(s) via the RTP Network, in the format specified in the RTP Rules. The terms "Sender", "Receiver", "Sending Participant", "Receiving Participant" and "Request for Payment" as used in this Part are defined in the RTP Rules.

Your obligations:

(a) <u>Sending Payments and Messages</u>. You are deemed to create a Payment Order or an RTP Message request when we receive your instructions using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures. We may place a maximum dollar limit for any Payment Order requests; and/or, a limit on the number of Payment Orders or RTP Message requests within any certain period. Upon receipt of your Payment Order or RTP Message request, you authorize us to debit your Account in the amount of the Payment Order and/or any related fees. Each Payment Order and RTP Message request must be related to RTP transactions and for legitimate business purposes.

(b) <u>U.S. Accounts</u>. All accounts (Sender and Receiver) used for RTP must be located within the United States. To the extent a Sender sends, or a Receiver receives a payment or message as part of a money transmission transaction, whether such Sender or Receiver is a payment service provider or not, the person on whose behalf the Sender sends, or the Receiver receives, must be a resident of or otherwise domiciled in the United States.

(c) <u>Applicable Law</u>. We are under no obligation to honor, in whole or in part, any Payment Order or RTP Message that could result in a violation of Applicable Law, as determined in our sole discretion.

(d) <u>Third-Party Service Provider</u>. You agree that you will not act as or employ a Third-Party Service Provider with respect to performing any Payment Order or RTP Message without obtaining our written consent; and you further acknowledge and agree that you are unable to act on our behalf to perform any RTP functions.

(e) <u>Block, Delay or Reject</u>. We may delay, block or reject any Payment Order or RTP Message based on a reasonable belief that the transaction may arise from or result in fraud, or regulatory or compliance issues. We may also delay, block or reject, in whole or in part, an outgoing or incoming payment if the aggregate transaction amount exceeds transaction frequency or limits as determined by us, in our sole discretion. If any Payment Order or RTP Message is rejected by us or the RTP network as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a corrected Payment Order or RTP Message to us.

(f) <u>Cancellation or Amendment</u>. You have no right to cancel or amend any Payment Order or RTP Message after we have received it. However, to the extent permitted by Applicable Law, we will use our reasonable efforts to act on your request to cancel any such RTP transaction before we process it, but we will have no liability if such cancellation is not affected.

(g) <u>Inconsistency of Information or Errors</u>. You agree to use a format acceptable to us and in accordance with the RTP Rules. We are not responsible for detecting errors in any Payment Order or RTP Message, including obvious errors in your Account information or that of the Receiver.

**Section 2. Request for Payment Messages**. You may provide us instructions to initiate an RTP Message that serves as a request for payment from a Receiver ("**Request for Payment Message" or "RfP**"). The recipient of Request for Payment Message may respond directly to your message by transferring funds (a "**Funds Transfer**") to an Account you designated in the RfP. You are deemed to initiate an RfP when we receive your instruction using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures. We may place a maximum dollar limit for any single RfP, a batch of RfPs and/or limit the number of RfPs you may request within any certain period. In initiating a Request for Payment, you authorize us to share your Account information with the Receiver.

If you elect to receive payments from consumers in response to an RfP or otherwise, you will indemnify and hold us harmless against any disputes or chargebacks initiated by a consumer, including, without limitation, Regulation E disputes.

We have the right, at our sole discretion, to reject, and refuse to accept, any Funds Transfer in response to a Request for Payment for any reason, including your failure to abide by the RTP Rules or that the Funds Transfer fails to comply with Applicable Law; provided, however, that in rejecting, or refusing to accept any Funds Transfer, we shall act in good faith and use our reasonable business judgment. We will have no liability to you based on such rejection or refusal of any Funds Transfer. If we reject any Funds Transfer, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice.

**Section 3. <u>Use of Security Procedures and Terms of Payment Orders</u>.**

(a) The Implementation Documentation includes a description of the Security Procedures offered by us that apply to RTP. Your use of the RTP services constitutes your acceptance of those Security Procedures as commercially reasonable and as a means of authenticating an RTP transaction communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any RTP transaction. Any RTP transaction communicated by or on your behalf shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such RTP transaction is received in accordance with the applicable Security Procedures, and if we accept such RTP transaction in good faith. In addition, if any RTP transaction was actually communicated or authorized by you or you otherwise benefited from such RTP transaction, then you will be obligated to pay us the amount of the related funds transfers without regard to whether we complied with the Security Procedures. We may, in our discretion, use additional procedures to verify the authenticity of any RTP transaction. You agree to implement any other reasonable authentication or Security Procedures established by us. Failure to do so shall be a material breach of this Agreement.

(b) <u>Compliance with Security Procedures</u>. If you choose to communicate any Payment Order or RTP Message (including any cancellation thereof) to us in a manner that varies from the Security Procedures, and if we accept such Payment Order or message in good faith, then you agree to be bound by such Payment Order or message, whether or not authorized, and you will be deemed to have refused the Security Procedures that we offer and recommend as "commercially reasonable," and you will be obligated to pay us the amount of such Payment Order and/or fees applicable to an RTP Message. However, we have no obligation to accept any Payment Order or RTP Message that is not communicated in compliance with the Security Procedures. We are not responsible for refusal to act upon any Payment Order or RTP Message received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order or RTP Message in accordance with the Security Procedures has failed or where such action is delayed until verification can be obtained.



**PART XV: WIRE TRANSFER SERVICES**

**Section 1. <u>Wire Transfers and Authorization to Charge Account</u>.** You may provide us wire transfer instructions (each a "**Payment Order**") to execute wire transfers from Accounts you designate. You are deemed to make a wire transfer request when we receive your Payment Order using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures.  Payment Orders must be received by us on a Business Day prior to our established cut-off time to be executed on that Business Day. If you make a wire transfer request after our cut-off time or on a non-Business Day, we may process such wire transfer request on the following Business Day. We may place a maximum dollar limit for any single wire transfer. 28

**Section 2. <u>Use of Security Procedures and Terms of Payment Orders</u>.**

(a)    <u>Security Procedures</u>. The Implementation Documentation includes a description of the Security Procedures offered by us that apply to wire transfers and Payment Orders. Your use of the Wire Transfer services constitutes your acceptance of those Security Procedures as commercially reasonable and as a means of authenticating a Payment Order communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any Payment Order. Any Payment Order communicated by or on your behalf shall be effective as your Payment Order, and shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such Payment Order is received in accordance with the applicable Security Procedures, and if we accept such Payment Order in good faith. In addition, if any Payment Order was actually communicated or authorized by you or you otherwise benefited from such Payment Order (or resulting funds transfer), then you will be obligated to pay us the amount of the related funds transfers without regard to whether we complied with the Security Procedures (including, but not limited to, a Customer Courtesy Wire). We may, in our discretion, use additional procedures to verify the authenticity of any Payment Order. You agree to implement any other reasonable authentication or Security Procedures established by us.  Failure to do so shall be a material breach of this Agreement.

(b)    <u>Compliance with Security Procedures</u>. If you choose to communicate any Payment Order (including any cancellation thereof) to us in a manner that varies from the Security Procedures, and if we accept such Payment Order in good faith, then you agree to be bound by such Payment Order, whether or not authorized, and you will be deemed to have refused the Security Procedures that we offer and recommend as "commercially reasonable," and you will be obligated to pay us the amount of such wire transfer (including, but not limited to, a Customer Courtesy Wire). However, we have no obligation to accept any Payment Order that is not communicated in compliance with the Security Procedures. We are not responsible for refusal to act upon any Payment Order received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order in accordance with the Security Procedures has failed or where such action is delayed until verification can be obtained.

(c)    <u>Rejection of Payment Orders</u>. We have the right, at our sole discretion, to reject, and refuse to accept,  any Payment Order for any reason, including your failure to maintain a sufficient balance of collected funds in an Account or that such Payment Order fails to comply with Applicable Law; provided, however, that in rejecting, or refusing to accept, any funds transfer request or Payment Order, we shall act in good faith and use our reasonable business judgment. We will have no liability to you based on such rejection or refusal of any Payment Order. If we determine that processing or honoring any Payment Order would cause the designated Account to be overdrawn, we may, but have no obligation to, execute the Payment Order and (i) create an overdraft in such Account or (ii) transfer to the designated Account from another of your Accounts, funds sufficient to cover the deficiency in the designated Account.  If an Overdraft is created in an Account in order to complete a wire transfer, you agree to immediately repay us, and you agree and authorize us to debit any of your Accounts with us in the amount equal to the overdraft and applicable fees. If we reject any Payment Order, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice.    If any Payment Order is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a correct Payment Order to us.

(d)    <u>Cancellation or Amendment of Payment Order</u>. You have no right to cancel or amend any Payment Order after we have received it. However, to the extent permitted by Applicable Law, we will use our reasonable efforts to act on your request to cancel any such Payment Order before we process it, but we will have no liability if such cancellation is not affected.

(e)    <u>Inconsistency of Name and Account Number</u>. We are not responsible for detecting errors in any Payment Order, including in the identifying number of any intermediary bank or beneficiary's bank, even if that number does not correspond to the bank identified by name. You acknowledge and agree that wire transfers may be made on the basis of account number or other identifying number (including a bank transit routing number, SWIFT BIC or CHIPS UID Code). We and any receiving bank (including any beneficiary's bank and any intermediary bank) may rely on the account number or other identifying number of any bank (including a bank transit routing number, SWIFT BIC or CHIPS UID Code), person or bank account specified in the Payment Order even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to pay the amount of such Payment Order (or resulting funds transfer) to us is not excused in  those circumstances.



(f)     Customer Courtesy Wire. If you choose to provide us a Payment Order without using the Web Portal or other pre-established Security Procedure (i.e., PIN, batch, debit drawdown or standing order wire), you acknowledge that (i) a Customer Courtesy Wire is not covered by this Agreement; and (ii) that only one authorized signer on an Account is needed to initiate a Customer Courtesy Wire. You may prohibit the use of Customer Courtesy Wires. Doing so will block any Customer Courtesy wire from being initiated by us on behalf of any authorized signer on an Account under any circumstances including but not limited to the inability to use the Web Portal or other pre-establish wire transfer service.

**Section 3. <u>Use of Third Parties: Transfers in Foreign Currency</u>.**

(a)     <u>Intermediary Banks</u>. You shall specify routing instructions for wire transfers in any Payment Order communicated to us. If no such specification is made, you hereby instruct us to send wire transfers through such correspondent(s) as deemed appropriate by us in our sole discretion after consulting standard bank references as to correspondent relationships. In executing any wire transfers, we shall use whatever funds transfer system, communications system, and intermediary designated by you, except where we in good faith conclude that the use of such funds transfer system, communication system, or intermediary is not feasible or would involve undue delay, in which case we shall use such of the funds transfer systems and communications systems in which we participate, and such intermediaries, agents or sub-agents as we determine to be appropriate in connection with any such wire transfers. To the fullest extent permitted by law, (i) any such funds transfer system, communications system, or intermediary, agent or sub-agent shall not be a Processor, and shall be deemed to be your agent, and we shall not be liable for any errors, negligence, suspension or default of any of them or for any failure to identify the beneficiary or any mis-payment by any of them, and (ii) we shall not be liable for any errors, mutilations, delay, mis-delivery or failure of delivery in the transmission of any wire transfers in connection with such transaction or for any suspension of any means of transmission or for any imposition of any censorship, exchange control or other restriction, all such risk being borne by you.

(b)     <u>Transfers in Foreign Currency</u>. Any request for the wire transfer of funds in a currency other than U.S. Dollars shall require you to first validly purchase such foreign currency from us or we shall purchase such amount from our affiliate or correspondent bank. Unless otherwise agreed between you and us, the value of any such wire transfer shall be reported to you in the U.S. Dollar equivalent of the amount of foreign currency transferred. Any loss of exchange arising from a subsequent cancellation of such wire transfer request, or because of a rejection of delivery for any reason, shall be charged to your Account. You agree that if we utilize the services of other banks for the purpose of giving effect to any request or order for the wire transfer of funds in foreign currency, then we do so for your account and at your risk.



## PART XVI: ZERO BALANCE ACCOUNTING SERVICES

**Section 1. <u>Zero Balance Accounting Services</u>.** We will set up and provide Zero Balance Accounting services. At your request, we will establish, or designate your existing Accounts as Zero Balance Accounts ("**ZBAs**") that end each day with a zero balance. Under the Zero Balance Accounting service, ZBAs are linked to a separate account to which all deposits from one or multiple ZBAs are automatically swept each Business Day, and from which any ZBA may be funded (the "**Concentration Account**"). At the end of each Business Day, we will post all deposits, checks, and other debits and credits with respect to each ZBA or Concentration Account, after which we will automatically adjust the balances in each ZBA to zero by moving the funds, whether collected or uncollected, into or out of each ZBA, and simultaneously debiting or crediting the applicable Concentration Account. Your ZBAs will be processed in order of Account number (lowest to highest) unless otherwise agreed to by you and us in writing. A daily status report summarizing activity in each ZBA and Concentration Account will be available using an approved Communication Method.

We will provide these services to you and your designated Affiliates, if applicable, in accordance with this Part for all Accounts that you and your Affiliates designate. You and your Affiliates will designate the Account names and corresponding Account numbers with us to become ZBAs and Concentration Accounts. You and your Affiliates authorize us to pay checks and other debit items that are properly payable (in accordance with Applicable Law and our policies and procedures) against a ZBA or Concentration Account from available funds in the respective ZBA, the respective Concentration Account, or available funds transferred from a ZBA or Concentration Account to the other. You and your Affiliates authorize us to transfer funds to and/or from the designated ZBAs and Concentration Accounts as contemplated by this Part. You and your Affiliates acknowledge that separate identification of the funds in the ZBAs and Concentration Account(s) is your responsibility and that of your Affiliates.

**Section 2. <u>Representations and Warranties</u>.** Each of you and your Affiliates, as applicable, hereby represents and warrants to us that (a) you are the owners of the respective ZBAs and Concentration Accounts you designate; (b) you and your Affiliates are affiliated by common ownership as reflected on the organizational chart attached to the Authorization; (c) you and your Affiliates have full power and authority to execute and deliver this Agreement and carry out the transactions contemplated herein; (d) the execution, delivery and performance of this Agreement does not and will not violate any provision of law or any regulation applicable to you or your Affiliates; (e) all accounts designated as ZBAs and Concentration Accounts are owned by you and/or your Affiliates, as appropriate, and that none of such accounts are owned by another entity; (f) separate identification of funds in the ZBAs and Concentration Accounts will be maintained by you and your Affiliates; (g) before signing the Authorization, you and your Affiliates have reviewed the books, records and other documents and information in the possession of any of you and your Affiliates or any other person or entity with respect to the Concentration Account(s) and any or all of the ZBAs, or so much thereof as was necessary to make the warranty that separate identification of funds is maintained, and (h) the ownership of all entities executing the Authorization and/or using the Zero Balance Accounting service is owned as indicated on the organizational chart provided to us.

Further, you and your Affiliates represent, warrant and covenant with us that they will deliver written notice, in reasonable detail to us, immediately upon receiving knowledge of any event which would cause either you or any of your Affiliates to cease to exist or file any bankruptcy or insolvency proceedings, in which case we may, in our discretion, at any time after receiving knowledge of such an event, remove you or such Affiliate from the ZBA configuration and transfer to the affected ZBA all collected and uncollected funds currently in the Concentration Account(s) which are identified by you or your Affiliate as belonging to you or such Affiliate. You and your Affiliates agree that if ownership of any one of the ZBAs or Concentration Accounts were to be transferred to an entity other than an affiliate company which is a party to this Agreement, regardless of how closely related, you and your Affiliates will immediately unlink from the ZBA/Concentration Account relationship such account(s) and we shall have no liability for your or your Affiliates' failure to do so. If you or any Affiliate is removed from the ZBA configuration, it is your and your Affiliates' responsibility to determine which funds belong to you and which belong to your Affiliates. We are not required to make any such determination.

**Section 3. <u>Guaranty by You</u>.** If applicable, to induce us to provide the Zero Balance Accounting service to your Affiliates, you absolutely, irrevocably and unconditionally guaranty to us the full and prompt performance and payment when due (by acceleration or otherwise), of all obligations, agreements, covenants, liabilities, expenses, representations and warranties of any of your Affiliates to us, whether now existing or hereafter arising, under or in connection with this Part and the Zero Balance Accounting service (collectively, the "**Obligations**"). This is a continuing guaranty and shall remain in full force and effect and be binding upon you and your successors and permitted assigns, if any. This guaranty shall continue to be effective if at any time payment or performance of the Obligations of you or any of your Affiliates, or any part thereof, is, upon the insolvency, bankruptcy or reorganization of such Affiliate or otherwise pursuant to Applicable Law, rescinded or reduced in amount or must otherwise be restored or returned by us, all as though such payment or performance had not been made. Your obligations hereunder are those of a primary obligor, and not merely a surety, and are independent of the Obligations. This is a guaranty of payment and not of collection. You unconditionally waive any right to require us to (a) proceed against any of your Affiliates or any other obligor in respect of the Obligations, provided we have first given notice of default to you and your Affiliate and the Affiliate has failed to



cure such default within two (2) days of the date of such notice; (b) proceed against or exhaust any security held directly or indirectly on account of the Obligations; or (c) pursue any other remedy in our powers whatsoever. You hereby waive (i) notice of acceptance of this guaranty; (ii) presentment and demand for payment of any of the Obligations; (iii) protest and notice of dishonor or default to you or to any other party with respect to any of the Obligations; and (iv) all other notices to which you might otherwise be entitled. You agree to pay all reasonable attorneys' fees and charges, the reasonable allocated cost of internal legal services, and all other reasonable costs and expenses which may be incurred by us in the enforcement of this guaranty.

**Section 4.** <u>**Removal or Addition to ZBA or Concentration Accounts**</u>. You and each of your Affiliates agree to advise us promptly of any consolidation, merger, sale or conveyance of you or any Affiliate or any principal part of your assets, or the sale or conveyance of any controlling interest in you or such Affiliate to the extent you or such Affiliate is no longer affiliated with you and the remaining Affiliates (either by common ownership or control), and upon any such occurrence, we shall have the right to terminate this Part and the Zero Balance Accounting service with respect to such Affiliate immediately. In addition, you may, on behalf of all Affiliates, add additional affiliate companies to the Zero Balance Accounting service via an amendment, in form and substance acceptable to us, and to otherwise act for and on behalf of you and each Affiliate signing the Authorization, or subsequently added by amendment as provided herein. If a new affiliate company being added is newly created, you will update your organizational chart and provide such updated chart to us.



## PART XVII: GLOSSARY OF TERMS

Unless otherwise specifically defined in another Part of this Agreement, the following terms shall have the definitions below:

(a) "*ACH Rules*" means the rules and regulations of NACHA and those of any regional clearinghouse in effect from time to time used by us to settle ACH transfers.

(b) "*Affiliate(s)*" means any company owned by or under common control as you or us as applicable in the context of this Agreement.

(c) "*Applicable Law*" means all applicable federal and state laws, rules and regulations, and regulatory guidance (to the extent such guidance is enforced by Governmental Authority) as in effect from time to time governing or relating to this Agreement or the Services, including, without limitation, the ACH Rules and the rules of any funds transfer system, and guidance issued by the Federal Financial Institutions Examination Council and similar advising bodies.

(d) "*Authorized User*" means your employee(s) or other person(s) that the Master User has authorized to be able to access and use the Services.

**(e)** "*Business Day*" means every day, Monday through Friday from 8:00 a.m. to 4:45 p.m. in Columbus, Ohio, but excluding federal holidays**.**

(f) "*Check*" means checks, drafts, money orders, and other instruments or items for the payment of money that may be handled as cash items by Federal Reserve Banks.

(g) "*Customer Courtesy Wire*" means a wire transfer Payment Order processed by the Bank without the use of a pre-established wire transfer service (Web Portal, use of a personal identification number (PIN), batch, debit drawdown or standing order wire) and/or pre-established Security Procedure.

(h) "*Effective Entry Date*" means the date specified, in accordance with the ACH Rules, on the Entry by the Originator (as defined in the ACH Rules) on which the Originator intends the Entry to be settled.

(i) "*Entry*" or "*Entries*" means an order or request appropriately sent through the ACH network (i) for the transfer of money to the deposit account of a person (a "Credit Entry") or (ii) for the withdrawal of money from the deposit account of a person (a "Debit Entry"). For purposes of the Services, the term "Entries" is the plural of the term "Entry."

(j) "*Funds transfer*" shall have the meaning ascribed to it in Article 4A of the Uniform Commercial Code.

(k) "*Governmental Authority*" means the Office of the Comptroller of the Currency, the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of Foreign Assets Control of the U.S. Treasury Department, and the Consumer Financial Protection Bureau.

(l) "*Implementation Documentation*" means all materials that explain or facilitate the use of a Service, including, without limitation, set-up forms, user booklets, operational manuals, Security Procedures, instruction and training materials, and information provided by us relating to the Services, but shall expressly exclude any marketing, sales or other promotional material in any form or delivery method.

(m) "*Item*" means any and all debit or credit transactions and communications, including but not limited to electronic checks, Checks, Entries, remittance advice, etc.

(n) "*Losses*" means any and all claims, actions, demands, losses, damages, judgments, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) and all costs of settlement of claims.

(o) "*Master User*" means the administrator that you have designated in accordance with our Security Procedures for controlling access to the Services.

(p) "*Payment Order*" shall have the meaning ascribed to it in Article 4A of the Uniform Commercial Code.

(q) "*Person*" means an individual, corporation, limited liability company, partnership (general or limited), business trust or any other form of business entity.

(r) "*PIN*" means a personal identification number which may be used electronically or verbally as part of a Security Procedure.

(s) "*Records*" means, with respect to the Services, the hard copy or images retained in connection with the Services, and may include, but not be limited to reports, receipts, confirmations, notices, statements, adjustments, charges, entries, checks, deposit slips, debit or credit memos, invoices, or other documents submitted with a deposit or remittance, corrections, adjustments, transactions, or any document processed as part of a Service and retained by us.



(t)     ***"Retail Lockbox"*** is a Lockbox that processes payments of consumers made to businesses.  Generally, the Retail Lockbox receives a high volume of payments than Wholesale Lockbox.  Remittance coupons must have a machine readable optical character recognition (OCR) line.

(u)     *"**Security Procedures**"* means Passwords, call back protocols, tokens, keys, test keys, security devices, and other systems and procedures we disclose to you to enable you to use the Services and for us to verify the origin of instructions and communications to us.

(v)     "***UCC***" means the Uniform Commercial Code, as enacted in the State of Ohio.

(u)     "***Web Portal***" means any internet or web-based application accessed via the internet and/or the programs and data provided by us for use on a computer in connection with one or more particular Services.

(v)     ***"Wholesale Lockbox"*** is a Lockbox that processes payments which are from one business to another. Generally, there is a lower volume of payments than Retail Lockbox.



**<u>IMPORTANT INFORMATION ABOUT YOUR TREASURY MANAGEMENT SERVICES AGREEMENT</u>**

Please know that unless otherwise agreed upon, changes have been made to the Treasury Management Services Agreement which are effective November 1, 2022.

Changes to the Treasury Management Services Agreement are in Part XI as follows:

1.  Part XI:  INFORMATION REPORTING SERVICES is now "PART XI:  INFORMATION REPORTING SERVICES AND ELECTRONIC DATA TRANSMISSION".

2.  A new sentence has been added after the first sentence, second paragraph, Section 2:  "You may elect to use our services to assist in the translation of Documents to our specific formats".

3.  A clarification has been made in the last sentence of Section 5 (additional language italicized): "We shall not be responsible for errors in, or delays regarding, information provided to us by other financial institutions, *information provided to us by you*, or other non-Bank sources".

Additional changes were made to correct typos and formatting.



# TREASURY MANAGEMENT SERVICES AGREEMENT

This Treasury Management Services Agreement (this "**Agreement**") is entered into by and between The Huntington National Bank ("**Bank**," "**we**," "**our**," or "**us**") a national banking association with its main office located at Huntington Center, 41 South High Street, Columbus, Ohio 43287, and each Company as identified on the Authorization and Agreement for Treasury Management Services or other document requesting treasury management services ("**Authorization**") and governs the treasury management services described in Parts II through XVI below (each a "**Service**"; collectively, the "**Services**") to be provided by us. The terms "you" and "your" refer to each Company identified on the Authorization.

**Business Security Suite:** We have available certain products designed to discover or prevent unauthorized transactions, including unauthorized checks and ACH debits, forgeries, and alterations. While no such product is foolproof, we believe that the products we offer will reduce the risk of loss to you from fraud.

**You agree that if your account is eligible for those products and you choose not to avail yourself of them, then we will have no liability for any transaction that occurs on your account that those products were designed to discover or prevent, nor will we have any duty to re-credit your account for any such losses.**

Huntington also recommends that all customers initiating Payment Orders use the following Security Procedure(s) based on the type of payment and method of submission:

**Payment Center (submit via Digital Tool):** Two unique User IDs assigned to two unique users. If you decline these Huntington recommendations, please understand that you will be solely responsible to design and implement verification methods prior to submitting Payment Orders to Huntington via Huntington-provided applications or direct transmission.

**Integrated Payables:** Two unique User IDs assigned to two unique Administrative Users who can approve batches (Company Program Administrator or Administrative User with Final Approver permission). User ID #1 used to enter the payment request and User ID #2 subsequently used to approve the request.

**Payment Center (submit via Payments Automation/File Transmission):** Payments Automation ID used to submit a payment request via direct file transmission and a unique User ID assigned to a human user used to subsequently approve each payment via the Payment Center online application.

**Direct ACH File Transmission:** ACH File Control Totals submitted via Direct ACH File Manager accessed via online application or by separate file transmission.

**Phone-In Wire Transfer (using PIN):** Two unique PINs assigned to two unique callers: PIN #1 used to phone in the wire request and PIN #2 subsequently used to approve the request.

**If you decline these Huntington recommendations, please understand that you will be solely responsible to design and implement verification methods prior to submitting Payment Orders to Huntington via Huntington-provided applications or direct transmission. Therefore, Company acknowledges their authentication responsibility for Payment Orders manually input into or transmitted to a Huntington system. Huntington will be responsible for processing the Payment Order as received.**

You may be required to sign additional agreements (i.e., amendments) or complete other Implementation Documentation before certain Services will be made available to you. Unless otherwise expressly provided, to the extent any terms or provisions of this Agreement directly conflict with the terms or provisions of any such additional agreements or Implementation Documentation, the terms and provisions of those additional agreements or Implementation Documentation shall control with respect to the Services they cover. Unless otherwise expressly provided, to the extent any provisions of the General Terms and Conditions set forth in Part I directly conflict with any other Part, the provisions of such other Part shall control with respect to Services described in that Part. You must maintain and designate checking/demand deposit accounts with us (each, an "**Account**"), which we will use for debiting or crediting with respect to all payments, debits, and deposits and related adjustments and charges. Except as otherwise provided, you must have collected and available funds on deposit in your Account(s) sufficient to cover your obligations under this Agreement.

® and Huntington® are federally registered service marks of Huntington Bancshares Incorporated.
Member FDIC. © 2022 Huntington Bancshares Incorporated.
Revised 09/30/22



CONTENTS

PART I: GENERAL TERMS AND CONDITIONS ....................................................................3

PART II: ACCOUNT RECONCILEMENT SERVICES ...............................................................8

PART III: AUTOMATED CLEARING HOUSE ORIGINATION SERVICES ...............................9

PART IV: AUTOMATED SWEEP SERVICES..........................................................................12

PART V: BUSINESS SECURITY SUITE SERVICES ............................................................16

PART VI: CASH DEPOSIT AND FULFILLMENT SERVICES.................................................19

PART VII: CONTROLLED DISBURSEMENT SERVICES ........................................................21

PART VIII: EBILL PRESENT & PAY.........................................................................................22

PART IX: ELECTRONIC DEPOSIT SERVICES .....................................................................25

PART X: ESCROW SOLUTION SERVICES...........................................................................27

PART XI: INFORMATION REPORTING SERVICES AND ELECTRONIC DATA TRANSMISSION ..........................28

PART XII: INTEGRATED PAYABLES ......................................................................................30

PART XIII: LOCKBOX SERVICES ...........................................................................................31

PART XIV: REAL TIME PAYMENTS… .....................................................................................33

PART XV: WIRE TRANSFER SERVICES.................................................................................35

PART XVI: ZERO BALANCE ACCOUNTING SERVICES..........................................................37

PART XVII: GLOSSARY OF TERMS ........................................................................................39



---

## PART I: GENERAL TERMS AND CONDITIONS

**Section 1. <u>Our Services</u>.** We will provide you with each of the Services that you choose to use on the Authorization and any addendum or amendment thereto, or any subsequent Authorization, subject to the terms and conditions of this Agreement. We may offer additional services to you, which additional services may be represented by separately executed agreements that may incorporate the terms and conditions of this Agreement. Our Business Deposit Accounts Rules and Regulations and deposit account disclosures (i.e., Funds Availability Schedule) governing your Accounts ("**Account Rules**") shall continue to apply. In the event of any direct conflict between this Agreement and the Account Rules, the terms of this Agreement shall govern, but only to the extent reasonably necessary to resolve the conflict. Capitalized terms used in this Agreement that are not defined in the text are defined in the Glossary in Part XIV. You shall use the Services solely to carry on your lawful business, and you shall not use any of the Services to process or facilitate transactions for or on behalf of any third party without obtaining our prior written consent.

**Section 2. <u>Fees; Funds Availability; Overdrafts</u>.** You agree to pay us the applicable fees and charges disclosed to you for use of the Services. We reserve the right to change any fees at any time. Any new fees will take effect with the next account analysis or statement period after we send notice to you that a change in fees has occurred, unless some other effective date is set forth in such notice. Unless other arrangements are made with us, including reduction in fees through account analysis and compensating balances as calculated by us, you agree that we are authorized to charge the fees and charges to any of your Account(s) when due. You shall be responsible for payment of all sales, use or excise, value added, utility or other similar taxes relating to your use of the Services. Deposits made using any of the Services are subject to our Funds Availability Schedule. With respect to any Service, we may, at our sole discretion, allow an overdraft to occur in your Account. Except as we agree or advise you otherwise in writing, you must repay us immediately, without demand, the amount of such overdraft plus any overdraft fees, charges or interest. In such cases, the fact that we previously allowed an overdraft to occur does not obligate us to do so in the future. For purposes of satisfying your payment obligations, we may consider any overdraft line of credit or other arrangement you have with us.

**Section 3. <u>Communication Methods; Online Services</u>.** You will select during the implementation process for any Service a means of communicating with us for use of that Service and for executing transactions in connection with such Service, including telephone, facsimile, email, and electronic transmission (a "**Communication Method**"). Information and instructions may be sent and received by you using such Communication Method. Certain Services may require you to use a Web Portal or may otherwise not have all Communication Methods available for use. The terms of the agreements governing any Web Portal we provide are hereby incorporated herein. In the event of any direct conflict between this Agreement and agreements governing a Web Portal, the terms of the Web Portal agreement shall control, but only to the extent reasonably necessary to resolve the conflict. A Web Portal shall be deemed a Communication Method under this Agreement.

You are responsible for obtaining, installing, maintaining and operating all hardware, software, and internet access necessary and appropriate to access Services. You must obtain or have appropriate firewalls, anti-spyware software, anti-viral software, network security, and environmental security to prevent unauthorized access to Services through your facilities, networks, or equipment. You will be solely responsible for any loss, liability or damage relating to phishing, pharming or similar scams. You are responsible, at your sole cost and expense, for obtaining and maintaining your communications link to Services and to ensure that your use of such communications link is in compliance with applicable requirements, including any requirements of telecommunications companies and authorities.

**Section 4. <u>Security Procedures; Your Responsibility</u>.** You agree to comply with all of our Security Procedures with respect to Services covered by this Agreement. Our Security Procedures are contained in this Agreement and in other written procedures we may provide to you, whether via a separate writing or via a Web Portal. Our Security Procedures may include the issuance of online login ids, passwords, or personal identification numbers ("**Passwords**"). You agree that your use of the Services constitutes your acceptance of the Security Procedures (including the use of Passwords) as commercially reasonable in the context of your business operations. You agree to give all of our Security Procedures the same level of confidentiality you would give to your own Security Procedures and ensure that Passwords are not used by or accessible to anyone other than those individuals to whom they were issued. You agree that the Security Procedures are designed to prevent unauthorized access and not to detect errors in transactions. Notwithstanding any Security Procedures that may from time to time be in effect for detecting errors in transactions undertaken pursuant to any of the Services, we shall have no duty to discover or report to you any such errors, and neither shall we be liable to you for the failure of such Security Procedures to detect such errors.

You agree you shall be liable for all use of the Services under this Agreement and any and all transactions made, authorized, or blocked when we receive required information or instructions in accordance with our Security Procedures, including but not limited to, use of Passwords assigned to your employees, even if the person sending information or instructions has exceeded his/her authority; (ii) does not have authority from you; (iii) has had his or her authority changed or revoked; or (iv) is not the same person as the employee whose Password is being used. If you permit any Affiliate or other Person to access one of our Services through any Communication Method or Password, we will not be responsible or liable for such Affiliate or Person's use or misuse of our



Services or access to Accounts for which you did not authorize that Affiliate or Person to have access and you agree to be liable for any such use of the Services. We may and will treat all instructions and information received by us through this arrangement as provided by and for the benefit of you and subject to all our rights under this Agreement with respect to the pertinent Services.

**Section 5. <u>Confidentiality of Passwords and Access Devices</u>.** You acknowledge and agree that Passwords are strictly confidential and should only be disclosed to the Master User or Authorized Users (as defined in Part XIV) to whom they were assigned. You must instruct the Master User and all Authorized Users that they should not disclose their Passwords to anyone, including your other employees. You agree to establish and maintain procedures reasonably adapted to assure the confidentiality of the Passwords and to be solely responsible for the security of Passwords. We are not responsible or liable for any loss or damages in connection with transactions made using Services if supplied with required Passwords.

If you believe a Password for a Master User has become known by unauthorized persons (whether or not employed by you), then you must contact us immediately by telephone during a Business Day and we will, as soon as practical, remove the compromised information from the system, and issue new Passwords in accordance with our security requirements. You must also re-issue any Passwords for Authorized Users used to perform unauthorized transactions. If you believe a Password for an Authorized User has become known by unauthorized persons (whether or not employed by you), you must (i) immediately remove the compromised Password from access to the Services, (ii) issue a new Password to the Authorized User(s) whose Password was compromised, and (iii) immediately notify us of any unauthorized transactions. We reserve the right to change or suspend Passwords at any time upon notice.

**Section 6. <u>Your Duty to Review and Inspect</u>.** You are responsible for promptly reviewing and inspecting any and all invoices and Records (as defined in Part XIV). Except as otherwise provided in the description of a particular Service, you agree to notify us of any errors or discrepancies with regards to fees or invoice charges within thirty (30) days after the invoice or Records which contain such errors or discrepancies are received by you or otherwise made available to you (including through any Web Portal). You must immediately notify us of any transactional errors or discrepancies. If you fail to notify us of such error or discrepancy within the afore-mentioned time periods in which such information or Records is received by you or otherwise made available to you by us (including through any Web Portal), then you shall be precluded from asserting such error or discrepancy against us. Notwithstanding the foregoing, we reserve the right to, but are not obligated, in our sole discretion, adjust transaction records for good cause at any time.

**Section 7. <u>Financial Review</u>.** You shall, upon our request, promptly provide us with financial information and statements as we determine to be reasonably necessary or appropriate. Such information may include, but shall not be limited to, audited financial statements, including balance sheets, income statements, statements of retained earnings, and consolidated statements of changes in financial position, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year and all prepared in accordance with GAAP consistently applied. Notwithstanding the foregoing, if you are a publicly traded entity, you shall, upon our request, provide or make available to us your most recent publicly available annual consolidated statements of financial condition in lieu of the aforementioned financial information.

**Section 8. <u>Indemnification</u>.** You will indemnify and hold us harmless from and against any and all Losses arising out of or related to any claims and demands made, asserted, or threatened by any person (whether an individual or other legal entity) that is not a party to this Agreement which may be incurred by us relating to or arising out of this Agreement; other than those arising out of our gross negligence or willful misconduct. In addition, if we become involved in legal action to defend or enforce this Agreement against you, you agree to pay our reasonable attorneys' fees and costs if we prevail in any such action, to the extent not prohibited by law. The preceding two sentences may not apply if you are a public funds customer (e.g. government or public university) and the governing state law or rule, regulation or regulatory opinion prohibits indemnification by such entities.

You also agree to reimburse us for any and all fees, penalties, fines, costs or the like assessed against us by the National Automated Clearing House Association ("Nacha") for any violation of the ACH Rules, or by any Governmental Authority with jurisdiction over us, that is incurred by us due to actions we take under this Agreement as instructed by you.

**Section 9. <u>Limitation of Liability</u>.** Notwithstanding any provision of this Agreement providing to the contrary, our liability to you for failure to exercise ordinary care resulting in a delay in executing, improper execution of, or failure to execute a transaction shall be limited to actual damages sustained by you that are a direct result of our failure to exercise ordinary care in providing the service. Failure to exercise ordinary care shall not be inferred by reason of a loss of a Check, deposit, transaction, or Entry, or any other Item. We shall not be responsible for your acts or omissions, those of your Vendor (as defined in Section 22 of this Part), agent or employee, any other party providing services to you, or any other person or entity, including, without limitation, Fed Wire, SWIFT, Telex, any automated clearing house, or any other financial institution. We shall not be responsible for any Loss arising from or in connection with any inaccuracy, act or failure to act on your part or on the part of any person not within our reasonable control. We shall not be responsible for any charges imposed by any Vendor or other third party not retained by us as our Processor (as defined in Section 23 of this Part). Our liability hereunder for interest losses will be calculated by using a rate equal to the average Federal Funds rate at the Federal Reserve Bank in Cleveland, Ohio and any such compensation shall be limited to the amount of interest lost for a period not exceeding thirty (30) days following your receipt of the confirmation advice, account



statement or when we have otherwise made such information available to you (whichever comes first) less any interest actually earned on the funds. Except as expressly provided in this Agreement, we shall not be required to act upon any notice or instruction received from you or any other person with respect to any matter.

IN NO EVENT WILL WE BE LIABLE FOR A N Y SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE FROM SUBSEQUENT WRONGFUL DISHONOR RESULTING FROM OUR ACTS OR OMISSIONS PURSUANT TO THIS AGREEMENT OR LOST PROFITS WHETHER OR NOT WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE.

**Section 10.** <u>**Disclaimer of Warranties**</u>. EXCEPT AS PROVIDED IN ANY APPLICABLE SERVICE DESCRIPTION, WE MAKE NO REPRESENTATIONS, WARRANTIES, EXPRESS OR IMPLIED, IN LAW OR IN FACT, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE SERVICES OR EQUIPMENT USED IN CONNECTION WITH THE SERVICES TO BE PROVIDED BY US. NO DESCRIPTIONS OR SPECIFICATIONS, WHETHER OR NOT INCORPORATED INTO THIS AGREEMENT, NO PROVISION OF MARKETING OR SALES MATERIALS AND NO STATEMENT MADE BY ANY SALES REPRESENTATIVE IN CONNECTION WITH THE SERVICES SHALL CONSTITUTE REPRESENTATIONS AND WARRANTIES OF ANY KIND.

**Section 11.** <u>**Events Beyond Our Control**</u>. We will be excused from any delay or prevention in performance, and will not be responsible or liable for any loss of information, errors or delays in transmission and/or processing of your transactions, damage, cost, loss, or liability, arising out of causes beyond our reasonable control, including, but not limited to, strike, lockout, war, lack of energy, riot, insurrection, fire, flood, unavoidable accident, acts of God, acts of nature or any cause which is attributable to a third party, governmental acts or regulations, legal constraint, computer malfunction including, but not limited to, computer viruses, equipment breakdown, electrical or mechanical failure, or the enactment, or the issuance or operation of any adverse governmental law, ruling, regulation, order or decree. We will not be responsible for any error, delay or loss of information caused by any other person or entity not a party to this Agreement. In the event of any errors or delays by us, we will only be responsible to use ordinary care to correct any such errors or resume transmissions of information required to be made by us as soon as reasonably possible.

**Section 12.** <u>**Termination of Service**</u>. Either of us may terminate this Agreement, or suspend or terminate any of the Services provided, at any time upon notice to the other party, effective thirty (30) days after such notice is received. In addition, we may terminate this Agreement, or suspend or terminate any Service, immediately without notice (or immediately with notice if legally required), in the event (i) of fraud, suspected fraud, suspected illegal or suspicious activity, safety and soundness considerations, bankruptcy, receivership, merger, business necessity, regulatory compliance, administrative order, judicial order, or breach of this Agreement; (ii) in our good faith opinion your financial condition has become impaired or deteriorated; (iii) your non-use of the Service(s) for a period of six (6) months or more; or (iv) your default on any agreement or instrument between you and us or our Affiliate, or from you in our favor or our Affiliate's favor, but we will use commercially reasonable efforts to provide notice after termination if permitted by Applicable Law. The applicable Services will terminate automatically without notice in the event (a) your Account(s) associated with any of the Services is/are closed, (b) of termination of a Processor contract which is necessary for the performance of the Services, or (c) either we are prohibited by Applicable Law from performing the Services or you are prohibited by Applicable Law from receiving the Services. In the event of any termination, all fees incurred in connection with the effected Services on or before termination will become immediately due and payable. If the funds in the Account used by a particular Service(s) does not have adequate funds available, we may use any other Account to collect any immediately due and payable amounts. No termination by either of us shall relieve the other from responsibility as to any Check drawn, presented, or paid prior to termination of any Service; or, termination initiated but not executed prior to the effective date of termination. We shall have no obligation to provide any Service or execute any transaction or transfer that was not initiated or transmitted prior to the effective date of termination. If you fail to submit necessary documentation, provide necessary access to your business (if applicable), or undertake necessary training (if applicable) during the implementation process for a Service, the Service may be terminated or suspended without notice.

**Section 13.** <u>**Severability**</u>. If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable as written, that provision will be interpreted so as to achieve, to the extent permitted by Applicable Law, the purposes intended by the original provision, and the remaining provisions of this Agreement will continue intact.

**Section 14.** <u>**Governing Law; Venue; Waiver of Jury Trial**</u>. Except with respect to the UCC, this Agreement is governed by the laws of the State which governs your Accounts according to the Account Rules, without regard to its conflicts of laws rules. You hereby submit to the exclusive jurisdiction of such State's state and federal courts, and waive any objection to venue and forum non-convenience with respect to actions brought in such courts. Each of you and us expressly and irrevocably waive our right to trial by jury in any matter arising out of or related to this Agreement or any Service.

**Section 15.** <u>**Complete Agreement**</u>. This Agreement, together with (i) the Account Rules, (ii) any Web Portal agreements, and (iii) any amendments and/or Implementation Documentation, constitute the entire agreement between you and us. Any



representations, promises or conditions in connection therewith not set forth in the foregoing or in a writing signed by all affected parties will not be binding. In the event performance of the Services in accordance with the foregoing would result in a violation of any present or future statute, regulation or government policy to which we are subject, then the foregoing will be deemed amended to the extent necessary to comply with such statute, regulation or policy.

**Section 16. Modification; No Waiver.** We reserve the right to modify, at any time and in our sole discretion, without your consent, and without notice to you unless required by law, any of the terms and conditions set forth in this Agreement, and we may notify you of such changes in writing or by electronic means (including via a Web Portal). Except as otherwise provided in this Agreement or as otherwise stated in the notice (if sent), any modification by us will be effective when we send notice to you. You may modify this Agreement only with signed written consent from us. Except for changes made in accordance with this Section, no deviation, whether intentional or unintentional, shall constitute an amendment or modification of this Agreement, nor constitute a waiver by us of any rights in this Agreement. No delay or omission on our part in exercising any right hereunder shall operate as a waiver of such right or any other right.

**Section 17. Assignment; Parties.** We may at any time assign or delegate our rights or duties under this Agreement. You may not assign your rights or obligations under this Agreement in any way without our prior written consent. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. No other person or entity is deemed to be a third-party beneficiary of this Agreement or any of the Services.

**Section 18. Notices.** Except as otherwise provided in this Agreement, all notices concerning the administration of the terms of this Agreement between you and us that are sent by either you or us shall be in writing and, if to you, addressed to the primary mailing address as shown on our records at such time, and if to us, addressed to our Treasury Management Client Services office at such address as we specify in writing. Any such notice will be effective either on the date it is actually received by the receiving party or five (5) days after it is mailed by first class mail whichever is earlier; provided, however, that any notice sent by you terminating this Agreement or a Service shall be rendered ineffective if you use or avail yourself of any such terminated Service after the date of termination contained in any such notice.

Additionally, you and we each acknowledge and agree that certain notices and communications concerning the operation of Services may be provided by you or us to the other by telephone, fax or electronic means (including email) in accordance with the information provided by the receiving party as specifically set forth in this Agreement or in our Implementation Documentation. Any such notice or communication provided by fax or electronic means will be effective upon verified or successful transmission thereof to the receiving party, and any such notice given by telephone will be effective upon the receiving party's receipt thereof. Unless specifically stated otherwise, each of you and us may rely on such notices or communications given by fax or electronic means as though they are originals. Notwithstanding any terms in this Part to the contrary, any addition, deletion or change to any Services requested by you must be submitted in a form acceptable to us, and no such requested addition, deletion or change will become operative or effective until we confirm to you that such addition, deletion or change has been implemented, which we agree to do within a reasonable period of time.

**Section 19. Representations and Warranties.** You warrant and represent that (a) you are duly organized, validly existing, and in good standing in the jurisdiction in which you are organized; (b) there are no provisions of any law, or any certificate of incorporation, certificate of organization, by-laws, operating agreement, partnership agreement, or any agreement of any kind, nature or description binding upon you which prohibits you from entering into or performing under this Agreement; (c) your execution and performance of this Agreement has been duly authorized; (d) the person(s) executing this Agreement on your behalf is authorized by you to do so; (e) this Agreement is a binding obligation of yours; (f) all Accounts accessible pursuant to the Services were established only for business purposes; and the transactions made with respect to those Accounts will only be for business purposes; and (g) you are authorized to accept for deposit any Checks deposited in your Account(s) or an Account of your Affiliate using any of the Services. You will be deemed to repeat all of the foregoing warranties and representations each time we perform Services under this Agreement. We will be entitled to rely on any written notice or other communication believed by us in good faith to be genuine and to have been signed or authorized by an authorized representative of yours.

**Section 20. Compliance.** The Services are subject to all applicable laws, rules, and regulations, including, without limitation, the Uniform Commercial Code, the Bank Secrecy Act, as well as the rules and regulations of any money transfer systems, clearing houses, or Processors used by us in providing the Services. You and we agree to be bound by all applicable laws, rules, and regulations, as amended from time to time.

**Section 21. License, Copyright, Patents, Trademarks and Other Intellectual Property Rights.** You acknowledge that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Services and any versions thereof, including all Implementation Documentation and instructions relating thereto, are and shall remain our sole property or that of our Processors. You shall not during or at any time after the

expiration or termination of this Agreement in any way question or dispute our ownership thereof. In the event that new inventions, designs or processes evolve in performance of or as a result of the use of any of the Services, you acknowledge that the same



shall be our property, unless otherwise agreed in writing by us. If applicable, we grant you a license to use the Web Portals in connection with the Services provided hereunder during the term of this Agreement.

**Section 22. <u>Vendor</u>.** Any third party servicer or vendor, including any value added networks ("**Vendor**") used by you in connection with any of the Services shall be deemed to be your agent, and you will be liable for (i) any Vendor's failure to comply with any Security Procedures or operating requirements relating to the Services hereunder, (ii) for all fees, costs and expenses owed to each Vendor for its services, and (iii) for any claims, damages, costs and expenses incurred as a result of any Vendor's failure to perform, or delay or error in performing, its services. This paragraph shall survive termination of this Agreement.

**Section 23. <u>Processor</u>.** You acknowledge and agree that we may arrange for some parts of the Services to be performed or provided by a third party service provider, vendor or processor (each a "**Processor**"). Our use of a Processor shall not relieve us of our obligations under this Agreement, and we and any Processor shall only be responsible for the acts or failures to act by such Processor to the same extent we would incur responsibility therefore under this Agreement if we had so acted or failed to act. You agree not to bring a claim or any form of legal action against any Processor and agree to hold any such Processor harmless in connection with this Agreement and acknowledge that any such claims will be brought only against us.

**Section 24. <u>Unfair, Deceptive or Abusive Acts or Practices</u>.** Where you or your third parties utilize the Services provided herein to display or otherwise present content to consumers, and you create, add, modify or otherwise modify such display or content (your "**Modifications**"), you acknowledge and agree that we shall not be responsible for your Modifications. Notwithstanding the foregoing, you further agree that Modifications shall be clear, concise and not misleading. If we receive notice that the Modifications may be or is violative of this provision, as determined in our sole discretion, you agree to amend or cease use of the Modifications upon our request.

**Section 25. <u>Survival</u>.** All warranties, indemnities, limitations of liability, and confidentiality requirements will survive the performance and termination of this Agreement.

**Section 26. <u>Recording</u>.** We are authorized (but not obligated) to electronically record and retain telephone conversations between you (and your purported authorized representatives) and us.

**Section 27. <u>Headings</u>.** The headings used in this Agreement are for reference and convenience purposes, only, and shall not in any way limit or affect the meaning or interpretation of any of the terms hereof.

**Section 28. <u>Acceptance</u>.** You may accept the terms and conditions of this Agreement by signing the Authorization for this Agreement. Delivery of an executed Authorization via facsimile transmission or other similar method of electronic transmission shall be effective as if it were delivery of a manually delivered, original, executed counterpart thereof. Additionally, your use of any Service shall be deemed an acceptance of all the terms and conditions in this Part I and the Part for that particular Service.



---

**PART II: ACCOUNT RECONCILEMENT SERVICES**

**Section 1. <u>Disbursement Reconcilement and Deposit Reconcilement Services</u>.** We will provide Deposit Reconcilement Services and/or Disbursement Reconcilement Services to you as set forth in this Part. The Services to be provided to you may consist of any or all of the following as selected by you on the Implementation Documentation:

For Deposit Reconcilement Services: deposit reconciliation, which includes a report of multiple locations depositing into a single Account.

For Disbursement Reconcilement Services:

      A.    Partial reconciliation, which will include a list of Checks paid and items posted by us.

      B.    Full reconciliation that will include a list of both the paid Checks and the outstanding Checks still on file (information provided as to outstanding Checks is contingent upon information supplied by you).


**Section 2. <u>Check/Deposit Stock</u>.** In ordering Checks and/or deposit tickets, you agree to use the specifications provided by us. Your Check(s) must be business sized (8" X 3 3/8"), not personal or consumer sized. If, for any reason, your Checks or deposit ticket stock are substituted with blank stock or stock other than your stock, you hold us harmless from any Losses arising out of the use of such stock. We reserve the right to charge a reject rate or additional fees for any items rejected (i.e., Check quality causing manual intervention) over 2% of the items processed per month. Upon completion of a serial number digit sequence of Check stock, you will not re-use or recycle the same check serial number until at least three (3) months have passed.

**Section 3. <u>Check Issue Data</u>.** If you have full reconciliation you will provide the check issue file information prior to the checks posting for proper reconciliation.



**PART III: AUTOMATED CLEARING HOUSE ORIGINATION SERVICES**

**Section 1. ACH Origination.** We will act as an Originating Depository Financial Institution with respect to Entries initiated by you pursuant to this Agreement and the ACH Rules. Unless otherwise defined in this Part, Part I or Part XIV, all capitalized terms in this Part shall have the meanings ascribed to them in the ACH Rules.

**Section 2. Settlement Account.** You must maintain an appropriately designated deposit account (the "**Settlement Account**") with us for settlement of your ACH transactions. Changes to your Settlement Account may only be made by us through established procedures and the use of set-up forms outlined within the Implementation Documentation. We may, without prior notice or demand, obtain payment of any amount due and payable (including both fees for services and transaction settlements) to us under this Part by debiting your Settlement Account, and shall credit the Settlement Account for any amount received by us for which we have previously received payment from you. You shall maintain a balance of available funds in the Settlement Account or receive credit approval for exposure limits sufficient to cover your settlement obligations. In the event there are not sufficient available funds in the Settlement Account to cover your obligations, you acknowledge that we may debit any other Accounts with us and maintained by you or that we may set off against any amount we owe to you, in order to obtain payment of your obligations.

**Section 3. Transmittal of Entries by You; Transaction Limits.** You shall transmit Entries to us to the location(s) and in compliance with the formatting and other requirements set forth in the ACH Rules and as specified by us. You may transmit Entries using one of the secure Communication Methods as permitted by us from time to time, including, but not limited to, our Web Portals or direct transmission, as set forth in the Implementation Documentation. The total dollar amount of Entries transmitted by you to us on any one day or on consecutive days shall not exceed the transaction limits set by us from time to time.

**Section 4. Processing, Transmittal and Settlement by Us.** Except for On-Us Entries (defined further in this Section) or rejected Entries, we shall (i) process Entries received from you which conform with the instructions provided by us, (ii) transmit such Entries as an Originating Depository Financial Institution to the Federal Reserve Bank or any other ACH Operator, and (iii) settle for such Entries as provided in the ACH Rules. Funds transfers will be originated based on the Entries transmitted or otherwise communicated to us by you, or on your behalf using a Third-Party Service Provider (a "**TPSP**") which shall be deemed your Vendor under this Agreement (regardless of any referral by us). Each such Entry shall be deemed a "Payment Order." You agree that any Entries or Payment Orders originated by you or your TPSP will be solely for your own account and not for the benefit of a third party, unless you are a Third Party Sender You agree to be obligated and liable for any Payment Order submitted by you or by a TPSP on your behalf. The types of funds transfers that you wish to originate will be documented in our Implementation Documentation and must have our approval before you may use the ACH Services. If you are a Third Party Sender, you agree to enter into a Third-Party Processing Agreement with us, in addition to this Agreement. Please note that we do not provide or support ACH Services to a Third Party Sender which has an agreement with another Third Party Sender to act on behalf of an Originator but does not have a direct agreement with us (a "nested Third Party Sender").

(a)  General Requirements for Payment Orders.

(i)  *Compliance with Laws.* You acknowledge and agree that each Payment Order, whether submitted by you or a TPSP, will comply with all Applicable Law. You further acknowledge and agree that we may limit or restrict the type of Entries that you may originate. The specific types of Entry limitations are set forth in the Implementation Documentation or other notice we have separately provided to you. Upon our request therefore, you will promptly furnish to us evidence of your compliance with Applicable Law relating to any Payment Order or resulting funds transfer.

(ii)  *Compliance with Bank's Requirements; Accuracy of Information.* We may, from time to time, prescribe rules or requirements relating to the format of Payment Orders, cut-off times for delivery of Payment Orders for processing, and other administrative rules relating to funds transfers, Payment Orders and the Services governed by this Part. You agree to comply with such rules and requirements. We have no obligation to (a) process or act on any Payment Order that is not received in compliance with this Agreement or the Implementation Documentation or (b) correct, adjust or reverse any Payment Order received, resulting from non-compliance with the terms of this Agreement. You are solely responsible for the accuracy and completeness of all Payment Orders and for obtaining and documenting all authorizations and consents for any and all Payment Orders (and the related funds transfers) as required by Applicable Law (including ACH Rules), and for undertaking appropriate identity verification and other matters as may be required by Applicable Law. You may elect to use a third-party verification or compliance provider, which shall be deemed your Vendor under this Agreement (regardless of any referral by us). We are not responsible for detecting errors in any Payment Order and are entitled to rely on any Payment Order and other information in the form received from you. Any Payment Order received by us after the cut-off time established by us may be treated by us as being received on the next succeeding Business Day. In the event of a discrepancy between our records and your records with respect to any Payment Order, our records will be presumed to be correct.

(b)  Security Procedures. Your use of the ACH service constitutes your acceptance of our Security Procedures as a commercially reasonable means of authenticating a Payment Order communicated to us by you or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any Payment Order. Any Payment



Order communicated by you or on your behalf shall be effective as your Payment Order, and shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such Payment Order is received in accordance with the applicable Security Procedures, and if we accept such Payment Order in good faith. In addition, if any Payment Order was actually communicated or authorized by you or you otherwise benefited from such Payment Order (or resulting funds transfer), then you will be obligated to pay us the amount of the related funds transfer without regard to whether we complied with the Security Procedures. We may, in our discretion, use additional procedures to verify the authenticity of any Payment Order. You agree to implement any other reasonable authentication or Security Procedures established by us. You expressly agree that the funds transfers and Payment Orders communicated by a TPSP via direct connection with us or our ACH Operator shall be deemed in compliance with the Security Procedures and commercially reasonable.

(c)     Compliance with Security Procedures. If you choose to communicate any Payment Order (including any cancellation thereof) to us in a manner that varies from the established Security Procedures, and if we accept such Payment Order in good faith, then you agree to be bound by such Payment Order, whether or not authorized, and you will be deemed to have refused the Security Procedures that we offer and recommend as "commercially reasonable," and be obligated to pay us the amount of such Payment Order (or resulting funds transfer). However, we have no obligation to accept any Payment Order that is not communicated in compliance with the established Security Procedures. We are not responsible for refusal to act upon any Payment Order received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order in accordance with the Security Procedures have failed or where such action is delayed until verification can be obtained.

(d)     Rejection of Payment Orders. We have the right to reject, and refuse to accept, any Payment Order for any reason, including your failure to maintain a sufficient balance of collected funds in an Account; *provided, however,* that in rejecting, or refusing to accept, any Payment Order, we shall act in good faith and use our reasonable business judgment. We will have no liability to you, or any Affiliate based on such rejection or refusal of any Payment Order. If we determine that processing or honoring any Payment Order would cause the Settlement Account to be overdrawn, we may, but have no obligation to, execute the Payment Order and (i) create an overdraft in Settlement Account or (ii) transfer to the Settlement Account from another Account, funds sufficient to cover the deficiency in the Settlement Account. If any Payment Order is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a corrected Payment Order to us.

(e)     Cancellation or Amendment of Payment Order. You have no right to cancel or amend any Payment Order after it has been received by us. However, to the extent permitted by Applicable Law (including ACH Rules), we will use reasonable efforts to act on your request to cancel any such Payment Order before we process it, but we will have no liability if such cancellation is not affected. To the extent permitted by Applicable Law, we will also use reasonable efforts to, upon your request, reverse an Entry after we have processed such Entry, but we will have no liability if such reversal is not affected.

(f)     Transmittal and Settlement of On-Us Entries. We will transmit each Entry (other than an Entry where we, or at our option, our Affiliate, is also the Receiving Depository Financial Institution ("**RDFI**") (an "***On-Us Entry***")) that complies with this Agreement to the ACH network before the applicable deadlines if you timely deliver to us a complete and conforming Payment Order. We will settle for each such Entry in accordance with the Applicable Law and industry practice. In the case of an On-Us Entry, we will credit or debit, as appropriate, the account of the Receiver in the amount thereof on the effective date contained in the related Payment Order provided that the effective date is a Business Day. You hereby acknowledge that credit given by the RDFI to the Receiver for payment made via Entry is provisional until the RDFI receives final settlement for such Entry. You are hereby notified and agree that if the RDFI does not receive final settlement, the RDFI is entitled to a refund from the Receiver in the amount of the credit to the Receiver's account, and you will not be considered to have paid the amount of the Entry to the Receiver.

(g)     Inconsistency of Name and Account Number. We are not responsible for detecting errors in any Payment Order, including the identifying number of any intermediary bank or beneficiary's bank, even if that number does not correspond to the bank identified by name. You acknowledge and agree that funds transfers may be made on the basis of account number or other identifying number (including a bank transit routing number, SWIFT BIC or CHIPS UID Code). We and any receiving bank (including any beneficiary's bank and any intermediary bank) may rely on the account number or other identifying number of any bank (including a bank transit routing number, SWIFT BIC or CHIPS UID Code), person or bank account specified in the Payment Order even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to pay the amount of the Payment Order (or resulting funds transfer) to us is not excused in those circumstances.

**Section 5. Payment by You.** You authorize us to debit your Settlement Account to initiate Entries based on the Payment Orders received by us, and you agree to pay to us the amount of each Entry no later than the date the Entry is processed by us as set forth in the Implementation Documentation, and you hereby authorize us to charge your Account for payment of each Entry, including, but not limited to, any reversed or returned debit Entry. You agree to be obligated and liable for any Payment Order submitted by a TPSP as if such Payment Order was submitted directly by you. We may in our sole discretion (i) refuse to originate



any credit Entry or any batch of credit Entries for which adequate funds are not on deposit in your Settlement Account at the time the Entry is to be sent, even though such credit Entry may have already been received or accepted for processing, (ii) at any time without prior notice require you to pay the aggregate sum of the credit Entries in any batch or any credit Entries before you send such Entries to the ACH network, or before crediting a Receiver's account in the case of an On-Us Entry ("Prefunding", as further described in the Implementation Documentation). If we request that you Prefund a batch of credit Entries, and you fail to so pay for such Entries, then we are not obligated to process any of those Entries or send any Entries to the ACH network or debit or credit the account of a Receiver in the case of an On-Us Entry. If any Entry, including a reversed or returned debit Entry, creates an overdraft in the Settlement Account, then you agree to promptly pay us on demand and in immediately available funds, the amount of any such overdraft and any applicable overdraft fees.  The foregoing payment obligations will survive termination of this Agreement and this Part.

**Section 6. <u>Notice of Returned Transfers</u>.** We will endeavor to notify you through one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation of the receipt of a returned Entry, but we will have no liability to you based on the fact that such notice was not given at an earlier time. Provided that we have complied with the terms of this Agreement in connection with such an Entry, we will have no liability to you based on the return thereof.

**Section 7. <u>Data Retention; Audit</u>.** You shall retain data on file adequate to permit remaking of Entries for seven (7) days following the date of their transmittal to us as provided herein, and shall provide such data to us upon our request.  Also, upon our request, you agree to promptly provide copies of information maintained by you as required by Applicable Law.  In addition, upon request and during reasonable business hours, you agree that we, our regulators, and our auditors shall have access to your records relating to your use of the ACH services as required herein, and by Applicable Law, to evaluate your compliance with Applicable Law.  Failure to allow such access shall be deemed a material breach of this Agreement.

**Section 8. <u>Your Representations and Warranties</u>.** You represent, warrant and covenant that (i) any Payment Order submitted by you to us, or on your behalf by a TPSP, authorizes us to initiate Entries in accordance with the terms thereof; (ii) all Payment Orders and resulting funds transfers, and the origination thereof, comply with this Agreement and all Applicable Law, and all authorizations therefor will be obtained and all notifications related thereto will be provided by you before any Payment Order is communicated to us; (iii) any and all Payment Orders are and shall be accurate and complete; (iv) you will maintain all records relating to Transfers as required by Applicable Law; and (v) you shall originate Payment Orders only for your Accounts and not as agent or on behalf of any other third party, and you will notify us of your use of any TPSP or any other Vendor for the ACH services and you shall be responsible for the acts of any such Vendor as if they were your own. You shall be deemed to make on your own behalf, and on behalf of any TPSP, the same warranties to us with respect to Payment Orders and funds transfers as (A) we are deemed to make under the Applicable Law and the ACH Rules with respect thereto and (B) as you would make in connection with items endorsed and deposited to any of your Accounts under the UCC. Moreover, with respect to On-Us Entries, you shall be deemed to make the same warranties with respect thereto as we are deemed to make under Applicable Law with respect to Entries that do not constitute On-Us Entries. Each time a Payment Order is communicated or  delivered by you or your TPSP to us, you reaffirm the representations and warranties set forth in this Section.

**Section 9. <u>Cross Border Entries</u>.** To the extent permitted by us, cross  border Entries are transmitted by us in U.S. dollars and converted to the local currency for receipt in the foreign country at the exchange rate determined by our Processor on the date determined by our Processor, unless you have specifically agreed with the Receiver to send U.S. dollars and the Receiver has an account able to accept such currency.  All risk of fluctuation in the applicable exchange rate is borne by you. In the event of a returned cross border Entry, consumer payments will be credited to you at the originated U.S. dollar amount; corporate payments will be credited to you at the exchange rate determined by our Processor at the time of return.

**Section 10. <u>Notification of Change</u>.** We shall notify you of all Notifications of Change received from the ACH operator relating to Entries previously transmitted by you via the method selected by you, and repair any Entries at such time, for which we will charge a fee. You agree to promptly reflect such changes in your own records pay the applicable fee we charge for such repair.  The fee will apply each time we have to repair an Entry for you.



## PART IV: AUTOMATED SWEEP SERVICES

**Section 1. <u>Automated Sweep Services</u>.** Pursuant to this Part, you may choose to establish Automated Funds Investment ("**AFI**") or Automated Credit Sweep ("**ACS**") services in connection with your Account(s). For AFI, you may designate multiple Accounts to have the service (hereafter, the "**AFI Account(s)**"). For ACS, you may designate only one Account for the service (hereafter, the"**ACSA**").

**Section 2. <u>Definitions</u>.** For purposes of this Part the terms below shall be defined as follows:

A. "**Available Balance**" means the book or ledger balance minus uncollected funds and hold items.

B. "**Daily Activity Report**" means the written daily confirmations of securities purchase transactions for the repurchase agreement or collateralization option provided to you via our Web Portal or other agreed Communication Method.

C. "**Minimum Transfer Amount**" means an amount initially established by us that represents the minimum amount required before we will transfer funds to the ACSA from your line of credit, or from the ASCA to your line of credit. Before a transfer occurs to or from the ASCA, the Available Balance in your ASCA must vary from the Target Balance by at least the Minimum Transfer Amount. The Minimum Transfer Amount is subject to change at our discretion and we will notify you of such change.

D. "**Money Market Fund**" means any of the money market mutual funds as made available from time to time by us as part of the AFI services.

E. "**Sweep Amount**" means the Available Balance in your AFI Account in excess of the Target Balance, which is available to be transferred from your AFI designated Account(s) to the Sweep Target Account.  However, funds will only be transferred to Sweep Target Account if they meet the Variance Amount.

F. "**Sweep Target Account**" means the deposit or investment option to and from which funds are swept in connection with the AFI services pursuant to the procedures described in Section 3 of this Part.

G. "**Target Balance**" means an account balance which will be mutually established by you and us prior to any sweep transactions occurring and which represents the amount of money you elect to remain in each AFI Account after the Sweep Amount is transferred using the AFI services, or the money you elect to remain in the ACSA before or after transfers to or from your line of credit, as applicable.  In no event will the Target Balance be less than a minimum amount we will establish from time to time by notifying you.

H. "**Variance Amount**" means an amount initially established by mutual agreement of you and us of the minimum transfer amount to and/or from the AFI Account(s). Before a transfer from a particular AFI Account occurs, the Available Balance in that AFI Account must exceed the Target Balance by the Variance Amount. The Variance Amount is subject to change at our discretion and can vary depending upon your sweep option and other factors. In no event will the Variance Amount be less than a minimum amount we will establish from time to time by notifying you.

**Section 3. <u>Automated Funds Investment Service</u>.** At the end of each Business Day, we will automatically transfer the Sweep Amount to or from your AFI Account(s) and your Sweep Target Account according to our procedures as described in this Section and the Implementation Documentation. You appoint us and we accept the appointment to act as agent for you for the purpose of depositing, withdrawing, transferring and investing funds as described in this Section.

*A* **Sweep Target Account Options.** At the time you establish AFI services, you will choose  from one of the Sweep Target Account options offered by us from time to time. You designate the Sweep Target Account option to which its funds are swept based upon your risk tolerance. You must designate only one Sweep Target Account option for the AFI Account(s). *If you invest Public Funds, you must determine which Sweep Target  Account option is permissible under applicable state or federal  law.*

*1. Repurchase Agreement (**NOT FDIC INSURED**)*

In the event that you select this option, this Agreement shall constitute a written repurchase agreement as required by law. Each Business Day, we will automatically debit the Sweep Amount from your AFI Account and will transfer to you, as noted on our records, securities with a market value equal to or greater than the Sweep Amount. The securities are held in our account with a Federal Reserve Bank or such other financial institution as we determine, which may be us. The transfer of the securities to you shall be reflected in the Daily Activity Report.  We will repurchase the securities from you on the next Business Day. The repurchase price is the Sweep Amount plus the return provided by us as indicated on the Daily Activity Report. We do not retain any right to substitute securities.



We are acting solely as agent for you pursuant to this option in connection with the securities transfer and repurchase transactions described above. Such transactions are intended by both you and us to be sales and purchases. However, if any such transaction is determined to be a loan by you to us, we hereby pledge and grant to you, as security for the performance of our obligation to repay the loan, a security interest in the securities transferred to you.

Such security interest shall automatically attach upon withdrawal of the Sweep Amount from your AFI Account(s) by us pursuant to this Agreement. In the event of a bank failure or default by us in repurchasing the securities, you have the right to direct us to sell the securities and apply the proceeds in satisfaction of our obligation to repurchase. If the value of the securities transferred to you is less than the repurchase price to be paid by us, you may be deemed an unsecured creditor of ours for such deficiency.

FUNDS HELD FOR INVESTMENTS MADE IN THE REPURCHASE AGREEMENT OPTION, AND THE SECURITIES TRANSFERRED TO YOU, ARE NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, THE HUNTINGTON NATIONAL BANK, OUR AFFILIATES OR ANY OTHER BANK, AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC) OR GUARANTEED IN ANY WAY BY THE U.S. GOVERNMENT OR ANY AGENCY THEREOF.

Our repurchase agreement collateral pool from which securities transferred to you are purchased consists of investment grade debt securities issued by private corporations and private label collateralized mortgage obligations. All securities will be rated by Standard and Poor, Moody's, or Fitch as A or higher. This collateral pool also includes single and/or multi-family mortgages, home equity loans, credit card receivables and other debt issuances which have been securitized and structured to create short, intermediate, and long term mortgage-backed and asset-backed securities. These securities generally have an expected weighted average life maturity of less than five (5) years.

**The collateral pool for public funds customers consists solely of treasury notes and debt securities issued by the U.S. Treasury, and federally guaranteed or sponsored agencies such as FHLB, FNMA, FFCB, FHLMC or SLMA; however, we transfer securities from the collateral pool with a market value equal to or greater than 102% of any public funds Sweep Amount.**

2. *FDIC Insured Money Market Account* (the "**Money Market Deposit Account**")

Please note that automated funds transfers between your AFI Account and the Money Market Deposit Account are subject to federal regulations which impose limits as set forth in the "Rules and Regulations for Business Checking Accounts and Business Money Market Accounts." Upon the sixth withdrawal from your Money Market Deposit Account, your entire balance will be transferred to an AFI Account for the remainder of that statement period. If this limit is exceeded, you or we have the right to adjust the Target Balance and the Variance Amount for your AFI Account in order to reduce the number of automated transfers, or you or we can terminate your AFI service.

**3.** *Money Market Mutual Funds* **(*NOT FDIC INSURED*)**

If you select one of the Money Market Funds made available by us from time to time, there is no assurance that a fund will be able to maintain a stable net asset value of $1.00 per share. The rate of return is not guaranteed. We will endeavor to forward to you any proxies, financial statements or other literature received by us in connection with or relating to the shares held in the investment, but we shall be under no obligation to forward such proxies, financial statements or other literature. Your interest in the Money Market Funds may not be transferred, participated, assigned or hypothecated and any such transfer participation, assignment, or hypothecation shall be of no force or effect.

You acknowledge that shares of the above Money Market Funds (i) are not insured by the FDIC; (ii) are not deposits or other obligations of ours and are not guaranteed by us; and (iii) are subject to investment risks, including possible loss of the principal invested. Our sole duty with respect to the Sweep Target Account and the agency relationship with you is to execute purchases and redemptions of shares in the Money Market Funds as you have ordered pursuant to this Agreement. We have not made, and will not make, any recommendations with respect to the nature or investment quality of the Money Market Funds or shares therein, and expressly disclaim any responsibility for your decision to invest in the fund, which decision you represent has been made and will be made without our participation or advice. No officer or representative of ours is or shall be authorized to provide any information to you about the funds other than by the delivery of a prospectus or other related material.

If we decide to terminate a Sweep Target Account option that you have chosen, then we will provide advance notice to you of such termination effective thirty (30) days after we send notice unless a shorter time period is required due to closing of an investment firm. During such thirty (30) day period, you must choose another available Sweep Target Account option or terminate the AFI service.



*For the Money Market Funds and the FDIC Insured Money Market Account Options.* If, after posting all credits and debits, the Available Balance in your AFI Account(s) is below the Target Balance by an amount equal to or greater than the Variance Amount and if there are sufficient funds in the Sweep Target Account, funds are swept back into the AFI Account from the Sweep Target Account to increase the AFI Account balance to the Target Balance.

**B. Interest and Dividends.**

(i) For the Repurchase Agreement Sweep Target Account Options. At the opening of the next Business Day, the available balance in your AFI Account(s) will reflect the amounts in your Sweep Target Account so that the funds are immediately available to you for intra-day banking needs. Interest, or rate of return, is calculated on the Sweep Amount and is credited as a separate transaction to your AFI Account(s) at the end of the next Business Day.

(ii) For FDIC Insured Money Market Account Sweep Target Account Option. The Money Market Deposit Account will earn interest as described in, and is otherwise subject to, the terms set forth in our Account Rules. Interest is credited as a separate transaction to your Money Market Account monthly.

(iii) For Non-FDIC Insured Money Market Fund Options (Including those affiliated with The Huntington National Bank). All income earned on the investment will be termed "Dividends." Dividends shall be calculated at a rate determined by the fund, net of all service and transaction charges imposed by (i) the fund, (ii) its custodian and/or (iii) its transfer agent. Such Dividends shall also be calculated net of our fees pursuant to our current fee schedule which may be amended as set forth in Part I. Dividends are credited as a separate transaction monthly. We may also receive investment management and other administrative fees with respect to your shares of the money market funds from such funds, their distributors or investment advisers. These fees are set forth in the prospectuses of the money market funds.

**C. Changing Investment Options.** You may change your Sweep Target Account option only by completing and delivering to us the appropriate form approved by us, and you must notify us by contacting your account officer or Treasury Management representative. Changes in the Sweep Target Account option may require opening a new Sweep Target Account and closing the existing Sweep Target Account. In such case, you authorize us to deposit, withdraw or otherwise transfer money, or to purchase or sell securities, as required to accomplish the change to your Sweep Target Account.

**D. End of Year Reporting Requirements.** We are required to report to the Internal Revenue Service (IRS) interest or other income paid in connection with the Repurchase Agreement, taxable Money Market Funds, and FDIC Insured Money Market Accounts. We will provide you an IRS Form 1099 if you elect to sweep funds to any of the Sweep Target Account options described in the prior sentence any time during the tax year.

**Section 4. <u>Description and Terms of Automated Credit Sweep Services</u>.** In order to maintain your Target Balance in your ACSA, you authorize us to draw on your revolving line of credit ("**LOC**") from time to time and deposit such advances to your ACSA, and debit your ACSA from time to time to make payments on your LOC. ACS services are available only with lines of credit with maximums and minimums as established by us from time to time. Even if the principal amount of your LOC falls below any minimum principal amount we have so established, you may not lower your Target Balance below any minimum we have established.

After the end of each Business Day, we will post all credit and debit transactions to your ACSA, and we will calculate your Available Balance.

(i) If your Available Balance is above the Target Balance by an amount greater than or equal to the Minimum Transfer Amount, we will debit the amount by which such balance exceeds the Target Balance and apply such amount to repayment of your LOC in accordance with the promissory note and/or loan agreement executed by you.

(ii) If your Available Balance is less than the Target Balance by an amount that is greater than or equal to the Minimum Transfer Amount, you authorize us to draw on your LOC in the amount necessary to attain a balance equal to the Target Balance (up to the LOC maximum principal amount), and we will credit such advance to the ACSA.

(iii) If the Available Balance is above or below the Target Balance by an amount less than the Minimum Transfer Amount or if the Available Balance equals the Target Balance, no transfers to or from your LOC are made.

If you desire to use funds from multiple checking/demand deposit accounts for purposes of determining your Available Balance, you may do so only by using our Zero Balance Accounting service (described in Part XII). In such instance, the Concentration Account used in connection with that Service will be designated as the ACSA used to determine your Available Balance.

**Section 5. <u>Important Notice about FDIC Insurance Coverage in Connection with your Automated Sweep Services</u>**

The Federal Deposit Insurance Corporation ("**FDIC**") is requiring all banks to provide certain disclosures to their customers regarding sweep features linked to deposit accounts in the event the bank fails and is taken over by the FDIC. The requirement to provide this disclosure is general for all banks and is not related in any way to the current or expected condition of any bank.



If the FDIC takes over a bank, the FDIC has indicated that it will complete all internal transfers but will attempt to block transfers from coming into or going outside of a bank.

Currently the applicable FDIC insurance limits for deposits with us are combined with other funds on deposit with us by you in accordance with the FDIC's aggregation rules ("**Applicable FDIC Insurance Limits**"). Funds in your checking account prior to being swept out are insured up to the Applicable FDIC Insurance Limits.

If the FDIC takes over the Bank, funds swept from your checking account to another loan or credit account you have with us are not FDIC insured, but the FDIC will recognize your claim for the reduction of the balance of such other loan or credit account you have with us by the amount of the swept funds.

If you have selected our AFI services, where funds in your checking account are periodically swept into one of the following options that you have selected:

- Into an FDIC-insured money market deposit account with us; or
- Into a non-FDIC-insured investment product.

If the FDIC takes over the bank, funds swept from your checking account to an <u>FDIC-insured money market deposit account</u> with us continue to be FDIC-insured up to the Applicable FDIC Insurance Limits. Funds in the FDIC-insured money market deposit account in excess of the Applicable FDIC Insurance Limits are treated by the FDIC as uninsured deposits.

If the FDIC takes over the Bank, funds swept from your checking account to a <u>non-FDIC-insured investment product</u> will be treated by the FDIC as follows:

- *Sweeps to a Mutual Fund*. Funds swept to a mutual fund are not FDIC-insured if the sweep is completed, but the FDIC will recognize your claim for the value of your ownership interest in the mutual fund. If the sweep is not completed, the FDIC will treat the funds as if they remain in your checking account. The funds in your checking account will be insured up to the Applicable FDIC Insurance Limits and funds in excess of the Applicable FDIC Insurance Limits will be treated by the FDIC as uninsured deposits.

- *Repurchase Agreement Sweep*. Funds swept to the Repurchase Agreement option are not FDIC-insured, but the FDIC will recognize your claim for the value of your interest in the securities. If the value of your interest in the securities is less than the amount of our repurchase obligation, the FDIC will treat such deficiency amount as a general unsecured obligation of ours. If the sweep is not completed, the FDIC will treat the funds as if they remain in your checking account. The funds in your checking account will be insured up to the Applicable FDIC Insurance Limits and funds in excess of the Applicable FDIC Insurance Limits will be treated by the FDIC as uninsured deposits.



**PART V: BUSINESS SECURITY SUITE SERVICES**

Our Business Security Suite services permit you to return Checks and Entries which do not match the Check issue data or Entry data provided by you in advance, among other services described in this Part.

**Section 1. <u>Check Positive Pay Services</u>.** Each Business Day, you shall provide us a report listing the Checks drawn on your Account(s) that day (hereinafter the "**Check Register File**") using an agreed upon Communication Method and in the timeframe specified by us. Each Check Register File submitted shall accurately list all Checks drawn on the Account(s), by check number, dollar amount and any other criteria communicated by us to you, since the last Check Register File was submitted. If you have signed up for the "Payee Positive Pay" option, you must also provide the exact payee name for all Checks in the Check Register File. You agree that we may delay activation of or suspend services unless and until you provide test files to verify that the service is functioning as required and we notify you that the service is active.

Each Business Day, we will process Checks presented against the Account(s) through the check collection system in accordance with our normal procedures. In addition, we will compare the Checks presented against the Account(s) to the Check Register File provided by you. We will pay each Check that matches a Check listed on the Check Register File and charge the respective Account(s). We will create a list (hereinafter an "**Exception List**") of any Checks presented for payment against the Account(s) which do not match a listing on the Check Register File (hereinafter "**Exception Checks**")  Exception Checks may include stale-dated Items (using the time period elected by you for a Check to qualify as "stale dated" in the Implementation Documentation and on the face of the Check). If you use our Payee Positive Pay option and the payee name or a reasonable variation thereof does not match the Check Register File, those checks will become Exception Checks and become part of the Exception List. If you have signed up for the "Pay but Correct" option, you may correct Exception Checks for the Check number or dollar amount. If you correct the amount, it must match the written (not numeric) amount of the Check. The Exception List may also contain items that were originated by you as Checks but were converted into an Entry. We will make the Exception List available to you through one of the Communication Methods now or hereafter made available by us as early as is reasonably practical on the next Business Day after the Checks are presented. On the same Business Day an Exception List is made available, you agree to review the Exception List and instruct us, prior to the cut-off time disclosed to you, which Exception Checks to pay and which Exception Checks to return unpaid. In the event that we experience system issues where an Exception List was created that includes all Checks attempting to clear your account, whether or not they appear on the Check Register File, you will then be responsible to make a decision whether to pay or return each item by the cut-off time disclosed to  you. We will not be liable for any items over $10,000 that you fail to decision by the cut-off time disclosed to you. If you decision a Check to be returned, you agree the default return reason will be "Refer to Maker".  If you select an alternative return reason, you agree that the return reason selected is accurate**.**

If you do not instruct us by the cut-off time using an approved Communication Method on each day Exception Checks are presented, then we will return the Exception Checks unpaid and reverse the provisional debit against the Account(s).

Regardless of any pay decision by you, we have no obligation to pay any Check for which there is a stop payment order or which would create an overdraft. Each Check we pay in accordance with the provisions of this Section shall be deemed properly payable, and you waive any right to assert that any such Check  was not properly payable, including with respect to any Check which is a counterfeit, is altered, bears a forged or unauthorized signature, or was otherwise not validly issued.

You may elect to receive notifications from us ("**Alerts**") regarding pending Exception Checks via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply.

**A. Teller Positive Pay.** Teller Positive Pay allows a teller in our branches to compare a Check that someone is attempting  to cash with your Check Register File, and, notwithstanding other provisions in this Agreement, refuse  to cash the item if:  (i) the Check presented is not listed in the Check Register File, (ii) we do not receive a Check Register File, (iii) the Check is stale-dated (using the time period elected by you for a Check to qualify as "stale dated" in the Implementation Documentation and on the face of the Check, (iv) the Check is above any maximum dollar limit set by you, (v) there is a stop payment placed on the  Check, or (vi) the Check has been previously paid. Although an Exception List will be provided to you in connection with Teller Positive Pay, you will be unable to use the Exception List to review and make payment decisions

***Please note that you must specifically elect to receive Teller Positive Pay***. If you do not elect to turn on Teller Positive Pay or you subsequently turn off Teller Positive Pay, any Check presented at our branches to be cashed could be cashed despite the information in the Check Register File or a default setting or instructions to return any check not listed in the Check Register File. During the time in which you do not turn on or elect to turn off Teller Positive Pay, you assume all risk for any Checks cashed at our branches, even if not contained in a Check Register File.



**Section 2. <u>Reverse Positive Pay</u>.** Reverse Positive Pay is useful in situations in which you wish to prevent fraud and misuse of an Account(s), but cannot efficiently send us a Check Register File. With Reverse Positive Pay, we provide you with a list on each Business Day which provides images or lists of Check(s) (by check number and dollar amount) presented to us for payment on your Account(s) (hereinafter an "**Exception List**"). This Exception List will be made available to you using an agreed upon Communication Method and in the time-frame specified by us.

On the same Business Day an Exception List is made available to you, you agree to review the Exception List and instruct us, prior to the cut-off time disclosed to you, of your decision on each Check (*i.e.,* whether to return or pay the Check or pay the Check for a different amount). If you correct the amount, it must match the written (not numeric) amount of the Check.  If you decision a Check to be returned, you agree the default return reason will be "Refer to Maker"**.**  If you select an alternative return reason, you agree that the return reason selected is accurate**.**

If you do not instruct us as to your decision for any individual Check, or the entire Exception List, by the cut-off time using the approved Communication Method on the day the Exception List is presented, we will pay those Check(s) in the Exception List as presented and finalize the provisional debit against the Account(s). In these instances, we will deem your failure to decision any Check as an express authorization by you that such Check be timely paid and charged to the Account(s), regardless of whether such Check is in fact properly payable, and such inaction by you shall constitute a waiver and release by you of any and all claims you may then or in the future have that such Check was not properly payable, including with respect to any Check which is counterfeit, is altered, bears a forged or unauthorized signature, or was not otherwise validly issued. However, we have no obligation to pay any Check for which there is a stop payment order or which would create an overdraft.

**If you elect our Reverse Positive Pay service, you acknowledge and agree that Checks presented to our tellers for cash or immediate credit which are issued, or allegedly issued, by you on your Account(s) will not appear in the Exception List and may be paid by us, and you   agree such Checks are properly payable, and you shall not subsequently contest the validity thereof.**

You may elect to receive Alerts regarding a pending Exception List via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply.

A. **Teller Block.  Teller Block prevents the cashing of Checks at the teller line.  If you select the Teller block service, payees may only be able to deposit Checks at the teller line.**   Please note that you will also be prevented from transacting counter checks, withdrawal slips and debit memos at the teller line.

**Section 3. <u>ACH Positive Pay</u>.** ACH Positive Pay services allow you to provide us instructions to (i) block all Entries from posting to your designated Account(s) with us, or (ii) permit individual Entries to post to your designated Account(s) with us.  If you sign up for ACH Positive Pay, we will block all Entries (whether credit or debit) that attempt to post to your Account(s). In order to permit individual Entries, you must provide us, in a timely manner, with all of the required information (as communicated by us), and if you do not provide us with all of the required information, we will continue to block such Entry. However, we    will not comply with any instruction to block an Entry that represents the reversal of an Erroneous Entry. The term "**Erroneous Entry**" is defined for purposes of this Section as an Entry that (i) is a duplicate of an Entry previously initiated by the Originator or Originating Depository Financial Institution; (ii) orders payment to or from a person not intended to be credited or debited by the Originator; or (iii) orders payment in a dollar amount different than was intended by the Originator.

You are responsible for reviewing those Entries that are blocked or permitted as required for review of transactions under this Agreement. You may elect to receive notifications from us ("**Alerts**") regarding pending Entries via email or other Communication Method offered by us. Since Alerts will be sent over the internet, you may not receive Alerts in a timely manner due to internet traffic. In consideration of the two foregoing sentences, you should review transactions via the Web Portal and appropriately change any instructions in a timely manner if you so desire, otherwise current instructions where you have provided us all of the required information in a timely manner shall apply. Unless you sign up for Alerts, we assume no responsibility for advising you regarding pending Entries.

If you send us the required information to allow an Entry or change an Entry (an "**Instruction**") on a Business Day prior to our established cut-off time, and before the Settlement Date of that Entry, we will begin to process such Instruction on that Business Day. If you send us an Instruction after the established cut-off time on a Business Day, but before the Settlement Date of the Entry, we will begin to process such Instruction on the next Business Day. After the Business Day of the Settlement Date of an Entry, we will not follow any Instruction regarding such Entry. The "**Settlement Date**" is the date funds are exchanged between banks with respect to an Entry as reflected on the books of the Federal Reserve Bank.

**Section 4. <u>Check Block Services</u>.** Our Check Block service will automatically return all Checks presented against your Account(s). If you select Check Block, you agree not to issue Checks in connection with the designated Account(s).   We will



return all Checks presented against such Accounts (each, an "**Exception Check**"). However, we will permit any electronic debit, which includes, but is not limited to, Entries (including checks converted to Entries), wire transfers, or other electronic debits, unless specifically blocked or returned pursuant to other services described in this Part.  Please note that you will also be prevented from transacting counter checks, withdrawal slips and debit memos at the teller line.

**Section 5.  <u>Wire Block Services</u>**.  Wire Block services allow you to provide us instructions to (i) block all incoming, outgoing or all Payment Orders from posting to your designated Account(s) with us.  However, we will not comply with any instruction to block a Payment Order that represents a reject of an "**Erroneous Entry"**.  The term "Erroneous Entry" is defined for purposes of this Section as a Payment Order that (i) is a duplicate of a Payment Order previously submitted by you; (ii) orders of payment to or from a person not intended to be credited or debited by you; or (iii) a Payment Order in a dollar amount different than was intended by you.

**Section 6.  <u>Limitation of Liability.</u>**  In no event shall we be liable for any Losses relating  to paying a  Check that was  not properly payable, wrongful dishonor of a Check, or our or your actions  with respect to payment or return of any Check  (under the UCC or otherwise), or our failure to honor any Entry, including return or rejection of  any ACH Debit Entry, to  the extent such payment or return was completed in accordance with the terms of this Part. You agree that we exercise ordinary care whenever we rightfully pay or return a Check, Exception Check, or Entry consistent with the terms of this Part or your instructions. You expressly agree that your failure to timely direct us to return any presented Checks in accordance with the terms hereof will constitute acceptance by you of such presented Checks and each such presented Check will be properly charged against the Account on which it is drawn and we shall have no liability in connection with such presented Checks.



**PART VI: CASH DEPOSIT AND FULFILLMENT SERVICES**

**Section 1. Vault Services.** Our Vault services allow you to hire a Vendor to (i) deliver coin, currency, and Checks to us for deposit to your Account ("**Deposit**") or (ii) to order currency or coins ("**Order**") from a vault owned or operated by us ("**Vault**") to be delivered to you by the Vendor. Orders and Deposits will be debited and credited to an existing Account. As used in this Part, "**Vendor**" means a certified armored carrier that is acceptable to us and meets our requirements for transporting coins, currency, and Checks between you and the Vault. In the event that your Vendor ceases to meet such requirements, we may suspend the Vault services until your Vendor meets such requirements.

In addition, you may place Deposits into a Safe on your premises, the contents of which will be delivered to our Vault by the Vendor. As used herein, a "**Safe**" is a safe that utilizes "smart safe" technology, which you must obtain from an approved third party or us, and which will remain our property located at your premises. Notwithstanding that the Safe is our property, you are responsible for any loss or theft of the Safe, and its contents, while the Safe is in your physical possession or on your premises.

A. **Deposits.** The Vendor will pick up and deliver Deposits to the Vault. We may accept Deposits which have been prepared in accordance with our instructions from anyone who purports to be an agent of the Vendor or you. We are not liable for any loss of Deposits in connection with Vault services until they have been delivered to the Vault. We may refuse or not accept a Deposit for any reason at any time; provided, however, that in refusing any Deposit, we shall act in good faith and use our reasonable business judgment. Other than Deposits placed in a Safe, you will receive credit on the next Business Day after we receive, verify, and accept a Deposit at our Vault. For Deposits made via an envelope placed in the Safe you will receive credit on the Business Day we receive, verify, and accept the Deposit at our Vault. However, at our reasonable sole discretion, we will provide provisional credit to you for U.S. denominated currency placed in a Safe on the Business Day you place such currency in the Safe, and such credit will become final once we receive, verify, and accept the Deposit at our Vault. All credits (including advance credits from the Safe) are subject to our verification. We may adjust your Account, whether higher or lower, in connection with reconcilement of Deposits made at the Vault. We may establish limits for the amount of coin and currency that can be placed in the Safe, and we will communicate those limits to you.

B. **Orders.** We may provide an Order to anyone who purports to be an agent of the Vendor or you. Your Account will be debited for the amount of the Order on the day the Order is packed for release to the Vendor. Orders placed for delivery on Saturday, Sunday, or Monday are debited from your Account on the previous Business Day. You must place Orders by the time designated by us from time to time to receive next Business Day delivery. If you do not meet that deadline, we may not process the Order until the following Business Day. Orders exceeding $25,000 (or other amount set by us from time to time) will be debited from your Account on the Business Day such coin and currency is available for release from the Vault to your Vendor. We are not liable for any loss or delay in delivery of Orders and are not a guarantor of any delivery day or time. We may refuse to process an Order for any reason at any time; including, but not limited to, insufficient funds in your Account.

C. **Representations and Warranties.** You represent and warrant to us that: (i) you are the payee or holder of any Checks deposited; (ii) any Checks deposited do not contain image replacement documents, as that term is defined in 12 U.S.C. § 5001 *et seq.* and corresponding regulations ("**IRDs**"); (iii) any Checks included are in such form that we can create electronic files or IRDs that conform to all standards prescribed by 12 U.S.C. § 5001 et seq. and corresponding regulations; (iv) the Deposit does not contain any fraudulent or counterfeit items; (v) no depository bank, drawee, drawer, or endorser will reject presentment or return any Check, or a copy or other paper or electronic version of any Check such that we, a bank, drawer, drawee, or endorser will be asked to make payment based on a check, draft, or other negotiable instrument that a bank, drawee or endorser has already paid; and (vi) Checks are drawn on a financial institution in the United States and are payable in United States currency.

You agree not to deposit items via Vault services that are "ineligible items", as that term is defined by the Board of Governors of the Federal Reserve.

D. **Automatic Termination.** If you fail to use the Vault services for a period of thirteen (13) months, the Vault services will be automatically terminated.

**Section 2. Electronic Coin and Currency Orders.** Huntington provides coin and currency ordering via the telephone as part of its Vault Services. Huntington also supports the use of certain Vendors for coin and currency ordering or other enhancements of Vault Services. By utilizing a Vendor, you agree to the following additional terms:

(i) You acknowledge that we are not responsible or liable for your Vendor, and that your Vendor is responsible for the delivery of services and the hosting of any data provided by you. You will enter into a separate agreement with your Vendor, as your agent for delivering coin and currency order files to us.

(ii) We make no representations or warranties with respect to your Vendor or Vendor's services. You acknowledge that use of a third party Vendor is at your own risk.



(iii)      As such, you release and forever discharge Huntington, its directors, officers, employees and agents from any and all claims, losses, expenses, damages, costs or other liability which may result from the use of Vendor or our fulfilling coin and/or currency orders in response to transactions received through your Vendor; and, you will indemnify and hold us and our Affiliates, directors, officers, employees and agents harmless from and against all losses, expenses, damages, costs and liabilities, including internal and external counsel fees, that may arise out of your use of Vendor or our fulfilling coin and/or currency orders in response to transactions received through your Vendor. Notwithstanding the foregoing, you will have no obligation to indemnify if the losses, expenses, damages, costs or other liability results from our gross negligence or willful misconduct.

**Section 3. <u>Additional Terms and Conditions Unique to SafeCash Manager</u>.** Other than as specifically altered in this Section, all provisions of Section 1 still apply to use of the SafeCash Manager service. If you elect to receive the SafeCash Manager service, you must complete or provide any documents, authorizations, or information we or our approved provider requests and needs for implementation of Services. You are responsible for connectivity to the internet for use of online reporting services provided by SafeCash Manager. You must provide a location to operate the Safe in compliance with its operations manual provided to you. You must allow the approved provider access as necessary to your premises for installation of the Safe, and your premises must be prepared for the Safe prior to its installation.

**Service Term; Termination of SafeCash Manager.** You will automatically be obligated for a service term (and payment for such term) of 60 months ("**Initial Service Term**"). After expiration of the Initial Service Term, your obligation for SafeCash Manager services shall renew automatically each month ("**Successive Service Term**") until you or we terminate it. If you choose to terminate SafeCash Manager prior to expiration of the Initial Service Term, or we terminate SafeCash Manager for cause during the Initial Service Term, you are obligated to pay us the amount of the any fixed monthly fees times the number of months left of the Initial Service Term for each Safe. If we choose to terminate SafeCash Manager without cause prior to expiration of Initial Service Term, you are only obligated to pay for fees associated with SafeCash Manager incurred prior to and during the month of termination. Each time you obtain a Safe from us, or our approved Provider, the Initial Service Term shall commence for that Safe. After termination of SafeCash Manager, all Safe(s) must be returned to us by our Provider. You are obligated to use our Provider to de-install if the Safe(s) is owned by us. You are responsible for all costs associated with de-installing of the Safe(s) (freight, replacement parts, labor, deletion of customer information) which are billed to you.

**A. Equipment Warranty and Maintenance.** We will pass through warranties regarding the Safe received from our approved provider. The approved provider warrants that the equipment will be free from defects in material and workmanship and will substantially conform to the approved provider's published specifications for twelve (12) months (the "**Warranty Period**") after shipment to you. The approved provider will repair or replace, at its option and expense, items of equipment that do not meet this warranty provided you report the problem to approved provider, or us, during the Warranty Period. The approved provider may fulfill warranty obligations at an approved provider designated site or depot. If you return the equipment to the approved provider site for warranty repair, shipping will be at your expense and risk. The approved provider will return the equipment at approved provider expense and risk if the equipment was defective. Replaced items under a warranty event become the approved provider's property. This warranty does not extend to damage caused by normal wear and tear, accident, misuse, disaster, improper supplies or alterations, attachments, parts, or repairs not provided or authorized by the approved provider, and is not in lieu of a maintenance agreement.

Maintenance is in addition to the warranty and covers damage caused by normal wear and tear, but does not cover accidental damage, misuse, disaster, improper supplies or alterations, attachments, parts, or generalized repairs. Maintenance also does not include equipment which must be updated, for example, modems which become outdated and are no longer operative. Maintenance services by the approved provider are in addition to the fees for Vault Services and/or the SafeCash Manager.

**Section 4. <u>Limitation on Liability</u>.** In addition to the limitations on liability set forth in Part I of this Agreement, you agree that, absent a breach of the standard of care set forth in this Agreement, our verification of the amount of any Deposit made using the services in this Part shall be binding and conclusive upon you, absent manifest error by us, and our liability for any discrepancies or shortages in the amount of any Deposit verified by us shall be limited to the amount of such discrepancy or shortage. Further, we shall have no liability for any discrepancy or shortage in the amount of an Order and the amount of cash received by you from any such Order, it being understood that it is the duty of your Vendor to review and approve the amount of any Order prepared for you prior to such Order leaving our Vault. You agree to fully cooperate in the investigation of any alleged loss or discrepancy.



**PART VII: CONTROLLED DISBURSEMENT SERVICES**

**Section 1. <u>Description and Terms of Disbursement Services</u>.** We will identify each controlled disbursement account designated by you (each, a "**CDA**") by providing you a specified Controlled Disbursement Routing Number ("**CDRN**"), which you must use on all Checks issued from the CDAs. You must order checks for each CDA by using the MICR line specification sheet provided by us in connection with each CDA and depicting the CDRN. You shall not use such line specification sheet in connection with ordering Checks for any other Account(s) with us that you have not designated as a CDA. You agree to destroy all unused Checks used in conjunction with a CDA before you designated such Account as a CDA. If you or we terminate Controlled Disbursement services, you agree to immediately stop using and destroy any Checks with the CDRN. You must re-purchase Checks without the CDRN if you continue to use the Account without Controlled Disbursement services. If you continue to use the CDRN on Checks after termination of Controlled Disbursement services for more than one hundred twenty (120) days, we will close your Account and return all Checks attempting to clear the closed Account.

Each Business Day, we will ascertain the amounts payable on all Checks drawn on your CDAs and presented to us for payment and report such information to your (the "**Report**") on that Business Day. We will make the Report available to you via a Communication Method that we may, at our sole discretion, change from time to time. The Report will not include the amount of any Checks presented to us for payment which have been either rejected by our check processing equipment or by Federal Reserve check processing equipment. The Report may, but will not be required to, include electronic payment transactions.

Each Business Day you must access the Report via an agreed Communication Method and determine the total dollar amount required to pay all Checks presented for payment (the "**Presentment Amount**") for each CDA and fund each CDA with the Presentment Amount each Business Day with immediately available funds in accordance with our Funds Availability Policy. You will designate one method to fund all CDAs with the Presentment Amount as set forth on the Implementation Documentation by the applicable cut-off time.

**Section 2. <u>Overdrafts and Charges</u>.** If you fail to fund the CDA with the Presentment Amount for any reason whatsoever, and each CDA individually does not contain enough collected funds to cover the Presentment Amount, we will deem the CDA in an overdraft position ("**Overdrawn**"). At such time, we may charge the CDA any applicable overdraft or non-sufficient funds fees, whether or not we pay or dishonor any or all Checks. We reserve the right to dishonor and return any and all Checks drawn on a CDA (i) if the CDA is Overdrawn, or (ii) that, if cleared, will make the CDA Overdrawn.



## PART VIII: EBILL PRESENT & PAY

**Section 1. eBill Present & Pay Service.** The eBill Present & Pay Service ("**EBPP**") provides electronic presentment of invoices and the collection of payments on such invoices via the web (the "**Web**"), your customer service representative ("**CSR**"), interactive voice response ("**IVR**") system and/or short message system (a "**Text**"). Automated Clearing House ("**ACH**") and credit card transactions are the acceptable forms of payment. Therefore, in using this Service, you agree to abide by ACH Rules and applicable credit card rules.

**Section 2. Invoice Presentment.** We will provide a webpage which is branded with your company name and logo for your payers to login and view invoices and/or make payments. You shall transmit invoice information to us to the location(s) and in compliance with the formatting and other requirements specified by us. You may transmit invoice information using one of the Communication Methods as permitted by us from time to time, including, but not limited to, our Web Portals or direct transmission, as set forth in the Implementation Documentation.

**Section 3. Payment Channels.** You have the option to select one or more of the following payment channels in which to collect payments from your payers: Web, CSR, IVR and Text. You will also have options available with regards to each payment channel as set forth in the Implementation Documentation.

**Section 4. Payment Processing.** Once your payers create ACH and credit card entries, we will periodically (at least once each Business Day) generate and send files for settlement. Generally, the funds will be available to you on the next Business Day. We will transmit to you, in an agreed upon format, payment information and other data received from your payer through the Web, IVR and Text channels. You must maintain an appropriate designated deposit account (the "**Settlement Account**") with us for settlement and returns of ACH and credit card payments. We may, without prior notice or demand, obtain payment of any amounts due and payable (including fees for services and transaction settlements) to us under this Part by debiting your Settlement Account, and we shall credit the Settlement Account for any available funds received from your payers. You shall at all times maintain a balance of available funds in the Settlement Account sufficient to cover your settlement obligations. In the event there are not sufficient available funds in the Settlement Account to cover your obligations, you acknowledge that we may debit any other Accounts maintained by you with us or that we may set off against any amount we owe to you, in order to obtain payment of your obligations. In addition, we may require a minimum balance to be maintained in the Settlement Account at all times in order to cover any fees and returns (the "**Target Balance**"). We may set the initial Target Balance at any time. We further reserve the right to unilaterally amend the Target Balance upon five (5) Business Days' notice to you.

**Section 5. Processing, Transmittal and Settlement by Us.** We shall (i) process data received from you that conforms with the formatting and other requirements specified by us, (ii) electronically present the data as invoices to your payers; (iii) provide payment channels, which you have selected, to your payers; (iv) collect and settle such payments into the Settlement Account; and (v) provide additional information from the payer to you, as you have selected. You agree that any invoices originated by you will be solely for your own account and not for the benefit of a third party.

    (a)   Your Obligations.

    (i)   *Compliance with Laws.* You acknowledge and agree that use of the Service is for a legitimate business purpose and each invoice will comply with all Applicable Law. You further acknowledge and agree that we may limit or restrict the type of invoices that you may originate. The specific types of limitations are set forth in the Implementation Documentation or other notice we may separately provide to you. Upon our request, you will promptly furnish to us evidence of your compliance with Applicable Law relating to any invoice or resulting payment.

    (ii)   *Compliance with Bank's Requirements; Accuracy of Information.* We may, from time to time, prescribe rules or requirements relating to the format of invoices, cut-off times for delivery of payments for processing, and other administrative rules relating to invoices, payments and the Services governed by this Part. You agree to comply with such rules and requirements. We have no obligation to (A) process or act on any invoice that is not received in compliance with this Agreement, the Implementation Documentation or such rules and requirements; or (B) correct, adjust or reverse any invoice received from you that is not in compliance with the terms of this Agreement, the Implementation Documentation or such rules and requirements. You are solely responsible for the accuracy and completeness of all transmitted data and invoices and for obtaining and documenting all authorizations and consents for any and all invoices and payments (and the related funds transfers) as required by Applicable Law, and for undertaking appropriate identity verification and other matters as may be required by Applicable Law. We are not responsible for detecting errors in any transmitted data, invoice or payment and are entitled to rely on any invoice and other information in the form received from you. Any payment received by us after the cut-off time established by us may be treated by us as being received on the next succeeding Business Day. In the event of a discrepancy between our records and your records with respect to any payment, our records will be presumed to be correct.

    (b)   Security Procedures. Your use of the Services constitutes your acceptance of our Security Procedures as a commercially reasonable means of authenticating the data communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, the data communicated to us. Any data or invoice communicated by or on your behalf shall be effective as your instruction, and shall be enforceable against you,



whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such data and/or invoice is received in accordance with the applicable Security Procedures, and if we accept such data or invoice in good faith.

In addition, if any data or invoice was actually communicated or authorized by you or you otherwise benefited from such invoice (or resulting payment), then you will be obligated to pay us the amount of the related payment without regard to whether we complied with the Security Procedures if we receive notice of a return. We may, in our discretion, use additional procedures to verify the authenticity of any transmitted data, invoice or payment. You agree to implement any other reasonable authentication or Security Procedures established by us.

(c)     Rejection of Data Transmissions and/or Invoices. We have the right to reject, and refuse to accept, any transmitted data, invoice or payment for any reason; *provided, however,* that in rejecting, or refusing to accept, any transmitted data, invoice or payment we shall act in good faith and use our reasonable business judgment.  We will have no liability to you or any Affiliate based on such rejection or refusal.  If we reject any transmitted data, invoice or payment, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice. If any data transmission, invoice or payment is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit the data or invoice, or supply the necessary documentation for the payment.

(d)     Cancellation or Amendment of Data Transmissions and/or Invoices. You have no right to cancel or amend any data transmission or invoice after it has been received by us. However, to the extent permitted by Applicable Law, we will use reasonable efforts to act on your request to cancel or amend any such data transmission or invoice before we process it, but we will have no liability if such cancellation or amendment is not effected.  To the extent permitted by Applicable Law, we will also use reasonable efforts to, upon  your request, reverse a payment after we have processed the payment, but we will have no liability if such reversal is not effected.

(e)     Inconsistency of Name and Account Number. We are not responsible for detecting errors in any payment instruction from your payers, including the identifying number of any [bank], even if that number does not correspond to the bank identified by name. You acknowledge and agree that payments may be made on the basis of account number or other identifying number (including a bank transit routing number). We and any receiving bank (including any beneficiary's bank) may rely on the account number or  other identifying number of any bank  (including a  bank transit  routing number), person  or bank account specified in the payment even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to return the amount of the payment (or resulting funds transfer) to us is not excused in those circumstances.

**Section 6. Notice of Returned Transfers.** We will endeavor to notify you through one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation of the receipt of a returned payment, but we will have no liability to you based on the fact that such notice was not given at an earlier time. Provided that we have complied with the terms of this Agreement in connection with such a return, we will have no liability to you based on the return thereof.

**Section 7. Data Retention; Audit.** You shall retain data on file adequate to permit remaking of transmittal data or invoices for seven (7) days following the date of their transmittal to us as provided herein, and shall provide such data to us upon our request. Also, upon our request, you agree to promptly provide copies of information maintained by you as required by Applicable Law.  In addition, upon request and during reasonable business hours, you agree that we, our regulators, and our auditors shall have access to your records relating to your use of these Services as required herein, and by Applicable Law, to evaluate your compliance with Applicable Law.  Failure to allow such access shall be deemed a material breach of this Agreement.

**Section 8. Your Representations and Warranties.** You represent, warrant and covenant that (i) any transmittal data or invoices submitted by you to us, or on your behalf by a Third Party Service Provider ("**TPSP**"), authorizes us to present invoices to your payers; (ii)  all transmitted data or invoices, as well as resulting payments, comply with this Agreement and all Applicable Law, and all authorizations therefor will be  obtained  and  all  notifications  related thereto will  be  provided  by  you  before any invoice is communicated to us; (iii) any and all transmitted data and/or invoices are and shall  be accurate and complete; (iv) you will maintain all records relating to the transmitted data and invoices as required by Applicable Law; (v) you shall originate invoices only for legitimate business purposes and not as agent or on behalf of  any other third party, (vi)  you will notify us  of  your use of any TPSP  or any other Vendor for these Services and you shall be responsible for the acts of any such Vendor as if they were your  own; and (vii) you shall invoice and apply payments to payer invoices or accounts in accordance with Applicable Law. You shall be deemed to make on your own behalf, and on behalf of  any  TPSP,  the  same  warranties  to  us  with respect to all Payment Orders and funds transfers related to your invoices as (A) we are deemed to make under the Applicable Law and the ACH Rules with respect thereto and (B) as you  would make in connection with items collected and deposited to any of your Accounts under the UCC and applicable credit card rules.

**Each time an invoice is communicated or delivered by you or your TPSP to us and each time you receive a payment into your Settlement Account, you reaffirm the representations and warranties set forth in this Section.**



**Section 9. <u>License, Copyright, Patents, Trademarks and Other Intellectual Property Rights</u>.** You have the right, title and ownership to grant, and hereby grant us, a license to use your company name, logo, copyright, trademarks, trade names and other of your intellectual property rights (the "**Marks**") in connection with EBPP during the term of the Service.   You will indemnify and hold us and our Processors harmless from and against any and all claims that use of the Marks as authorized by you, infringes upon the rights of another.

**Section 10.  <u>Modification of Users and Termination of EBPP</u>.**  You are responsible to notify us of the removal or modification of a Master User, Authorized User and/or termination of the EBPP Service.  ***Updating the Web Portal is not sufficient notification of changes to your EBPP Service***.  Likewise, you are responsible to notify us of the removal or modification of a Master User, Authorized User and/or termination of the Web Portal Service, with respect to your EBPP Service.  ***Updating the EBPP Service is not sufficient notification of changes to your Web Portal.***   Transactions which take place after the modification or termination of a Master User, Authorized User or termination of the EBPP Service will be subject to our review and resolution thereof shall be in our sole discretion.



## PART IX: ELECTRONIC DEPOSIT SERVICES

**Section 1. Remote Deposit Capture and Image Cash Letter.** We allow you to scan your Checks with equipment and software that we provide to you ("**Remote Deposit Capture**" or "**RDC**"), or that you own ("**Image Cash Letter**" or "**ICL**"), in order to create image files that you will send to us and that we may accept for deposit into your Account(s). You will access RDC and ICL and make deposits through an approved Communication Method in accordance with our Security Procedures. Deposits will be sent to us in the form of an electronic file containing images of Checks ("**Electronic File**").

**A. Electronic Files or IRDs.** You will create for deposit an Electronic File where you are the payee or the holder of the Checks. We may create Image Replacement Documents from such Electronic File. The terms "Substitute Check" and "Image Replacement Document" ("IRD") may be used interchangeably and have the same meaning as defined by 12 U.S.C. § 5001 *et seq*. and corresponding regulations. We may refuse to process or return IRDs or the Electronic File for any reason at any time before accepting such IRDs or Electronic Files for deposit; provided, however, that in returning, or refusing to process, any deposit, we shall act in good faith and use our reasonable business judgment. Your deposits are deemed made when we accept IRDs or Electronic Files for deposit. We in our discretion may notify you that we will or will not accept IRDs or Electronic Files for deposit. Until we accept the Electronic File or IRDs, any information contained in the Electronic Files or IRDs belongs to and is your sole responsibility. Any information from Checks or items contained in the software belongs to and is your sole responsibility. Any physical Check in your possession or your agent's belongs to and is your sole responsibility.

When you make deposits via RDC or ICL with Electronic Files, you represent to us and agree that:

(i)    you are the payee or holder of the Checks;

(ii)   the Electronic Files contain exact images of the front and back of the Checks which you seek to deposit;

(iii)  the Electronic Files enable us to create IRDs that meet the definition of "Substitute Check" and conform to all standards prescribed by 12 U.S.C. § 5001 et seq. and corresponding regulations;

(iv)   the Electronic Files do not contain any fraudulent items;

(v)    no depository bank, drawee, drawer, or endorser will receive presentment or return of an IRD, the original Check, or a copy or other paper or electronic version of an IRD or original Check such that we, a bank, drawer, drawee, or endorser will be asked to make payment based on a Check that bank, drawee or endorser has already paid;

(vi)   we are able to create IRDs from Electronic Files in such a manner that subsequent endorsements will not render previous endorsements illegible;

(vii)  Checks are drawn on a financial institution in the United States and are payable in United States currency; and,

(viii) you have procedures that require your employees using RDC or ICL to mark, frank, or otherwise indicate on the physical Check that it has been scanned for electronic deposit, and such marking or franking does not interfere with the MICR line, payee, date, amount (formal and informal), signature, or endorsement on the Check. A proper endorsement shall state, at a minimum, "For Remote Deposit to The Huntington National Bank". Although we provide a virtual endorsement, the virtual endorsement does not show on the physical Check.

(ix)   We reserve the right, in our sole discretion, not to accept deposits for any reason; provided, however, that in refusing to accept any deposit, we shall act in good faith and use our reasonable business judgment. You agree not to deposit via RDC or ICL "ineligible items," as that term is used by the Board of Governors of the Federal Reserve. You further agree not to deposit Remotely Created Checks (RCC) without our agreement.

**B. Availability of RDC and ICL.** You must initiate deposits before the applicable cut-off time (of which we will notify you) on a Business Day in order for us to process such deposits on that Business Day. If you initiate deposits after the applicable cut-off time on a Business Day, we will begin to process such deposits on the next Business Day. Processing of deposits by us does not mean that we have accepted deposits. The scanner(s) used in connection with RDC should be attached to the same stations throughout the use of the RDC service.

**C. Storage and Disposal.** You must limit who is permitted to access the history of deposits sent to us via RDC or ICL. You must keep records of the Checks for the length of time required by your applicable state record retention laws. You must shred any original Check after verification of deposit. Original Checks that have been deposited and verified must be destroyed within ninety (90) calendar days. Until you destroy any Check or image of the same, you must, at a minimum, keep such document in a secure locked area or in a password protected environment. If you create an image of the Check, you must create a read-only image that cannot be copied or reproduced.



**D. RDC Scanner**.  We will provide one scanner (including the manufacturer's warranty) for each location.  If this scanner breaks down or otherwise becomes obsolete or unusable, you will be responsible for the cost of a replacement scanner. All other expenses or fees associated with the RDC scanner we provide, as well as any replacement scanner, will be at your expense including, but not limited to, upgrades, scanner swaps, additional or extended manufacturer's warranty and/or cleaning and maintenance supplies and service. **Audit.** In order to ensure that you are in compliance with the terms of this Part and Applicable Law, we may conduct periodic onsite visits during reasonable business hours and upon at least twenty-four (24) hours advance notice. Further, you agree to cooperate with us and provide to us any documents or information we request, including, but not limited to, your files, records, and Checks (or images of the same if the originals have been destroyed). You agree to institute reasonable internal controls at our request.  Failure to comply with this section shall be a material breach of this Agreement.

**E. Reserve Account.** If, upon our review of your Account activity, we determine that abuse or unauthorized activity is or may be occurring with respect to deposits, we may require that you maintain a reserve account ("**Reserve Account**") with a minimum balance equal to the previous month's total deposits or an amount as otherwise requested by us, subject to quarterly adjustment on the first day of each quarter. You grant to us a security interest in, and lien on, the funds in the Reserve Account, to secure the prompt and full payment of all your obligations to us under this Part. We will make withdrawals from the Reserve Account for reimbursement in connection with returned deposited items (including those which are the subject of UCC warranty claims). The Reserve Account will be under our sole dominion and control, and you will have no right of withdrawal of any of the funds in the Reserve Account, notwithstanding any Account Rules for that account. After you or we terminate this Agreement or the RDC and ICL services, we will turn over remaining funds in the Reserve Account to you no later than one hundred eighty (180) days after such termination. In the event that the balance in the Reserve Account goes below the required amount for any reason, you shall immediately send us sufficient funds to bring the Reserve Account balance up to the minimum required level and we shall be permitted to debit another Account of yours to fulfill such request.

**F. Maintenance of Scanner and Supplies.** At all times, you must maintain the scanner on loan to you for use with RDC in good working order. You are responsible for all maintenance costs, which may include, but is not limited to cleaning kits, ink replacement cartridges, power cord and/or USB cord replacement.

**G. Termination of Service.** In addition to the requirements upon termination as set forth in Part I, upon any termination of the RDC service, you must return to us any scanner, power cords, cables and any other equipment (including any manuals or service records) (taken together and referred to as "**Equipment**") on loan from us in a condition satisfactory to us. You will be supplied a return shipping label to return all Equipment. If the Equipment is not received within 14 Business Days of your receipt of the shipping label, we reserve the right to charge your Account or otherwise obtain reimbursement for any unreturned, missing or damaged Equipment.



**PART X: ESCROW SOLUTION SERVICES**

**Section 1. <u>Description of Services</u>**. Our Escrow Solution Services (the "Services") provides sub-accounting through one master deposit account. You will access this Service through our Web Portal. The Services may consist of any or all of the following as selected by you:

    A.  Each sub-account may earn interest and reflect deposits and disbursements. You may elect to accrue interest or disburse interest periodically.

    B.  Each sub-account designee or beneficiary (the "sub-account holder") may access their assigned sub-account through our Web Portal, as authorized by you, in accordance with our Security Procedures.

    C.  We do not provide Services or open master or sub-accounts for a "Prohibited Business". A "Prohibited Business" includes, but is not limited to growers, manufacturers or dispensers of medical marijuana, hydroponics, illegal or synthetic drugs (such as bath salts). The list of Prohibited Businesses may be updated from time to time. Please contact your banker for a comprehensive list.

**Section 2. <u>Our Obligations</u>**. We will provide the Service in accordance with our Account Rules and this Part.

    A.  Interest, if any, for each sub-account shall be paid up to the date of closure for each sub-account.

    B.  Access to the master deposit Account is electronic. Checks will not be honored on the account and you will indemnify and hold us harmless for any Check that is returned unpaid from the master deposit Account.

    C.  We will retain Records in accordance with Applicable Law.

**Section 3. <u>Your Obligations</u>.** While we provide the ability to maintain sub-accounts, you are responsible to:

    A.  Provide identifying information for each sub-account holder. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each entity or person that opens an account or sub-account. We will ask for information that will allow us to identify the sub-account holder and may elect to decline a sub-account holder that is listed as a Specially Designated National or otherwise prevented from having an account in accordance with the Office of Foreign Assets Control or other Applicable Law.

    B.  Provide a completed Internal Revenue Service form(s) W-8 or W-9. You agree that we will be unable to credit interest to any sub-account holder until we receive and verify each sub-account holder's W-8 or W-9. You must also notify the sub-account holder if you retain all or a portion of the interest as a fee.

    C.  Comply with applicable law, rule and/or ordinances with respect to the purpose and use of each sub-account. For instance, if the sub-account is being used to account for tenant security deposits earning interest, you will be responsible to provide interest required over and above the amount offered by us.

    D.  You must be located within Ohio, Illinois, Indiana, Kentucky, Michigan, Pennsylvania, West Virginia, Wisconsin or Florida in the United States of America; or, as otherwise indicated by us.

    E.  Maintain legally required documentation with regards to your customers. We may access, upon reasonable request, your template agreement with your customer; or, specific agreements with each sub-account holder.

    F.  You acknowledge that a sub-account may not qualify for pass-through insurance through the Federal Deposit Insurance Corporation (FDIC) if you keep a portion of the interest without disclosing to the sub-account holder that the withheld portion is a fee.



**PART XI: INFORMATION REPORTING SERVICES AND ELECTRONIC DATA TRANSMISSION**

**Section 1. <u>Description of Services</u>.** Our Information Reporting services make certain account, transaction, and related information available to help you control and manage your Accounts. The information may include information from the Services used by you and transactions on your Account(s), including the Records produced using one of the Services. Information Reporting can be provided through any one or more of the Communication Methods permitted by us from time to time and subscribed to by you.

**Section 2. <u>Electronic Data Interchange</u>.** We will, on your behalf, receive or send information and data electronically with respect to an Account which is accompanied by payments transmitted or received through the National Automated Clearing House Association, other electronic payment networks, and other processing systems using an established Communication Method as may be set forth on the Implementation Documentation ("**EDI**"). In providing the services described herein, we are acting only to facilitate information flow and not as the originating bank or acting as the ODFI (as defined in the ACH Rules). We shall have no liability if payments are not made or funded pursuant to such information. We will, however, increase or decrease, as applicable, the balance of the Account on the designated settlement date.

You shall at your own expense provide and maintain the equipment, software and services necessary to effectively and reliably test, transmit and receive all EDI information received or sent by us since the most recent transmission or receipt of information ("**Documents**"). You may elect to use our services to assist in the translation of Documents to our specific formats. If you utilize one of our Web Portals to receive/view Documents, we will provide you with the appropriate specifications in order to facilitate your compliance with this paragraph. You will be deemed to have satisfied the requirements of this paragraph if you contract with a Value Added Network ("**VAN**") acceptable to us, which provides and maintains such equipment, software and services.

Where applicable, Documents will be transmitted to you or received by us either directly or through the VAN designated by you. Transmission to your designated VAN shall constitute transmission to you hereunder. You may modify your election to use, not use, or change a VAN upon thirty (30) days prior written notice to us. You will be responsible for all costs of any VAN with which you contract. You shall be liable and agree to indemnify and hold us harmless for any claim, action, suit or liability arising out of any act or omission of your VAN. The preceding sentence may not apply if you are a public funds customer (e.g. government or public university) and the governing state law, or rule, regulation or regulatory opinion prohibits indemnification by such entities.

We shall electronically transmit to you on each Business Day, the information received even if Documents contain no information that particular day. Documents with respect to the origination side of EDI will only be sent when scheduled with you as set forth in the Implementation Documentation. The Implementation Documentation will also include the reporting methodology agreed to between you and us.

Upon receipt by you of any Documents, you shall promptly and properly transmit a functional acknowledgement in return, unless you have chosen to waive the need for acknowledgement. The acknowledgement (or waiver thereof) shall constitute conclusive evidence Documents have been properly received. If any Document is received in an unintelligible or garbled form, you shall promptly notify us in a reasonable manner and upon receipt of such notice, we shall re-transmit such Document. In the absence of such notice, we shall have no further obligation with respect to the transmission of such Document.

**Section 3. <u>Data Exchange</u>.** In connection with the Data Exchange Service, we will collect certain information with respect to Accounts (and/or, via a Processor, accounts maintained with other financial institutions), transactions involving Accounts, or accounts maintained by others for whom you have been properly authorized to access such account information, and we will make such information available to you to be viewed electronically, all as more specifically described in the Implementation Documentation. Alternatively, we may send, via a Processor, certain information with respect to Accounts, transactions involving Accounts, or accounts maintained by others with us for whom you have been properly authorized to access such account information, so that such information may be made available to you via other financial institutions with whom you bank, all as more specifically described in the Implementation Documentation.

**Section 4. <u>Visual Archive</u>.** We will provide you with a CD that contains some or all of your Records in connection with and as applicable to the use of and transactions on an Account or specific Services that you designate. As used in this Section, "Records" means images of periodic statements, paid checks, deposited checks, deposit slips, debit or credit memos, corrections, adjustments, or any document or image that is processed through item processing. The CD provided to you may or may not be encrypted as selected by you in the Implementation Documentation. We recommend that you select the option to have such CDs encrypted.

If Records are provided to you on a CD and you determine Records on the CD are distorted, illegible or the like, then you, within fifteen (15) days of receipt of the CD, must notify us. If in connection with your notification, we determine that Records are distorted, illegible, or the like, then we will send (i) a copy of the Record in question via facsimile or (ii) another CD that contains the Record in question without the distortion or the like via U.S. postal mail, without charge. If you request a copy of a Record for reasons other than poor image quality, we will send a copy of the Record in question via facsimile, and you will be charged a fee. We will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records.



**Section 5. <u>Limitation on Information Reporting Services</u>**. You understand that the information available to you in connection with any of the Information Reporting Services is updated periodically and therefore, at any point in time may not reflect the most up to date information in our records, as more fully described in the Implementation Documentation. You acknowledge and agree that the service does not include any recommendation, guaranty, representation or warranty whatsoever. We shall not be responsible for errors in, or delays regarding, information provided to us by other financial institutions, information provided to us by you, or other non- Bank sources.



**PART XII: INTEGRATED PAYABLES SERVICES**

**Section 1. <u>Description of Services</u>**. Our Integrated Payables Services (the "Service") aggregates your treasury management payables types into a singular report.  Your Commercial Card Account Agreement and this Agreement govern the use of this Service.

**Section 2. <u>Our Obligations</u>**.  Upon your direction to make a payment, we will initiate payment to your payee via your credit card account (a "**Virtual Card**"), ACH, RTP or check as more fully described in the Commercial Card Account Agreement. We will combine the reporting of these payment types into one report.

**Section 3. <u>Your Obligations.</u>** You shall transmit payment data using our Web Portal. Huntington shall initiate the payments for Virtual Card, ACH, RTP or check payments. In order to process check payments, a test payment file, digital signature, and additional information must be completed and received by us at least 30 days prior to the requested production date in order to perform programming and set up.



## PART XIII: LOCKBOX SERVICES

**Section 1. <u>General Lockbox</u>.** With Lockbox services, you will direct your customers to send their remittances addressed to you but bearing a "Lockbox Address," assigned by us which is associated with a caller box or Post Office Box (P.O. Box) from the United States Postal Service, or other mechanism that we deem acceptable for processing remittances, and such caller box, P.O. Box, or other mechanism becomes your Lockbox Address. For purposes of this Part only: "**Records**" are images of the fronts of Checks, the front and back of remittances, correspondence, and/or envelopes; "**Source Documents**" are the original Check, remittances, correspondence, or envelopes; and "Work Processing Date" is the day on which we post the lockbox receipts to your Account.

We will collect on each Business Day mail sent to your Lockbox Address, open such mail, and process the enclosed remittances for deposit to the Account you designate (the "**Lockbox Account**") in accordance with our current processing procedures and/or your specific instructions provided to and agreed upon by us in writing. Upon set up, we will accept all payees. However, you may opt to have Checks inspected as payable to those names given by you to us or reasonable variations of such accepted by us in the Implementation Documentation ("**Acceptable Payees**"). You represent and warrant that you are, or your Affiliate is, the proper payee of each such Check regardless if you remain with accepting all payees or if you implement Acceptable Payees. If your Affiliate is the proper payee, you also warrant that such Affiliate has authorized checks payable to it to be credited to your Lockbox Account. Deposited Checks will be forwarded for collection through normal banking channels. You hereby irrevocably make and appoint us as your true and lawful attorney-in-fact to endorse your name (or an Acceptable Payee name) on all checks with the endorsement "Credit to the account of the within named payee" or words similar effect on checks received in the Lockbox.

If we process a Check not signed by the maker as instructed in the Implementation Documentation, and the Check is paid, but the account owner does not authorize payment, you agree to indemnify us, the drawee bank (which may also be us), and any intervening collecting bank for any liability or expense incurred by us or such other bank due to the payment and collection of the Check.

We do not isolate Checks which bear restrictive endorsements such as "Paid in Full," or words of similar import, and we assume no liability should such a Check be deposited, processed and paid. You hereby agree that we shall have no obligation to discover such legends or endorsements or to determine whether any deposit of remittances is in accordance with the terms and conditions of any contract between the remitter and you. If you desire us to identify and return Checks with a restrictive endorsement, you agree that we will perform the task on a best efforts basis; and, if we fail to identify such a Check that we will not be responsible for any Losses that may occur as a result.

You may also elect to provide a periodic file containing data in a form acceptable to us (e.g., CSV or Excel) ("**Stop File**") via an agreed upon Communication Method. You may elect to send a Stop File daily, weekly or monthly. Checks which match the Stop File will be returned to you without processing. You agree that we shall have no obligation to you if we process a Check which was not included on the Stop File or is processed prior to receipt of the Stop File from you.

If you so choose, the following documentation ("**Documentation**") will be sent to you: (i) any Checks not accepted for deposit due to wrong payee, obvious alteration, restrictive endorsement, and the like, and/or (ii) any Checks that do not meet your processing instructions. We will send the Documentation to the address given by you to us. If you have Lockbox services and you instruct us to do so, we will destroy Source Documents after the work processing date as follows: five (5) days for a Retail Lockbox and fourteen (14) days for a Wholesale Lockbox. In that event, we will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records or Source Documents. Image transmissions are also available upon your request.

If Checks are returned for any reason, we shall charge your Lockbox Account, or if there are insufficient funds in the Lockbox Account, then any other Account held by you, or handle as otherwise agreed between you and us. A visual record will be made of all deposited checks as part of our ordinary check processing procedures. The record created by our ordinary check processing procedure shall be retained in accordance with Applicable Law

**Section 2. <u>Web Exceptions/Pre-Deposit Exceptions</u>.** With Lockbox Services you may elect to use Web Exceptions/Pre-Deposit Exceptions, which allows you to provide us with instructions as to which Source Documents not to process or effect collection ("**Non-conforming Items**"). We will provide Records of such Non-conforming Items using an agreed upon Communication Method and you will have three Business Days after we provide such Records to direct us via an approved Communication Method as to processing of the Non-conforming Items. If you do not notify us after those three Business Days, we will not process the Non-conforming Items and we will mail the Source Documents of Non-conforming Items to you. Regardless of whether you direct us to process or not process a Non-conforming item, after the three Business Days, the Records concerning those Non-conforming Items will no longer be available electronically. We may terminate the Web Exceptions/Pre-Deposit Exceptions feature at any time with notice to you.



**Section 3. <u>Lockbox Online Viewing</u>.** You may view, through your designated Authorized User (the "**System Administrator**"), your Account information and Records via our Web Portal or via image transmission as elected by you in the Implementation Documentation. Images are available for viewing for up to seven (7) years from the work processing date. We will assign a unique access code, password and/or other security procedures to your System Administrator to administer the Lockbox Online Viewing services. We will also be listed as an Authorized User for you. Notwithstanding any terms in this Agreement to the contrary, the Lockbox Online Viewing services will terminate immediately if you delete or remove us as an Authorized User.

If you so choose, the following documentation ("**Documentation**") will be available to you via our Web Portal: (i) a listing of checks deposited for the Business Day's lockbox credits, and (ii) actual Source Documents (other than the original Check). We will forward Source Documents to you, unless you elect otherwise. If you elect not to have Source Documents forwarded to you, we may destroy the Source Documents after the work processing date as follows: five (5) days for a Retail Lockbox and fourteen (14) days for a Wholesale Lockbox. In that event, we will not be responsible or liable for any loss or damage suffered by you due to your inability to produce Records or Source Documents.

Account balances listed on our Web Portals or through image transmission for visual lockbox may not have been processed through the standard banking channels, and as such may not be an accurate reflection of your Account balance.

**Section 4. <u>E-Lockbox</u>:** You may obtain E-Lockbox services where you elect and authorize us to receive an electronic file from our bill payment service provider (your "**BPSP**") that we will process for you for credit to your Account. We will provide to you certain remittance information that we receive in connection with such credits using an approved Communication Method.

You will provide us with any information that we request for this service and you hereby authorize us to contact your BPSP and direct that electronic payments made to you be sent to us for further credit to your Account. You acknowledge and agree that payments made by Check to you will *not* be covered by this Section, and you will continue to receive such payments directly from your BPSP. We will credit your Account on the Business Day following receipt of the electronic file from your BPSP, and we will report information received regarding such credits from your BPSP using an agreed Communication Method. Information that we provide in connection with credits will be at our discretion. You authorize us to debit your Account in the event your BPSP issues such debit against your Account.

You recognize that credits and any associated information is provided by your BPSP and agree that we are not responsible or liable for mistakes or errors in connection with credits or associated information received by us and processed according to the terms of this Agreement. Remittance information and credits are informational only and you may not rely on such information and credits. You must rely only on your account statement for your Account balance and other information.



## PART XIV: REAL TIME PAYMENTS - RTP®

This Part is governed by the RTP System Operating Rules which can be found at https://www.theclearinghouse.org/payment-systems/rtp/document-library . By using the RTP Service, you agree to be bound to the RTP System Operating Rules ("**RTP Rules**") in addition to this Agreement.

**Section 1. <u>RTP Payment Origination and Messages</u>**. You may elect to send payments (a "**Payment Order**") and messages (an "**RTP Message**") to business(es) and/or consumer(s) via the RTP Network, in the format specified in the RTP Rules. The terms "Sender", "Receiver", "Sending Participant", "Receiving Participant" and "Request for Payment" as used in this Part are defined in the RTP Rules.

Your obligations:

(a) <u>Sending Payments and Messages</u>. You are deemed to create a Payment Order or an RTP Message request when we receive your instructions using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures. We may place a maximum dollar limit for any Payment Order requests; and/or, a limit on the number of Payment Orders or RTP Message requests within any certain period. Upon receipt of your Payment Order or RTP Message request, you authorize us to debit your Account in the amount of the Payment Order and/or any related fees. Each Payment Order and RTP Message request must be related to RTP transactions and for legitimate business purposes.

(b) <u>U.S. Accounts</u>. All accounts (Sender and Receiver) used for RTP must be located within the United States. To the extent a Sender sends, or a Receiver receives a payment or message as part of a money transmission transaction, whether such Sender or Receiver is a payment service provider or not, the person on whose behalf the Sender sends, or the Receiver receives, must be a resident of or otherwise domiciled in the United States.

(c) <u>Applicable Law</u>. We are under no obligation to honor, in whole or in part, any Payment Order or RTP Message that could result in a violation of Applicable Law, as determined in our sole discretion.

(d) <u>Third-Party Service Provider</u>. You agree that you will not act as or employ a Third-Party Service Provider with respect to performing any Payment Order or RTP Message without obtaining our written consent; and you further acknowledge and agree that you are unable to act on our behalf to perform any RTP functions.

(e) <u>Block, Delay or Reject</u>. We may delay, block or reject any Payment Order or RTP Message based on a reasonable belief that the transaction may arise from or result in fraud, or regulatory or compliance issues. We may also delay, block or reject, in whole or in part, an outgoing or incoming payment if the aggregate transaction amount exceeds transaction frequency or limits as determined by us, in our sole discretion. If any Payment Order or RTP Message is rejected by us or the RTP network as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a corrected Payment Order or RTP Message to us.

(f) <u>Cancellation or Amendment</u>. You have no right to cancel or amend any Payment Order or RTP Message after we have received it. However, to the extent permitted by Applicable Law, we will use our reasonable efforts to act on your request to cancel any such RTP transaction before we process it, but we will have no liability if such cancellation is not affected.

(g) <u>Inconsistency of Information or Errors</u>. You agree to use a format acceptable to us and in accordance with the RTP Rules. We are not responsible for detecting errors in any Payment Order or RTP Message, including obvious errors in your Account information or that of the Receiver.

**Section 2. <u>Request for Payment Messages</u>**. You may provide us instructions to initiate an RTP Message that serves as a request for payment from a Receiver ("**Request for Payment Message" or "RfP**"). The recipient of Request for Payment Message may respond directly to your message by transferring funds (a "**Funds Transfer**") to an Account you designated in the RfP. You are deemed to initiate an RfP when we receive your instruction using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures. We may place a maximum dollar limit for any single RfP, a batch of RfPs and/or limit the number of RfPs you may request within any certain period. In initiating a Request for Payment, you authorize us to share your Account information with the Receiver.

If you elect to receive payments from consumers in response to an RfP or otherwise, you will indemnify and hold us harmless against any disputes or chargebacks initiated by a consumer, including, without limitation, Regulation E disputes.



We have the right, at our sole discretion, to reject, and refuse to accept, any Funds Transfer in response to a Request for Payment for any reason, including your failure to abide by the RTP Rules or that the Funds Transfer fails to comply with Applicable Law; provided, however, that in rejecting, or refusing to accept any Funds Transfer, we shall act in good faith and use our reasonable business judgment. We will have no liability to you based on such rejection or refusal of any Funds Transfer. If we reject any Funds Transfer, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice.

**Section 3. <u>Use of Security Procedures and Terms of Payment Orders</u>.**

(a)  The Implementation Documentation includes a description of the Security Procedures offered by us that apply to RTP. Your use of the RTP services constitutes your acceptance of those Security Procedures as commercially reasonable and as a means of authenticating an RTP transaction communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any RTP transaction. Any RTP transaction communicated by or on your behalf shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such RTP transaction is received in accordance with the applicable Security Procedures, and if we accept such RTP transaction in good faith. In addition, if any RTP transaction was actually communicated or authorized by you or you otherwise benefited from such RTP transaction, then you will be obligated to pay us the amount of the related funds transfers without regard to whether we complied with the Security Procedures. We may, in our discretion, use additional procedures to verify the authenticity of any RTP transaction. You agree to implement any other reasonable authentication or Security Procedures established by us.  Failure to do so shall be a material breach of this Agreement.

(b)  <u>Compliance with Security Procedures</u>. If you choose to communicate any Payment Order or RTP Message (including any cancellation thereof) to us in a manner that varies from the Security Procedures, and if we accept such Payment Order or message in good faith, then you agree to be bound by such Payment Order or message, whether or not authorized, and you will be deemed to have refused the  Security Procedures that we offer and recommend as "commercially reasonable," and you will be obligated to pay us the amount of such Payment Order and/or fees applicable to an RTP Message. However, we have no obligation to accept any Payment Order or RTP Message that is not communicated in compliance with the Security Procedures. We are not responsible for refusal to act upon any Payment Order or RTP Message received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order or RTP Message in accordance with the Security Procedures has failed or where such action is delayed until verification can be obtained.



## PART XV: WIRE TRANSFER SERVICES

**Section 1. <u>Wire Transfers and Authorization to Charge Account</u>.** You may provide us wire transfer instructions (each a "**Payment Order**") to execute wire transfers from Accounts you designate. You are deemed to make a wire transfer request when we receive your Payment Order using a Communication Method permitted and agreed upon by you and us in the Implementation Documentation, and in compliance with the Security Procedures. Payment Orders must be received by us on a Business Day prior to our established cut-off time to be executed on that Business Day. If you make a wire transfer request after our cut-off time or on a non-Business Day, we may process such wire transfer request on the following Business Day. We may place a maximum dollar limit for any single wire transfer.

**Section 2. <u>Use of Security Procedures and Terms of Payment Orders</u>.**

(a) <u>Security Procedures</u>. The Implementation Documentation includes a description of the Security Procedures offered by us that apply to wire transfers and Payment Orders. Your use of the Wire Transfer services constitutes your acceptance of those Security Procedures as commercially reasonable and as a means of authenticating a Payment Order communicated to us by or on your behalf. You acknowledge that the Security Procedures are used to verify the authenticity of, and not to detect errors in, any Payment Order. Any Payment Order communicated by or on your behalf shall be effective as your Payment Order, and shall be enforceable against you, whether or not authorized and regardless of the actual identity of the signer, sender or transmitter thereof, if such Payment Order is received in accordance with the applicable Security Procedures, and if we accept such Payment Order in good faith. In addition, if any Payment Order was actually communicated or authorized by you or you otherwise benefited from such Payment Order (or resulting funds transfer), then you will be obligated to pay us the amount of the related funds transfers without regard to whether we complied with the Security Procedures (including, but not limited to, a Customer Courtesy Wire). We may, in our discretion, use additional procedures to verify the authenticity of any Payment Order. You agree to implement any other reasonable authentication or Security Procedures established by us. Failure to do so shall be a material breach of this Agreement.

(b) <u>Compliance with Security Procedures</u>. If you choose to communicate any Payment Order (including any cancellation thereof) to us in a manner that varies from the Security Procedures, and if we accept such Payment Order in good faith, then you agree to be bound by such Payment Order, whether or not authorized, and you will be deemed to have refused the Security Procedures that we offer and recommend as "commercially reasonable," and you will be obligated to pay us the amount of such wire transfer (including, but not limited to, a Customer Courtesy Wire). However, we have no obligation to accept any Payment Order that is not communicated in compliance with the Security Procedures. We are not responsible for refusal to act upon any Payment Order received which does not comply with this Agreement, including where our reasonable efforts to verify the Payment Order in accordance with the Security Procedures has failed or where such action is delayed until verification can be obtained.

(c) <u>Rejection of Payment Orders</u>. We have the right, at our sole discretion, to reject, and refuse to accept, any Payment Order for any reason, including your failure to maintain a sufficient balance of collected funds in an Account or that such Payment Order fails to comply with Applicable Law; provided, however, that in rejecting, or refusing to accept, any funds transfer request or Payment Order, we shall act in good faith and use our reasonable business judgment. We will have no liability to you based on such rejection or refusal of any Payment Order. If we determine that processing or honoring any Payment Order would cause the designated Account to be overdrawn, we may, but have no obligation to, execute the Payment Order and (i) create an overdraft in such Account or (ii) transfer to the designated Account from another of your Accounts, funds sufficient to cover the deficiency in the designated Account. If an Overdraft is created in an Account in order to complete a wire transfer, you agree to immediately repay us, and you agree and authorize us to debit any of your Accounts with us in the amount equal to the overdraft and applicable fees. If we reject any Payment Order, we will notify you through a status report on one of our Web Portals or by other reasonable means within the time frames indicated in the Implementation Documentation, but we will have no liability to you based on our failure or delay in providing such notice. If any Payment Order is rejected by us or any funds transfer system as a result of incomplete information or a formatting or other similar error, it will be your responsibility to re-transmit a correct Payment Order to us.

(d) <u>Cancellation or Amendment of Payment Order</u>. You have no right to cancel or amend any Payment Order after we have received it. However, to the extent permitted by Applicable Law, we will use our reasonable efforts to act on your request to cancel any such Payment Order before we process it, but we will have no liability if such cancellation is not affected.

(e) <u>Inconsistency of Name and Account Number</u>. We are not responsible for detecting errors in any Payment Order, including in the identifying number of any intermediary bank or beneficiary's bank, even if that number does not correspond to the bank identified by name. You acknowledge and agree that wire transfers may be made on the basis of account number or other identifying number (including a bank transit routing number, SWIFT BIC or CHIPS UID Code). We and any receiving bank (including any beneficiary's bank and any intermediary bank) may rely on the account number or other identifying number of any bank (including a bank transit routing number, SWIFT BIC or CHIPS UID Code), person or bank account specified in the Payment Order even if such number identifies a bank, person or bank account different from the bank, person or bank account designated by name, and your obligation to pay the amount of such Payment Order (or resulting funds transfer) to us is not excused in those circumstances.



(f)     Customer Courtesy Wire. If you choose to provide us a Payment Order without using the Web Portal or other pre-established Security Procedure (i.e., PIN, batch, debit drawdown or standing order wire), you acknowledge that (i) a Customer Courtesy Wire is not covered by this Agreement; and (ii) that only one authorized signer on an Account is needed to initiate a Customer Courtesy Wire. You may prohibit the use of Customer Courtesy Wires. Doing so will block any Customer Courtesy wire from being initiated by us on behalf of any authorized signer on an Account under any circumstances including but not limited to the inability to use the Web Portal or other pre-establish wire transfer service.

**Section 3. <u>Use of Third Parties; Transfers in Foreign Currency</u>.**

(a)     <u>Intermediary Banks</u>. You shall specify routing instructions for wire transfers in any Payment Order communicated to us. If no such specification is made, you hereby instruct us to send wire transfers through such correspondent(s) as deemed appropriate by us in our sole discretion after consulting standard bank references as to correspondent relationships.  In executing any wire transfers, we shall use whatever funds transfer system, communications system, and intermediary designated by you, except where we in good faith conclude that the use of such funds transfer system, communication system, or intermediary is not feasible or would involve undue delay, in which case we shall use such of the funds transfer systems and communications systems in which we participate, and such intermediaries, agents or sub-agents as we determine  to be appropriate in connection with any such wire transfers. To the fullest extent permitted by law, (i) any such funds transfer system, communications system, or intermediary, agent or sub-agent shall not  be a Processor,  and shall be  deemed to be  your agent, and we shall not be liable for any errors, negligence, suspension or default of any of them or for any failure to identify the beneficiary or any mis-payment by any of them, and (ii) we shall not be liable for any errors, mutilations, delay, mis-delivery or failure of delivery in the transmission of any wire transfers in connection with such transaction or for any suspension of any means of transmission or for any imposition of any censorship, exchange control or other restriction,  all  such risk being borne by you.

(b)     <u>Transfers in Foreign Currency</u>. Any request for the wire transfer of funds in a currency other than U.S. Dollars shall require you to first validly purchase such foreign currency from us or we shall purchase such amount from our affiliate or correspondent bank. Unless otherwise agreed between you and us, the value of any such wire transfer shall be reported to you in the U.S. Dollar equivalent of the amount of foreign currency transferred. Any loss of exchange arising from a subsequent cancellation of such wire transfer request, or because of a rejection of delivery for any reason, shall be charged to your Account. You agree that if we utilize the services of other banks for the purpose of giving effect to any request or order for the wire transfer of funds in foreign currency, then we do so for your account and at your risk.



## PART XVI: ZERO BALANCE ACCOUNTING SERVICES

**Section 1. <u>Zero Balance Accounting Services</u>.** We will set up and provide Zero Balance Accounting services. At your request, we will establish, or designate your existing Accounts as Zero Balance Accounts ("**ZBAs**") that end each day with a zero balance. Under the Zero Balance Accounting service, ZBAs are linked to a separate account to which all deposits from one or multiple ZBAs are automatically swept each Business Day, and from which any ZBA may be funded (the "**Concentration Account**"). At the end of each Business Day, we will post all deposits, checks, and other debits and credits with respect to each ZBA or Concentration Account, after which we will automatically adjust the balances in each ZBA to zero by moving the funds, whether collected or uncollected, into or out of each ZBA, and simultaneously debiting or crediting the applicable Concentration Account. Your ZBAs will be processed in order of Account number (lowest to highest) unless otherwise agreed to by you and us in writing. A daily status report summarizing activity in each ZBA and Concentration Account will be available using an approved Communication Method.

We will provide these services to you and your designated Affiliates, if applicable, in accordance with this Part for all Accounts that you and your Affiliates designate. You and your Affiliates will designate the Account names and corresponding Account numbers with us to become ZBAs and Concentration Accounts. You and your Affiliates authorize us to pay checks and other debit items that are properly payable (in accordance with Applicable Law and our policies and procedures) against a ZBA or Concentration Account from available funds in the respective ZBA, the respective Concentration Account, or available funds transferred from a ZBA or Concentration Account to the other. You and your Affiliates authorize us to transfer funds to and/or from the designated ZBAs and Concentration Accounts as contemplated by this Part. You and your Affiliates acknowledge that separate identification of the funds in the ZBAs and Concentration Account(s) is your responsibility and that of your Affiliates.

**Section 2. <u>Representations and Warranties</u>.** Each of you and your Affiliates, as applicable, hereby represents and warrants to us that (a) you are the owners of the respective ZBAs and Concentration Accounts you designate; (b) you and your Affiliates are affiliated by common ownership as reflected on the organizational chart attached to the Authorization; (c) you and your Affiliates have full power and authority to execute and deliver this Agreement and carry out the transactions contemplated herein; (d) the execution, delivery and performance of this Agreement does not and will not violate any provision of law or any regulation applicable to you or your Affiliates; (e) all accounts designated as ZBAs and Concentration Accounts are owned by you and/or your Affiliates, as appropriate, and that none of such accounts are owned by another entity; (f) separate identification of funds in the ZBAs and Concentration Accounts will be maintained by you and your Affiliates; (g) before signing the Authorization, you and your Affiliates have reviewed the books, records and other documents and information in the possession of any of you and your Affiliates or any other person or entity with respect to the Concentration Account(s) and any or all of the ZBAs, or so much thereof as was necessary to make the warranty that separate identification of funds is maintained, and (h) the ownership of all entities executing the Authorization and/or using the Zero Balance Accounting service is owned as indicated on the organizational chart provided to us.

Further, you and your Affiliates represent, warrant and covenant with us that they will deliver written notice, in reasonable detail to us, immediately upon receiving knowledge of any event which would cause either you or any of your Affiliates to cease to exist or file any bankruptcy or insolvency proceedings, in which case we may, in our discretion, at any time after receiving knowledge of such an event, remove you or such Affiliate from the ZBA configuration and transfer to the affected ZBA all collected and uncollected funds currently in the Concentration Account(s) which are identified by you or your Affiliate as belonging to you or such Affiliate. You and your Affiliates agree that if ownership of any one of the ZBAs or Concentration Accounts were to be transferred to an entity other than an affiliate company which is a party to this Agreement, regardless of how closely related, you and your Affiliates will immediately unlink from the ZBA/Concentration Account relationship such account(s) and we shall have no liability for your or your Affiliates' failure to do so. If you or any Affiliate is removed from the ZBA configuration, it is your and your Affiliates' responsibility to determine which funds belong to you and which belong to your Affiliates. We are not required to make any such determination.

**Section 3. <u>Guaranty by You</u>.** If applicable, to induce us to provide the Zero Balance Accounting service to your Affiliates, you absolutely, irrevocably and unconditionally guaranty to us the full and prompt performance and payment when due (by acceleration or otherwise), of all obligations, agreements, covenants, liabilities, expenses, representations and warranties of any of your Affiliates to us, whether now existing or hereafter arising, under or in connection with this Part and the Zero Balance Accounting service (collectively, the "**Obligations**"). This is a continuing guaranty and shall remain in full force and effect and be binding upon you and your successors and permitted assigns, if any. This guaranty shall continue to be effective if at any time payment or performance of the Obligations of you or any of your Affiliates, or any part thereof, is, upon the insolvency, bankruptcy or reorganization of such Affiliate or otherwise pursuant to Applicable Law, rescinded or reduced in amount or must otherwise be restored or returned by us, all as though such payment or performance had not been made. Your obligations hereunder are those of a primary obligor, and not merely a surety, and are independent of the Obligations. This is a guaranty of payment and not of collection. You unconditionally waive any right to require us to (a) proceed against any of your Affiliates or any other obligor in respect of the Obligations, provided we have first given notice of default to you and your Affiliate and the Affiliate has failed to



cure such default within two (2) days of the date of such notice; (b) proceed against or exhaust any security held directly or indirectly on account of the Obligations; or (c) pursue any other remedy in our powers whatsoever. You hereby waive (i) notice of acceptance of this guaranty; (ii) presentment and demand for payment of any of the Obligations; (iii) protest and notice of dishonor or default to you or to any other party with respect to any of the Obligations; and (iv) all other notices to which you might otherwise be entitled. You agree to pay all reasonable attorneys' fees and charges, the reasonable allocated cost of internal legal services, and all other reasonable costs and expenses which may be incurred by us in the enforcement of this guaranty.

**Section 4. <u>Removal or Addition to ZBA or Concentration Accounts</u>.** You and each of your Affiliates agree to advise us promptly of any consolidation, merger, sale or conveyance of you or any Affiliate or any principal part of your assets, or the sale or conveyance of any controlling interest in you or such Affiliate to the extent you or such Affiliate is no longer affiliated with you and the remaining Affiliates (either by common ownership or control), and upon any such occurrence, we shall have the right to terminate this Part and the Zero Balance Accounting service with respect to such Affiliate immediately. In addition, you may, on behalf of all Affiliates, add additional affiliate companies to the Zero Balance Accounting service via an amendment, in form and substance acceptable to us, and to otherwise act for and on behalf of you and each Affiliate signing the Authorization, or subsequently added by amendment as provided herein. If a new affiliate company being added is newly created, you will update your organizational chart and provide such updated chart to us.



## PART XVII: GLOSSARY OF TERMS

Unless otherwise specifically defined in another Part of this Agreement, the following terms shall have the definitions below:

(a)  "*ACH Rules*" means the rules and regulations of Nacha and those of any regional clearinghouse in effect from time to time used by us to settle ACH transfers.

(b)  "*Affiliate(s)*" means any company owned by or under common control as you or us as applicable in the context of this Agreement.

(c)  "*Applicable Law*" means all applicable federal and state laws, rules and regulations, and regulatory guidance (to the extent such guidance is enforced by Governmental Authority) as in effect from time to time governing or relating to this Agreement or the Services, including, without limitation, the ACH Rules and the rules of any funds transfer system, and guidance issued by the Federal Financial Institutions Examination Council and similar advising bodies.

(d)  "*Authorized User*" means your employee(s) or other person(s) that the Master User has authorized to be able to access and use the Services.

**(e)**  "*Business Day*" means every day, Monday through Friday from 8:00 a.m. to 4:45 p.m. in Columbus, Ohio, but  excluding federal holidays**.**

(f)  "*Check*" means checks, drafts, money orders, and other instruments or items for the payment of money that may be handled as cash items by Federal Reserve Banks.

(g)  "*Customer Courtesy Wire*" means a wire transfer Payment Order processed by the Bank without the use of a pre-established wire transfer service (Web Portal, use of a personal identification number (PIN), batch, debit drawdown or standing order wire) and/or pre-established Security Procedure.

(h)   "*Effective Entry Date*" means the date specified, in accordance with the ACH Rules, on the Entry by the Originator (as defined in the ACH Rules) on which the Originator intends the Entry to be settled.

(i)  "*Entry*" or "*Entries*" means an order or request appropriately sent through the ACH network (i) for the transfer of money to the deposit account of a person (a "Credit Entry") or (ii) for the withdrawal of money from the deposit account of a person (a "Debit Entry").  For purposes of the Services, the term "Entries" is the plural of the term "Entry."

(j)  "*Funds transfer*" shall have the meaning ascribed to it in Article 4A of the Uniform Commercial Code.

(k)  "*Governmental Authority*" means the Office of the Comptroller of the Currency, the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of Foreign Assets Control of the U.S. Treasury Department, and the Consumer Financial Protection Bureau.

(l)  "*Implementation Documentation*" means all materials that explain or facilitate the use of a Service, including, without limitation, set-up forms, user booklets, operational manuals, Security Procedures, instruction and training materials, and information provided by us relating to the Services, but shall expressly exclude any marketing, sales or other promotional material in any form or delivery method.

(m)  "*Item*" means any and all debit or credit transactions and communications, including but not limited to electronic checks, Checks, Entries, remittance advice, etc.

(n)  "*Losses*" means any and all claims, actions, demands, losses, damages, judgments, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) and all costs of settlement of claims.

(o)  "*Master User*" means the administrator that you have designated in accordance with our Security Procedures for controlling access to the Services.

(p)  "*Payment Order*" shall have the meaning ascribed to it in Article 4A of the Uniform Commercial Code.

(q)  "*Person*" means an individual, corporation, limited liability company, partnership (general or limited), business trust or any other form of business entity.

(r)  "*PIN*" means a personal identification number which may be used electronically or verbally as part of a Security Procedure.

(s)  "*Records*" means, with respect to the Services, the hard copy or images retained in connection with the Services, and may include, but not be limited to reports, receipts, confirmations, notices, statements, adjustments, charges, entries, checks, deposit slips, debit or credit memos, invoices, or other documents submitted with a deposit or remittance, corrections, adjustments, transactions, or any document processed as part of a Service and retained by us.



(t)     ***"Retail Lockbox"*** is a Lockbox that processes payments of consumers made to businesses.  Generally, the Retail Lockbox receives a high volume of payments than Wholesale Lockbox.  Remittance coupons must have a machine readable optical character recognition (OCR) line.

(u)     *"**Security Procedures**"* means Passwords, call back protocols, tokens, keys, test keys, security devices, and other systems and procedures we disclose to you to enable you to use the Services and for us to verify the origin of instructions and communications to us.

(v)     "***UCC***" means the Uniform Commercial Code, as enacted in the State of Ohio.

(u)     "***Web Portal***" means any internet or web-based application accessed via the internet and/or the programs and data provided by us for use on a computer in connection with one or more particular Services.

(v)     ***"Wholesale Lockbox"*** is a Lockbox that processes payments which are from one business to another. Generally, there is a lower volume of payments than Retail Lockbox.

# Schedule A to
## Authorization and Agreement for Treasury Management Services



DocuSign Envelope ID: EEA818E6-1AB5-4F1A-AA48-C6A1E8BB7D70

| Account Name | EIN | Affiliate (for ZBA) | Account Number | Deposit Recon | Disbursement Recon | ACH | AFI | Auto Credit | Check Positive Pay | Teller Positive Pay | Payee Matching | Reverse Positive Pay | ACH Positive Pay | Check Block | Wire Block | Vault | Safecash Manager | CDA | Image Cash Letter | RDC | E-Lockbox | EBPP | Escrow Solutions | Business Online | EDI | MultiBank Reporting | Visual Archive | Lockbox | Web Exceptions | Visual | RTP | Wire Transfer | Wire Block | ZBA Concentration | ZBA Intermediate | ZBA Sub |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IYS VENTURES LLC | 83-2162420 | | 8201 | | | | | | x | x | x | | x | | | | | | | | | | | | | | | | | | | | | | | |
| IYS VENTURES LLC | 83-2162420 | | 2014 | | | x | | | x | x | x | | x | | | | | | | | | | | | | | | | | | | | x | | | | |
| IYS VENTURES LLC | 83-2162420 | | 2027 | | | x | | | x | x | x | | x | | | | | | | | | | | | | | | | | | | | x | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

# EXHIBIT 9



# AUTHORIZATION AND AGREEMENT FOR TREASURY MANAGEMENT SERVICES

By signing this Authorization, the Company accepts the General Terms and Conditions of the Treasury Management Services Agreement ("Master Agreement") and the terms and conditions outlined for each Service that Company has checked below. If Company has already executed an Authorization previously, then Company hereby confirms its acceptance of the terms and conditions for the Services it is currently using, and hereby accepts the terms and conditions for each additional Service checked below. *Moreover, your use of any Service constitutes your acceptance of the terms and conditions for that Service.*

Account Reconcilement
☐ Deposit Reconcilement
Account No. _____*
☐ Disbursement Reconcilement
Account No. _____*

☐ Automated Clearinghouse Origination
Account No. _____*

Automated Sweep
☐ Automated Funds Investment
Account No. _____*
☐ Automated Credit Sweep
Account No. _____*

☐ Business Online (BOL) or Web Portal
Account No. _____*

Business Security Suite
☒ Check Positive Pay
Account No. See Schedule A _____*
☐ ☒ Payee Matching  ☒ Teller Positive Pay
☒ ACH Positive Pay
Account No. See Schedule A _____*
☐ Check Block
Account No. _____*
☐ Reverse Positive Pay
Account No. _____*
☐ Teller Block
Account No. _____*
☐ Wire Block  ☐ Incoming  ☐ Outgoing
Account No. _____*

Cash Deposit and Fulfillment
☐ Vault
Account No. _____*
☐ SafeCash Manager
Account No. _____*

☐ Controlled Disbursement
Account No. _____*

☐ eBill Present & Pay
Account No. _____*
Electronic Deposit
☐ Image Cash Letter
Account No. _____*
☐ Remote Deposit
Account No. _____*
☐ E-Lockbox
Account No. _____*

☐ Escrow Solutions
Account No. _____*
Information Reporting
Account No. _____*
☐ Electronic Data Interchange
☐ Multibank Reporting
☐ Visual Archive
☐ Lockbox
Account No. _____*
☐ Web Exceptions  ☐ Visual

☐ Real-Time Payments (RTP®)
Account No. _____*
Daily Cumulative Limit _____
Per Transaction Limit _____

☒ Wire Transfer
Account No. See Schedule A _____*
Domestic Wire Limits (Online Only)
Daily Cumulative Limit 100000
Per Transaction Limit 100000
International Wire Limits (Online Only)
Daily Cumulative Limit _____
Per Transaction Limit _____
☐ Block – Customer Courtesy Wire(s) Prohibited

☐ Zero Balance Account
Concentration Account No._____*
Sub Account No._____*
Sub Account No._____*
Intermediate Account No._____*
Intermediate Account No._____*

*If multiple account numbers are needed for any Service, please complete the appropriate fields in Schedule A.

The undersigned hereby represents and warrants that he/she is authorized to execute this Authorization on behalf of the Company and all entities referenced on the attached Schedule A.

Company: IYS VENTURES LLC _____  EIN: 83-2162420 _____

Signature: _____  Title: President _____

Printed Name: MUWAFAK RIZEK _____  Date: 6/8/2022 | 10:51:32 AM PDT _____

® and Huntington® are federally registered service marks of Huntington Bancshares Incorporated. Member FDIC. ©2021 Huntington Bancshares Incorporated. RTP® is a registered service mark of The Clearing House Payments Company L.L.C. Revised 04/12/2021

# EXHIBIT 10



105 West Adams Street, 35*th* Floor
Chicago, Illinois 60603

**VALENTINE
AUSTRIACO
& BUESCHEL**
P.C.

T (312) 288-8285  F (312) 638-8137
VABLawFirm.com

December 6, 2022

**VIA CERTIFIED AND REGULAR**        **VIA EMAIL**
**U.S. MAIL AND EMAIL**

Mr. Muwafak Rizek                    Mr. Raed Shalabi, Esq.
IYS Ventures, LLC                    12630 S. Harlem Ave.
15416 S. 70th Ct.                    Palos Heights, IL 60463
Orland Park, Illinois 60462-5133     raed@shalabilaw.com
moerizek@gmail.com

RE:    Demand for Full Repayment of Overdrafts to The Huntington National Bank

Dear Mr. Rizek and Mr. Shalabi:

Our firm represents The Huntington National Bank ("HNB") in connection with the matters referenced above.  Paragraph 6(c) of the Deposit Agreement between IYS Ventures, LLC and HNB provides that "[i]f you overdraw your Account, you must pay us immediately for the amount of the overdraft and any associated fees."  Notice is hereby given that IYS Ventures, LLC has failed to pay overdrafts totaling **$1,880,075.01** for the following accounts:

| Account Title | Account Number | Overdraft Amount |
|---|---|---|
| IYS Ventures, LLC | 1060178201 | $495,822.39 |
| IYS Ventures, LLC | 1060242014 | $716,946.29 |
| IYS Ventures, LLC | 1060242027 | $667,306.33 |
| | | **$1,880,075.01** |

Please be advised that demand is hereby made for the immediate payment in full of all amounts outstanding under the Deposit Agreement, Treasury Management Agreement, and any documents executed in connection therewith, including, without limitation, **$1,880,075.01**, plus attorneys' fees and costs of collection.

**<u>Your prompt attention to this matter is required.</u>**  Please contact me at 312-238-9545 or smorris@vablawfirm.com at your earliest convenience, but in no event later than **<u>Friday, December 9, 2022</u>**. HNB reserves the right to exercise any and all rights and remedies provided

Mr. Muwafak Rizek
IYS Ventures, LLC
December 6, 2022
Page 2

in the Deposit Agreement and/or Treasury Management Agreement and/or available under
applicable law, including, without limitation, commencement of litigation.

Very truly yours,

Sandy L. Morris

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THE HUNTINGTON NATIONAL BANK,    )
    )
    *Plaintiff,*    )
    )    Case No.
    v.    )
    )
IYS VENTURES, LLC; MUWAFAK RIZEK;    )
I MART STORES L.L.C.; LEANNE HOLDINGS    )
LLC; and KENAN ENTERPRISES, INC.,    )
    )
    *Defendants.*    )

---

## EXHIBIT 11 TO THE AFFIDAVIT OF STEVE BERNAL
## IN SUPPORT OF THE HUNTINGTON NATIONAL BANK'S
## MOTION FOR PREJUDGMENT ATTACHMENT

---

The Huntington National Bank seeks to attach the following specific assets and personal property that it believes are in Defendant IYS Ventures, LLC, Muwafak Rizek, I Mart Stores LLC, Leanne Holdings LLC, and Kenan Enterprises, Inc.'s (collectively "Defendants") possession and control, and that the Court has authority to attach pursuant to 735 ILCS 5/4-101, *et seq.* and Fed. R. Civ. P. 64.

1. IYS Ventures LLC's Bank Accounts

    a. JP Morgan Chase Account No. 258852356

    b. JP Morgan Chase Account No. 768378058

    c. JP Morgan Chase Account No. 768373158

    d. BMO Harris Bank Account No. 4835757629

    e. Bremer Bank Account

    f. Bankers' Bank Account

2. IYS Ventures' Inventory, Fixtures, and Equipment

3. IYS Ventures' Real Estate

    a. 206 W Madison St Lake Mills WI 53551, Jefferson County

   b. 1001 Irving Park Rd, Elgin IL 60120, Cook County

   c. 830 E Cherry St, Vermillion SD 57069, Clay County

   d. 615 9th Ave SE, Watertown SD, Codington County

   e. 1903/1917 Dakota Ave, Huron SD, Beadle County

   f. 304 E College Dr, Marshall MN, Lyon County

   g. 10843 Montgomery Rd, Cincinnati OH 45242, Hamilton County

4. IYS Ventures' Motor Vehicle.

   a. 2023 BMW M8 Competition Convertible VIN:WBSDZ0C08PCL31154

5. Rizek's Investments and Related Accounts.

   a. E-Trade account

   b. Morgan Stanley account

   c. Individual stocks

   d. Cryptocurrency

6. Rizek's Real Estate.

   a. 286 Oliver St, North Tonawanda NY 14120, Niagara County

   b. 290 Oliver St, North Tonawanda NY 14120, Niagara County

7. I Mart's Bank Accounts.

   a. Unity Bank Account

   b. B1Bank Account

8. I Mart's Inventory, Fixtures, and Equipment.

9. Leanne's Bank Account.

   a. Bank TBD Account No. 79000604186

10. Kenan's Bank Account.

   a. Bank TBD Account No. 258852356